IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
--------------------------------------------------------X
                                            :
HARTFORD ROMAN CATHOLIC DIOCESAN  :              3:12 CV 1641 (JBA)
CORP.                                       :
                                            :
V.                                          :
                                            :
INTERSTATE FIRE & CASUALTY CO.     :              DATE: JANUARY 28, 2014
                                            :
--------------------------------------------------------X
```

<u>RULING ON PLAINTIFF'S MOTION TO COMPEL PRODUCTION</u>

On November 19, 2012, plaintiff Hartford Roman Catholic Diocesan Corporation ["plaintiff"] commenced this diversity action against defendant Interstate Fire & Casualty Co. ["defendant"], regarding seven excess liability insurance policies issued by defendant to plaintiff between September 1, 1978 and September 1, 1985. (Dkt. #1). Plaintiff has settled four lawsuits brought against it with respect to allegations of sexual misconduct by clergy affiliated with plaintiff, in which the plaintiffs' names for litigation purposes were <u>RM</u>, <u>KS</u>, <u>JA</u>, and <u>Matthew Doe</u> [collectively "the Underlying Claims"].  (<u>Id.</u> at 6-10).  Despite presenting its proofs of loss to defendant, defendant has failed or refused to pay plaintiff for these losses allegedly covered by the insurance policies. (<u>Id.</u> at 10).  Plaintiff's complaint contains three counts: breach of contract (Count One); breach of covenant of good faith and faith dealing (Count Two); and violation of the Connecticut Unfair Insurance Practices Act ["CUIPA"], CONN. GEN. STAT. § 38a-815 <u>et seq.</u> and of the Connecticut Unfair Trade Practices Act ["CUTPA"], CONN. GEN. STAT. § 42-110a <u>et seq.</u> (Count Three). (<u>Id.</u> at 11-18).  Defendant filed its answer and affirmative defenses on January 11, 2013. (Dkt. #16).  Under the present scheduling orders, all expert discovery will be completed within sixty days of the Court's ruling on the pending discovery motions.  (<u>See</u> Dkts. ##22, 24, 27, 30).

On November 1, 2013, plaintiff filed the pending Motion to Compel Production and brief in support.  (Dkt. #28).[1]  On December 6, 2013, defendant filed its brief in opposition.  (Dkt. #33[2]; see also Dkts. ##31-32).  Two weeks later, on December 20, 2013, plaintiff filed its reply brief.  (Dkt. #38).[3]

This motion was referred to this Magistrate Judge by U.S. District Judge Janet Bond Arterton on November 5, 2013.  (Dkt. #29).

For the reasons stated below, plaintiff's Motion to Compel Production (Dkt. #28) is granted in part and denied in part.

## I.  DISCUSSION

On May 14, 2013, plaintiff served twenty Requests for Production on defendant, as

---

[1]Attached is an affidavit from plaintiff's counsel, sworn to November 1, 2013 (Exh. A)["Federico Aff't"], with three subexhibits, copy of Defendant's Objections and Responses to Plaintiff's First Set of Requests for Production, dated August 12, 2013 (Exh. 1); copy of Defendant's Rule 26(a)(1) Initial Disclosures, dated March 8, 2013 (Exh. 2); and copy of plaintiff's Response to Subpoena to Produce Documents, dated September 30, 2013 (Exh. 3), along with copies of case law (Exh. B).

Also pending before the Court is defendant's Motion to Compel Production of Documents and brief in support, filed December 9, 2013 (Dkts. ##34-35), the briefing for which has not been completed yet.  (See Dkts. ##36-37).

[2]The following exhibits were attached: affidavit of defense counsel, sworn to December 6, 2013 (Exh. A)["Tobin Aff't"], to which was attached a copy of Plaintiff's Responses and Objections to Defendant's Requests for Production, dated July 25, 2013 (Exh. 1); and another copy of Defendant's Objections and Responses to Plaintiff's First Set of Requests for Production, dated August 12, 2013 (Exh. 2); copies of case law (Exh. B); affidavit of Deborah Sons, sworn to December 6, 2013 (Exh. C)["Sons Aff't"]; another copy of Defendant's Rule 26(a)(1) Initial Disclosures, dated March 8, 2013 (Exh. D); and copy of Plaintiff's Privilege Log (Exh. E).

[3]The following exhibits were attached: affidavit of plaintiff's counsel, sworn to December 20, 2013 (Exh. A)["Federico Aff't II"]; copies of e-mails between counsel, dated October 30, November 1, and December 10 & 13, 2013 (Exhs. 1-2); copy of Plaintiff's First Set of Requests for Production, dated May 14, 2013 (Exh. 3); copies of e-mails between counsel regarding Underlying Claims, dated August 30, 2002, April 3, 2008, June 16, 19 & 20, 2008, December 6 & 7, 2011 (Exhs. 4-5, 7-8, 10); copies of correspondence between counsel regarding Underlying Claims, dated July 9, August 6 & December 2, 2008, and January 6, 2012 (Exh. 6, 9, 11-12); and copies of case law (Exh. B).

to which defendant responded, with multiple objections, on August 12, 2013.  (See Federico Aff't, ¶¶ 4-5 & Exh. 1; Tobin Aff't, ¶¶ 4, 6 & Exh. 2).  Counsel conferred on September 11, 2013 and again on October 10, 2013, and were able to resolve their disputes with respect to Requests for Production Nos. 2, 3, 4, 7, 8, 9 and 16, with defendant agreeing to produce all non-privileged documents responsive to these seven requests.  (Federico Aff't, ¶¶ 6-7; Tobin Aff't, ¶¶ 8-9, 11-12; Federico Aff't II, ¶¶ 4-5).  According to plaintiff's counsel, defendant has "produced only 568 documents in response to all of [plaintiff's] requests[,]" of which one hundred twenty-five were completely redacted and ninety-seven were partially redacted. (Federico Aff't, ¶ 10).[4]   However, according to defense counsel, despite its objections, defendant produced 5,358 pages of responsive documents, with a fifty-two page privilege log. (Tobin Aff't, ¶ 7).

As previously indicated, on November 1, 2013, plaintiff filed the pending Motion to Compel with respect to the remaining thirteen requests, namely Nos. 1, 5, 6, 10, 11, 12, 13, 14, 15, 17, 18, 19 and 20.  (Dkt. #28, at 1).   Some time later, counsel were able to resolve their differences with respect to Nos. 1 and 11.  (Dkt. #33, at 4-7; Tobin Aff't ¶ 19; Federico Aff't II, ¶ 7).  Thus, this ruling need only address eleven requests, namely Nos. 5, 6, 10, 12, 13, 14, 15, 17, 18, 19 and 20.

The Court will address these discovery requests in an order which differs from that of counsel.

---

[4]On April 26, 2013, defendant served its Requests for Production upon plaintiff, as to which plaintiff served its responses and objections on July 25, 2013.  (Tobin Aff't, ¶¶ 3, 5 & Exh. 1). According to plaintiff's counsel, plaintiff has produced 13,817 documents in response to defendant's requests, with approximately 100 more documents to be produced shortly.  (Federico Aff't, ¶¶ 11-12).

Defendant's production requests served upon plaintiff are the subject of defendant's Motion to Compel Production of Documents, filed December 9, 2013, the briefing for which has not been completed yet.  (Dkts. ##34-37).  See note 1 supra.

A.  REQUESTS NOS. 5, 15, 18, 19 & 20 – OTHER CLAIMS

In these five requests, plaintiff seeks all documents concerning seven claims asserted against plaintiff by seven claimants other than RM, KS, JA and Matthew Doe (No. 5); all documents since 1978 concerning claims for coverage based on allegations of childhood sexual abuse against religious entities, made under policies sold by defendant (No. 15); all documents produced by defendant in Corporation of the Catholic Archbishop of Seattle v. Interstate Fire & Casualty Co., Case No. 11-00989 (W.D. Wash.)(No. 18); all documents produced by defendant in Interstate Fire & Casualty Co., Inc. v. Catholic Diocese of Phoenix, Case No. 2:09-CV-01405 (D. Ariz.)(No. 19); and the complaint and docket sheets of all lawsuits filed against defendant by religious entities for breach of contract or bad faith (No. 20); defendant has asserted a host of objections, including vagueness, over breadth, undue burden, irrelevancy, lack of access, attorney-client privilege, work product doctrine, availability within plaintiff's own files, and sensitivity and confidentiality.  (Federico Aff't, ¶¶ 18-22 & Exh. 1; Federico Aff't II, ¶ 10).[5]

In its brief, plaintiff argues that defendant has made "a general business practice to avoid its obligations" to its insureds under these policies; that defendant has "engaged in similar unfair tactics with at least two other insureds[,]" namely the Archdiocese of Seattle, Washington and the Diocese of Springfield, Massachusetts; that the standing protective order "is . . . perfectly adequate . . . [to] address[] any confidential issues[;]" that plaintiff cannot obtain this information except from defendant; and that under similar circumstances, federal judicial officers in this district and in the Southern District of New York have permitted such

---

[5]The Corporation for the Catholic Archbishop of Seattle has produced all non-privileged and non-confidential documents in the litigation pending in the Western District of Washington. (Federico Aff't, ¶ 22 & Exh. 3).

discovery.  (Dkt. #28, Brief, at 27-32).  In contrast, defendant responds that the requested documents are not relevant because CUTPA and CUIPA require that a violation occur in Connecticut (which bars discovery regarding out-of-state claims); that lawsuits filed by other insureds do not prove bad faith; that there is so much variation in each individual case so that the majority of jurisdictions, including Connecticut, bar "other insured" discovery; and that plaintiff's requests for all documents since 1978 is overbroad.  (Dkt. #33, at 27-32).  In its reply brief, plaintiff argues that in contrast to CUTPA, CUIPA does not require that a general business practice be restricted to Connecticut, and that "the current majority view around the country allow[s] such discovery."  (Dkt. #38, at 2-7).

While the Connecticut Appellate Court made clear three months ago that the "meaning" of CUTPA is "plain and unambiguous[]" in that "it proscribes only unfair trade practices occurring with the state of Connecticut," Western Dermatology Consultants, P.C. v. VitalWorks, Inc., 146 Conn. App. 169, 200-01 (Conn. App. Ct. 2013),[6] there appears to be no such restriction with respect to claims under CUIPA.  For example, in Southridge Cap. Mgmt., LLC v. Twin City Fire Ins. Co., No. 04 CV 02103527S, 2005 WL 1671549 (Conn. Super. Ct. June 3, 2005), plaintiff had referred to ten cases pending in the Connecticut Superior Court against the defendant-insurance company for bad faith/wrongful denial of coverage claims, as well as five cases pending in Delaware, Ohio, Texas and Massachusetts.  Id. at *3. In denying defendant's motion to strike on the grounds that the "factual situations" in the other lawsuits "must be virtually identical in order to state a legally sufficient claim for a CUTPA claim premised on CUIPA violations[,]" the Superior Court Judge specifically referred

---

[6]In so ruling, the Appellate Court explicitly rejected two federal court decisions holding to the contrary.  Id. at 200, n.9.

Just last month, the Connecticut Supreme Court granted certification with respect to the discussion of CUTPA in the Appellate Court decision.  310 Conn. 955 (2013).

to the fifteen pending lawsuits to hold that Connecticut law "do[es] not require that such a stringent test be met." Id. at *3-4.  See also Beck v. Utica Mut. Ins. Co., No. CV 11606022761, 2013 WL 3388880, at *6 (Conn. Super. Ct. June 18, 2013)(specifically mentioning plaintiff's allegation in Southridge of "wrongful denial of coverage in at least five states, including the state of Connecticut[]" as "indicative of the [defendant] insurance company's general practice.").

Defendant has cited two Connecticut cases, both more than twenty years old, that deny, with no explanation whatsoever, the type of discovery sought here, see North Am. Phillips Corp. v. Aetna Cas. & Sur. Co., No. CV-91-0395790S, 1992 WL 117998, at *1 (Conn. Super. Ct. May 26, 1992); Carrier Corp. v. Home Ins. Co., No. CV-889-3542383S, 1991 WL 182491, at *2 (Conn. Super. Ct. Sept. 5, 1991), as well as decisions from other jurisdictions from the 1980's and 1990's.  (Dkt. #33, at 30-31).  As plaintiff appropriately argues, the more current view appears to permit such discovery.  See, e.g., Paul Revere Ins. Co. v. Dibari, 3:08 CV 1795 (JBA), 2010 WL 1782022, at *2-3 (D. Conn. May 3, 2010)(Margolis, M.J.)[7]; Zurich Am. Ins. Co. v. ACE Am. Reinsurance Co., No. 05 Civ. 9170 (RMB)(JCF), 2006 WL 3771090, at *1-2 (S.D.N.Y. Dec. 22, 2006); see also  Dkt. #38, at 6, n.6.

This conclusion is not the end of the discussion, however, in that there are other legitimate considerations raised by defendant.  With respect to Request for Production No. 5, defendants are to submit the responsive documents regarding the seven other claims to this Magistrate Judge's Chambers for her in camera review, on the issue of attorney-client privilege, work product doctrine, and/or any other privilege, and only with respect to any documents that are not already in the possession of plaintiff's counsel, **on or before**

---

[7]In Paul Revere, the plaintiff-insurance company consented to some of this discovery.

6

**February 24, 2014**.

Defendant is also correct that Request No. 15 is overbroad, in that it seeks information back to 1978, more than thirty-five years ago.  Unless counsel agree otherwise, such production shall extend back to 2000, and defendant shall provide such documents to the Magistrate Judge's Chambers for <u>in camera</u> review, on the issue of attorney-client privilege, work product doctrine, and/or any other privilege, with the claimants identified only by their initials, **on or before February 24, 2014**.

Defendant shall respond to Requests for Production Nos. 18-19, **on or before February 14, 2014**.  And with respect to Request for Production No. 20, defendant shall respond **on or before February 14, 2014**, but only with respect to claims that are similar to those here, namely allegations of childhood sexual abuse against religious entities.

B.  REQUESTS NOS. 6, 12 & 13 – UNDERLYING CLAIMS

In these three requests, plaintiff seeks all claim files documents, and other documents concerning defendant's handling of the Underlying Claims, including but not limited to the claims log and claims review committee documents (No. 6); all documents concerning communications defendant had with any persons or parties concerning the Underlying Claims, including but not limited to the Onebane Law Firm (specially Attorney Timothy J. McNamara), representatives of Lloyds of London, London Underwriters and Gallagher-Bassett (No. 12); and all documents relating to the investigation or determination of coverage concerning the Underlying Claims, including all documentation produced, gathered, and transferred by the Onebane Law Firm, and Attorney McNamara in particular (No. 13); defendant similarly has asserted multiple objections, including vagueness, ambiguity, attorney-client privilege, work-product doctrine, and lack of access, but with respect to Nos. 6 and 12, has produced documents without waiving its objections and with respect to No. 13, has produced all non-

Case 3:12-cv-01641-JBA    Document 39    Filed 01/28/14    Page 8 of 19

privileged, non-work product, and non-reserve documents.  (Federico Aff't, ¶¶ 13-17 & Exhs. 1-2).

Insofar as defendant has produced documents responsive to No. 6, plaintiff's motion is moot with respect to that discovery request.    Insofar as defendant has produced documents responsive to No. 12 for communications with Lloyds of London, London Underwriters, and Gallagher-Bassett, then the open issue for that discovery request are the communications with Attorney McNamara and the Onebane Law Firm.   And insofar as defendant has produced all non-privileged, non-work product and non-reserve documents with respect to No. 13, then the only open issue for discovery requests are the privileged communications.

According to plaintiff, defendant has produced only fourteen documents, half of which contain redactions relating to privilege, some of which deprive the documents of any meaning.  (Dkt. #28, Brief, at 19-20; Federico Aff't, ¶ 15).  Plaintiff further argues that by having the Onebane Law Firm, and Attorney McNamara in particular, functioning as a claims adjustor, there is no attorney-client or work product doctrine available to defendant, and even if any privilege did exist, defendant waived any privilege by failing to create a timely privilege log. (Dkt. #28, at 20-26).  In contrast, defendant argues that these documents are protected from disclosure by the attorney-client privilege as well as the work product doctrine, and there has not been a waiver of either privilege.  (Dkt. #33, at 9-20, Sons Aff't & Exhs. D-E).[8]

With respect to the issue of attorney-client privilege, the pivotal determination is whether this case falls squarely under the holding of First Aviation Servs., Inc. v. Gulf Ins. Co., 205 F.R.D. 65 (D. Conn. 2001)(Dorsey, J.), as argued by plaintiff, or whether that case

---

[8]Plaintiff's reply brief does not address this issue.

8

is distinguishable, as asserted by defendant.   In <u>First Aviation</u>, plaintiffs sought from defendant, who provided a Directors and Officers liability insurance policy to plaintiff, defense and settlement costs allegedly incurred from an underlying claim.  <u>Id.</u> at 67.  Defendant had hired a law firm to investigate and make a coverage determination regarding the claim, which, according to plaintiff, was "a task . . . normally performed by an insurance company's claim department," so that the claims handling documents would not be protected by the attorney-client or work product privileges.  <u>Id.</u> at 68.  Defendant, in contrast, argued that this outside law firm "served as its legal advisor[,]" and that defendant had "anticipated an adversarial coverage dispute from the early stages of the matter[,]" so that both privileges were appropriate here.   <u>Id.</u>   Despite defendant's argument, its own expert witness had testified at his deposition that the outside lawyer had "functioned as a claims handler, and the decisions he made were primarily business decisions[.]"   <u>Id.</u> at 69.   Under these circumstances, the late U.S. District Judge Peter C. Dorsey held that the documents were not privileged:

> Such a practice cannot become a mechanism for avoiding disclosure of documents through an assertion of privilege.  The testimony of [defendant's] own expert witness indicates that [the outside law firm] was acting in a capacity other than merely a legal one.  An insurance company may not insulate itself from discovery by hiring an attorney to conduct ordinary claims investigations.  To the extent an attorney acts as a claims adjuster, claims process supervisor, or claims investigation monitor, and not as a legal advisor, the attorney-client privilege does not apply.

<u>Id.</u> (internal quotations, alteration, and citations omitted).

Just last year, U.S. Magistrate Judge Donna F. Martinez adhered to the <u>First Aviation Services</u> decision when she ruled, after an <u>in camera</u> review of the defendant-insurance company's records, that the defendant's claims specialist, who was an attorney, had not acted as a legal advisor prior to the coverage decision, so that her e-mails were discoverable

by plaintiff.  Mehta v. Ace Am. Ins. Co., 3:10 CV 1617 (RNC), 2013 WL 3105215, at *2 (D. Conn. June 28, 2013)(Martinez, M.J.).   However, in contrast, Judge Martinez held that a "post-complaint coverage opinion by outside counsel" was privileged.  Id. at *3.

In Tudor Ins. Co. v. McKenna Assoc., No. 01 Civ. 115 (DAB)(JCF), 2003 WL 21488058, at *1 (S.D.N.Y. June 25, 2003), the defendant-insured was sued by a claimant in a negligence action filed in the New York state court, and the plaintiff-insurance company appointed an attorney to defend McKenna in the state court while retaining another law firm, Thurm & Heller ["T&H"] to act as coverage counsel; the plaintiff-insurance company then commenced a federal lawsuit seeking a declaration that it was not obligated to defend or indemnify McKenna in the state court action.  U.S. Magistrate Judge James Francis held that because T&H had been retained to advise Tudor, it had "no duty of loyalty to McKenna[,]" and it was of no import that "Tudor is now in an adversarial posture with respect to McKenna[.]" At *3. As a result, the communications between Tudor and T&H were held to be privileged.  Id.

The same approach was taken by the Connecticut Supreme Court in Hutchinson v. Farm Family Cas. Ins. Co., 273 Conn. 33 (2005), where the parents of a child killed in an automobile accident had filed a bill of discovery against their own insurance company, after its adjuster allegedly reneged on an agreement to settle their claim arising out of their under-insured motor vehicle coverage.  Id. at 34-36.  Plaintiffs thereafter sought production of defendant's entire file, and after an in camera review, the Connecticut Superior Court Judge held that plaintiffs' allegation of bad faith by defendant entitled plaintiffs to have access to defendant's complete file, without regard to the attorney-client privilege.  Id. at 36-37.  On appeal, the Connecticut Supreme Court acknowledged that "the attorney-client privilege implicitly is waived when the holder of the privilege has placed the privileged communications in issue[,]" which often arises, inter alia, "when a party specifically pleads reliance on an

10

attorney's advice as an element of a claim or defense . . . ." Id. at 39 (citations omitted). The Connecticut Supreme Court held that just like the civil fraud exception, "there is no justification for the attorney-client privilege . . . when a communication was made [by an insurance company] for the purpose of evading a legal or contractual obligation to an insured without reasonable justification." Id. at 41-42 (citations & footnote omitted). The Connecticut Supreme Court continued:

> Accordingly, we conclude that an insured who makes an allegation of bad faith against his insurer is entitled to an in camera review of privileged materials when the insured has established, on the basis of nonprivileged materials, probable cause to believe that (1) the insurer acted in bad faith and (2) the insurer sought the advice of its attorneys in order to conceal or facilitate its bad faith conduct.

Id. at 42-43. However, the Court added that when an insurance company "raise[s] some form of a 'routine handling' defense, . . . the 'at issue' exception would apply." Id. at 44 (citation omitted). The Court explained: "In other words, in a typical claim of bad faith, disclosure of privileged materials is necessary for the resolution of the claim precisely because the materials have been placed 'at issue' by the insurer, in which case the privilege is waived." Id. (emphasis in original).

Regarding the issue of fiduciary duty, the Connecticut Supreme Court held that "[w]hen the relationship between the insured and the insurer is adversarial at the inception of a claim, . . . there is no . . . fiduciary relationship and the attorney-client privilege protects the insurer from disclosure of privileged materials created after the claim was made." Id. at 47 (citation omitted). In Hutchinson, the Connecticut Supreme Court held that the relationship between the plaintiffs-insureds and the defendant-insurer was adversarial at the time the claim was made, so that the insurance company's communications were privileged. Id. at 48. The Connecticut Supreme Court reversed the trial judge's decision, in that plaintiffs

11

had not "alleged that defendant gave information to or sought the advice of its attorneys for the purpose of concealing or facilitating its alleged bad faith conduct." Id. at 49 (citations omitted)(emphasis in original).    The Court continued: "Indeed, nothing in the record suggests that the defendant had any purpose in communicating with its attorneys except to obtain complete and accurate legal advice." Id.   Thus, the Court concluded that the in camera review had not been necessary, and that the trial court had improperly determined that the plaintiffs were entitled to disclosure of the privileged materials. Id. at  50.

Here, Deborah Sons, defendant's adjustor for the Underlying Claims, avers that since 2006, she has been the Claims Representative responsible for handling the claims for indemnification submitted by plaintiff and in that capacity, her role was "to investigate and evaluate any claim for indemnification submitted" by plaintiff, and that prior to 2006, the same function was fulfilled by Claim Representative Mary Casey. (Sons Aff't, ¶¶ 1, 4-5).  Sons further avers that Attorney McNamara and the Onebane Law Firm served as defendant's "outside coverage counsel in connection with the Underlying Claims and not in a claims adjustor capacity." (Id. at ¶ 6).

Although the Sons Affidavit is certainly sketchy about even the most generic functions served by Attorney McNamara and the Onebane Law Firm, plaintiff's counsel concedes that defendant's privilege logs indicates that they were "involved from the inception of the Underlying Claims." (Federico Aff't, ¶ 17; see also Federico Aff't II, ¶ 13 & Exhs. 4-7).  Thus, under the analysis of the federal courts in First Aviation, Mehta, and Tudor Ins., the documents that defendant has not produced appear to be privileged.   Similarly, the Connecticut Supreme Court's lengthy analysis in Hutchinson dictates the same result – that plaintiff has not satisfied the threshold necessary for disclosure of these documents.  While the Hutchinson decision does not require an in camera review at this point, in an abundance

of caution, the Magistrate Judge is willing to conduct an <u>in camera</u> review of the disputed documents with respect to Nos. 12-13, with such documents to be delivered to her Chambers **on or before February 24, 2014**.

<u>C.  REQUEST NOS. 10 & 14 – POLICY INTERPRETATION AND APPLICATION</u>

In these two requests, plaintiff seeks all documents concerning the underwriting of defendant's policies issued to plaintiff, including, but not limited to, all applications, underwriting notes, memoranda, and communications relating to the efforts to obtain, draft, review, comment on, evaluate, negotiate, purchase, accept, and place the policies (No. 10); and all documents concerning the meaning of "assault and battery" as that phrase is used in defendant's policies issued to plaintiff, including, but not limited to, any drafting history, regulatory filings, or other insurance industry documents (No. 14); defendant similarly has asserted multiple objections, including vagueness, over breadth, undue burden, irrelevancy, attorney-client privilege, work product doctrine, commercially sensitive and/or proprietary business information, and lack of access.  (Federico Aff't, Exh. 1).

In its brief, plaintiff argues that the two requests seek to prove that defendant is misconstruing its own policies and that its construction was asserted in bad faith, and that it is "silly" to direct plaintiff to Lloyds' policies. (Dkt. #28, Brief, at 13-18).  Defendant points plaintiff to Lloyds regarding No. 14, and further argues that the term "other insurance industry documents" is vague, and the request is "devoid of any temporal limitation." (Dkt. #33, at 7-8). In its reply brief, plaintiff confirms that it does not seek documents from Lloyds, but only those within defendant's possession and control.  (Dkt. #38, at 7-10).

With respect to No. 10, plaintiff has cited decisions in this district and in the various districts of New York that have permitted discovery regarding underwriting and term construction, albeit without any discussion.  <u>See, e.g.,Travelers Cas. & Sur. Co. v. Century</u>

Indemnity Co., 3:10 CV 400 (WWE), 2011 WL 5570784, at *3-4 (D. Conn. Nov. 16, 2011)(requiring production of "any memos, correspondence, documents or materials relied on that support [defendant's] 'assessment, determination, allocation, and presentation' of asbestos losses to its reinsurers.")(Fitzsimmons, M.J.); Pentair Water Treatment (OH) Co. v. Continental Ins. Co., No. 08 Civ. 3604 (BSJ)(JCF), 2009 WL 3817600, at *3-4 (S.D.N.Y. Nov. 16, 2009)(permitting plaintiff to depose a witness about defendant's underwriting manuals, bearing in mind that "not every aspect of underwriting practices will be relevant[,]" and instead leaving "the precise contours of appropriate questioning [to be] defined in the context of specific inquiries posed during [the] deposition.")(Francis, M.J.); see also 40 Gardenville LLC v. Travelers Prop. Cas., No. 02 CV 788, 2004 WL 1055821, at 1, n.1 (W.D.N.Y. Apr. 22, 2004)(court earlier had granted plaintiff's motion to compel production of defendant's underwriting file)(Scott, M.J.); Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, No. 90 Civ. 7811 (KC), 1993 WL 437767, at *3-4 (S.D.N.Y. Oct. 26, 1993)(ordering disclosure of plaintiff's underwriting guidelines that are "specifically relevant to this type of loss" and for the relevant time period)(Francis, M.J.).

With respect to No. 14, while the intent of the parties with respect to an insurance policy is generally "derived from the four corners of the policy[,]" Cmty. Action for Greater Middlesex Cnty., Inc. v. Am. Alliance Ins. Co., 254 Conn. 387, 399 (2000)(citations & footnote omitted); see also Yale Univ. v. CIGNA Ins. Co., 224 F. Supp. 2d 402, 406 (D. Conn. 2002)(same)(Underhill, J.), a court also may consider extrinsic evidence to ascertain the intent of the parties, if the terms of the insurance policy are "reasonably susceptible to more than one interpretation," which renders the terms to be "ambiguous[.]" Am. Home Assur. Co. v. Abrams, 69 F. Supp. 2d 339, 348 (D. Conn. 1999)(Goettel, J.).

As previously mentioned, plaintiff does not seek documents responsive to No. 14 from

14

Lloyds, but only those within defendant's own possession.  (Dkt. #38, at 7-8).

Defendant shall respond to Nos. 10 and 14 with documents created since 2000 **on or before February 14, 2014**.

D.  REQUEST NO. 17 – RESERVES

In this last request, plaintiff seeks all documents concerning reserves set for the Underlying Claims, as to which defendant objects on the basis of vagueness, over breadth, undue burden, irrelevancy, attorney-client privilege and work product privilege.  (Federico Aff't, Exh. 1).

Plaintiff argues that reserves information is "plainly relevant" to construction of the insurance policies, as well as being "certainly relevant" to plaintiff's bad faith claims.  (Dkt. #28, Brief, at 26-27).  In contrast, defendant argues that the reserves information is not relevant to plaintiff's claims or defendant's defenses, "loss reserves are inherently contingent and uncertain, and the amount of a reserve has nothing to do with the thoroughness of an investigation or claim[,]" and the requested information is clearly privileged from discovery pursuant to the work product doctrine, as it was created in anticipation of litigation.  (Dkt. #33, at 20-26).[9]

Plaintiff relies upon an unpublished ruling by U.S. Magistrate Judge Thomas P. Smith from 1992, in which he held that the defendant-insurer's information relating to reserves was not protected by the attorney-client privilege or work product doctrine, in that such reserves "were made for the primary purpose of securing financial advice rather than legal advice or legal services."  EDO Corp. v. Newark Ins. Co., No. H90-951 (AHN), slip op at 7-8 (D. Conn. Sept. 17, 1992.  Plaintiff similarly cited to Stone v. Allstate Ins. Co., No. 2:00-59, 2000 WL

---

[9]This issue also was not addressed in plaintiff's reply brief.

35609369, at *3-4 (S.D.W. Va. July 24, 2000), where the district court held, relying upon West Virginia law in a motion in limine, that plaintiffs could introduce evidence regarding reserve calculations with respect to their under-insured motorist claims sounding in bad faith, as such evidence "is relevant to show the insurer's state of mind in relation to its claim settlement practices." Id. (multiple citations omitted).  In the Stone case, despite the severity of the injuries, defendant had failed to set a reserve at the policy limits and did not raise the amount until well after it became clear that the other driver was one hundred percent at fault and the plaintiff-wife was a paraplegic.  Id. at *4.  As a result, "evidence of the time of the increase is relevant circumstantial evidence for a showing of bad faith, and is probative." Id.

As in Section I.A. supra, defendant has cited two decisions by the Connecticut Superior Court in the early 1990's, which denied discovery regarding reserves, with no explanation at all.  North Am. Phillips Corp., 1992 WL 117998, at *1; Carrier Corp., 1991 WL 182491, at *6.  See also Hartford Acc. & Indem. Co. v. Argonaut Ins. Co., 3:06 CV 1813 (WWE), 2008 WL 2559440, at *2 (D. Conn. June 23, 2008)(finding, without discussion, defendant's request for plaintiff's reserve and how each reserve was calculated was "not a proper subject of inquiry.")(Fitzsimmons, M.J.).

More recently, Senior U.S. District Judge Ellen Bree Burns addressed this issue in Estate of Mali v. Fed. Ins. Co., 3:06 CV 1475 (EBB), 2011 WL 2516246, at *1 (D. Conn. June 17, 2011), where, some eight months after the fire at plaintiffs' home, defendant's claims supervisor had increased the loss reserve for plaintiff's claim from $570,000 to $1,550,000, and then three weeks later, offered plaintiffs approximately $832,000, which they rejected; plaintiffs contended that such evidence was proof that defendant knew that its initial amount of loss reserve was "woefully inadequate," thus supporting a claim of breach of the covenant

of good faith and fair dealing.   Judge Burns held that such evidence was not admissible, because the introduction of this evidence would "lead to a wasteful and meaningless mini-trial[,]" and "setting loss reserves is not an exact science and is a highly variable task primarily because loss reserves are designed to protect against <u>potential</u> losses[,]" and such estimates "do not normally entail an evaluation of coverage based upon a thorough factual and legal consideration when routinely made as a claim analysis."   <u>Id.</u> at *2 (citations & internal quotations omitted).   In <u>Mali</u>, the claims supervisor's "loss reserve recommendation was not based on a thorough or conclusive consideration of the facts . . . [but rather] was based on only the barest of estimates[,]" so that such evidence would be "minimally probative, and may create the erroneous perception that the defendant had conclusively determined the value of the [p]laintiffs' claims."   <u>Id.</u>   Defendant also has cited multiple decisions from other jurisdictions reaching the same conclusion.   (<u>See</u> Dkt. #33, at 21-25).   However, in one of those decisions, <u>U.S. Fire Ins. Co. v. City of Warren</u>, No. 2:10 CV 13128, 2012 WL 1454008, at *10, n.5 (E.D. Mich. Apr. 26, 2012)["<u>City of Warren</u>"], U.S. Magistrate Judge Paul Komives observed that "[t]he courts are split as to whether reserve information is relevant in a suit alleging a bad faith failure to settle or other type of bad faith."   (citation omitted).   <u>See also Shataia v. Travelers Ca. Ins. Co. of America</u>, No. 12-cv-13657, 2014 WL 197734, at *3-4 (E.D. Mich. Jan. 16, 2014)(acknowledging continuing split of authority on this issue, citing <u>City of Warren</u>).

Defendant also has cited two decisions from the Southern District of New York that hold that as a "generally accepted rule[,]" reserves figures "represent work product, since they are normally created because of the anticipation of litigation."   <u>Lava Trading, Inc. v. Hartford Fire Ins. Co.</u>, 03 Civ. 7037 (PKC)(MHD), 2005 WL 66892, at *2 (S.D.N.Y. Jan. 11, 2005)(citations omitted)(Dolinger, M.J.); <u>In re Pfizer Inc. Sec. Litig.</u>, 90 Civ. 1260 (SS), 1994

WL 263610, at *1-2 (S.D.N.Y. June 6, 1994)(multiple citations omitted), recon. denied, 1994 WL 661104 (S.D.N.Y. Nov. 22, 1994). In an earlier decision in Pfizer, 1993 WL 561125 (S.D.N.Y. Dec. 23, 1993), U.S. Magistrate Judge Naomi Reice Buchwald engaged in a thorough analysis of whether Pfizer's calculations of reserves for litigation regarding its heart valves were done "for the business purpose of public reporting" as opposed to in anticipation of litigation or attorney-client communications, id. at *2-6; Judge Buchwald engaged in an in camera review of these documents before concluding that the documents "containing aggregate information are not 'predominately concerned' with conveying legal advice, and are therefore not entitled to attorney-client privilege protection[,]" whereas "documents containing individual case reserve figure are predominantly legal in nature[,]" so "[t]herefore, those are privileged assuming the information on which the documents were based was kept confidential by Pfizer."  Id. at *2,  4, 5, 6 (citations omitted).

In light of the split of authority on the relevancy of the reserve documents in the context of bad faith claims, as noted in City of Warren, and in light of the issues so adeptly analyzed in Pfizer after an in camera review, as in Section I.B. supra, it would be prudent to engage in an in camera review with respect to these documents as well.  Defendant shall provide copies of the reserve documents to this Magistrate Judge's Chambers for her in camera review, **on or before February 24, 2014**.


## II.  CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion to Compel Production (Dkt. #28) is:

granted with respect to Requests for Production Nos. 10, 14, 18, and 19, with compliance by defendant **on or before February 14, 2014**;

18

granted with respect to Request for Production No. 20 to the extent provided in Section I.A supra, with compliance by defendant **on or before February 14, 2014**;

granted in part with respect to Requests for Production Nos. 5, 15, and 17 to the extent that an in camera review is ordered by the Magistrate Judge, **on or before February 24, 2014**;

granted in part with respect to Requests for Production Nos. 12-13, to the extent that an in camera review of the disputed documents is ordered by the Magistrate Judge, **on or before February 24, 2014**; and

denied without prejudice as moot with respect to Request for Production No. 6.

This is not a Recommended Ruling, but a ruling on a non-dispositive motion, the standard of review of which is specified in 28 U.S.C. § 636; FED. R. CIV. P. 6(a), 6(e) & 72; and Rule 72.2 of the Local Rules for United States Magistrate Judges.  As such, it is an order of the Court unless reversed or modified by the District Judge upon timely made objection.

See 28 U.S.C. § 636(b)**(written objections to ruling must be filed within fourteen calendar days after service of same);** FED. R. CIV. P. 6(a), 6(e) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary, H&HS, 892 F.2d. 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).**

Dated at New Haven, Connecticut, this 28th day of January, 2014.


 /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge