UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE HARTFORD ROMAN CATHOLIC DIOCESAN CORPORATION, | : : : | |
| | : | CIVIL ACTION |
| Plaintiff, | : : | NO. 3:12-cv-01641-JBA |
| | : | |
| v. | : : | |
| | : | |
| INTERSTATE FIRE & CASUALTY COMPANY, | : : : | |
| | : | |
| Defendant. | : | MARCH 4, 2016 |

## JOINT TRIAL MEMORANDUM

Pursuant to D. Conn. L. Civ. R. 6 and the Standing Order Regarding Trial Memoranda in Civil Cases as modified by Judge Arterton's joint trial memorandum instructions, Plaintiff The Hartford Roman Catholic Diocesan Corporation ("Archdiocese") and Defendant Interstate Fire & Casualty Company ("Interstate") jointly file this Trial Memorandum.

## 1.    **TRIAL COUNSEL:**

The names, addresses and telephone numbers and email addresses of the Archdiocese's trial counsel are as follows:

> **Plaintiff's Counsel**:
>
> Elizabeth J. Stewart
> Murtha Cullina LLP
> 265 Church Street, 9th Floor
> New Haven, CT 06510
> Telephone:  (203) 772-7700
> Email:  estewart@murthalaw.com

Marilyn B. Fagelson
Murtha Cullina LLP
265 Church Street, 9th Floor
New Haven, CT 06510
Telephone: (203) 772-7700
Email: mfagelson@murthalaw.com

Melissa A. Federico
Murtha Cullina LLP
CityPlace I
185 Asylum Street
Hartford, CT 06103
Telephone: (860) 240-6000
Email: mfederico@murthalaw.com

The names, addresses and telephone numbers and email addresses of

Interstate's trial counsel are as follows:

Rhonda Tobin
Robinson & Cole LLP
280 Trumbull Street
Hartford, Connecticut 06103
(860) 275-8327
rtobin@rc.com

Stephen Clancy
Robinson & Cole LLP
280 Trumbull Street
Hartford, Connecticut 06103
(860) 275- 8367
sclancy@rc.com

Jessica A.R. Hamilton
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103
(860) 275-8396
jhamilton@rc.com

## 2.    JURISDICTION:

Jurisdiction is based upon diversity of citizenship.

3.	**JURY/NON-JURY**:

This case will be tried to the Court.

4.	**LENGTH OF TRIAL**:

The parties expect that the trial will take 10-12 full trial days. This includes testimony of two witnesses by videotape deposition.

5.	**FURTHER PROCEEDINGS**:

None.

6.	**NATURE OF CASE**:

**The Archdiocese's Claims:**

This is an action by Hartford Roman Catholic Diocesan Corp. ("Archdiocese") against Interstate Fire & Casualty Co. ("Interstate") alleging breach of contract, breach of the covenant of good faith and fair dealing, and violations of the Connecticut Unfair Insurance Practices Act ("CUIPA") and the Connecticut Unfair Trade Practices Act ("CUTPA"). In the First Count for breach of contract, the Archdiocese claims that Interstate wrongfully failed to reimburse it for losses covered by Interstate's excess liability insurance policies. The Archdiocese settled four claims asserted by Richard Mallory, KS, JA, and Matthew Doe ("the Underlying Claims").

In the Second Count for breach of the implied covenant of good faith and fair dealing, the Archdiocese claims that Interstate failed to indemnify covered claims that had merit by imposing unfair and improper conditions beyond the terms of the

policies, by not handling those claims consistently with the parties' course of dealing or with industry practice, and that these actions were done in bad faith.

In the Third Count for violation of CUIPA/CUTPA, the Archdiocese alleges that Interstate has made a general business practice of: (1) failing to acknowledge and act with reasonable promptness to communications regarding claims, (2) failing to affirm or deny coverage of claims within a reasonable time of submission of proofs of loss, (3) not attempting in good faith to effectuate prompt, fair and equitable settlement of claims in which liability has become reasonably clear, and (4) compelling dioceses around the country to bring coverage actions or to file for bankruptcy to recover amounts due under their policies.

**Interstate's Defenses:**

Interstate denies the Archdiocese's allegations and asserts the following Affirmative Defenses:

### Third Affirmative Defense

The Archdiocese's claims against Interstate with respect to the KS, Mallory, and Doe Settlements are barred from coverage under the Policies as they do not constitute an occurrence.

### Fourth Affirmative Defense

The Interstate Policies provide, Part V. – Conditions, 3. Action Against Company, that "[n]o action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy." The Archdiocese's claims against Interstate are barred because the

Archdiocese failed to produce relevant information and documentation required under the "books and records" and other provisions of the Policies, some of which the Court has already held to be critical to Interstate's coverage determinations. Compliance with this and other policy provisions is a condition precedent to coverage.

### Sixth Affirmative Defense

(6)     The Interstate Policies provide, **Part V. – Conditions**:

**2. Notice of Loss; Participation in Defense by the Company**

Notice of an occurrence which appears likely to involve this policy shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. The company at its own option may, but is not required to, participate in the investigation, settlement or defense of any claim or suit against the insured.

In addition, the Lloyds' Policy, to which the Interstate Policies follow form, provides, **Section IV, General Conditions**:

**3. INSPECTIONS, AUDITS, AND VERIFICATIONS OF VALUES**: The Underwriters or their duly authorized representatives shall be permitted at all reasonable times during the continuance of this Insurance to inspect the premises used by the Assured and to examine the Assured's book or records so far as they relate to coverage afforded by this Insurance.

The Lloyds' Policy further provides **Section IV, General Conditions**,

**11. CLAIMS**: The assured shall immediately notify Underwriters through Gallagher Bassett Insurance Services by registered mail, of any occurrence, the costs of which is likely to result in payment by Underwriters under this Insurance. Underwriters shall have the opportunity to be associated with the Assured in the defense of any claims, suits or proceedings relative to an occurrence wherein the opinion of the Underwriters, their liability under this Insurance

is likely to be involved, in which case the Assured and the Underwriters shall cooperate to the mutual advantage of both.

The Archdiocese's claims against Interstate are barred because the Archdiocese failed to fully comply with specific policy terms. Compliance with these terms was a condition precedent to coverage under the Policies. The non-compliance included failing to provide documents and other information related to the claims that Interstate requested as part of its investigation, as well as failing to provide reasonably detailed information regarding the status of the claims and the defense of those claims, which information was necessary to evaluate Interstate's indemnity obligations.

### Seventh Affirmative Defense

There is no coverage under the Interstate Policies for Fathers Crowley, Ladamus and Ferguson, individually, to the extent that each was acting intentionally and/or outside the course and scope of their priestly duties, and for their own self-gratification. The Interstate Policies, therefore, would not provide coverage for the priests nor allow their defense costs to be incorporated into the underlying limits and/or SIRs in order to reduce said limits and/or SIR and activate Interstate's excess indemnity coverage. Likewise, there is no coverage for the Archdiocese to the extent the acts of misconduct alleged against it are determined to be derivative of and inextricably intertwined with the actions of Fathers Crowley, Ladamus and Ferguson.

**Ninth Affirmative Defense**

The Archdiocese's claims against Interstate are barred, in whole or in part, by its own inequitable or bad faith conduct in withholding key information and documentation that it was disclosing to the underlying plaintiffs from Interstate, in failing to provide full access to information regarding the underlying claims to Interstate, and in its dealings with Lloyds in connection with the claims at issue in this litigation.

**Thirteenth Affirmative Defense**

Since there is no coverage for the abusing priests, Interstate is entitled to a reduction in the amounts paid by the Archdiocese to the underlying claimants, as well as the defense costs incurred, to defend and settle claims asserted against the priests and to secure releases of not only itself but also the abusing priests, to the extent that such payments and defense costs are allocable to the defense and release of the abusing priests. This allocation is necessary for the Archdiocese, as the insured, to satisfy its burden of proving a loss covered by the terms and conditions of the Interstate Policies.

7.    **TRIAL BY MAGISTRATE JUDGE:**

The parties do not consent to have the case tried by a magistrate judge.

8.   **LIST OF WITNESSES:**

   (a)   **Witnesses:**

**Plaintiff's Witnesses for Case in Chief:**

1.   Msgr. John McCarthy
     St. Dunstan Church
     1345 Manchester Road
     Glastonbury, CT 06033

Msgr. McCarthy was the Chancellor for the Archdiocese from 2005 to 2015.

He will introduce the Archdiocese, explain the corporate structure and the role of the

Archbishop, explain the Archdiocese's procedures and Canon law's requirements for

files and describe his review of the files for Frs. Ferguson and Crowley.  He also may

describe the Archdiocese's procedures for addressing sex abuse claims.

2.   Fr. Thomas Barry
     The Church of St. Patrick
     110 Main Street
     Farmington, CT 06032

Fr. Barry was Archbishop Whealon's priest secretary at the time the events

surrounding Fr. Crowley first came to Archbishop Whealon's attention, and he will

testify as to the Archbishop's actions at that time.

3.   Fr. Gene Gianelli
     Assumption Rectory
     81 Center Road
     Woodbridge, CT 06525

Fr. Gianelli was Archbishop Whealon's priest secretary at the time the events

surrounding Fr. Ferguson first came to Archbishop Whealon's attention, and he will

testify as to the Archbishop's actions at that time.

4. John W. Sitarz, Esq.
Cooney Scully and Dowling
Ten Columbus Boulevard
Hartford, CT 06106

Mr. Sitarz was the defense counsel for the Archdiocese for each of the four underlying claims and a number of other claims. He will testify as to those claims, the course of dealing with the insurance carriers and Gallagher Bassett, and the information provided to the insurance carriers.

5. Matthew Byrne
Director of Finance
Chancery
Archdiocese of Hartford
134 Farmington Avenue
Hartford, CT 06105

Mr. Byrne has been the Director of Finance for the Archdiocese since 2008. He will testify as to the settlement payments and defense cost payments the Archdiocese made on the four Underlying Claims, the Archdiocese's insurance program and how the various coverages worked, and the damages the Archdiocese seeks on each of its claims.

6. Philip T. Newbury, Jr., Esq.
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT 06114

Mr. Newbury serves as an expert witness. He has defended a number of sex abuse claims. He will testify as to the reasonableness of the settlements of the Underlying Claims and that liability was reasonably clear at the time those claims were settled.

7.    Seth A. Tucker, Esq.
      Covington & Burling LLP
      One CityCenter
      850 Tenth Street NW
      Washington DC 20001

Mr. Tucker is coverage counsel for the Archdiocese.  He will testify as to the

Archdiocese's attempts to get coverage from Interstate, the responses to requests for

information, and the settlement with Lloyds.

8.    Mark A. Darling, Esq.
      Litchfield Cavo LLP
      6 Kimball Lane, Suite 200
      Lynnfield, MA 01940

Mr. Darling is Interstate's local coverage counsel.  He will testify as to the

course of dealing between the Archdiocese and Interstate, the Archdiocese's

attempts to get coverage and the requests for information.

9.    Deborah L. Sons
      Interstate Fire & Casualty Co.
      33 West Monroe Street
      Chicago, IL 60603

Ms. Sons was the Interstate claims handler on all four of the Underlying

Claims, and she presently handles all of Interstate's sex abuse claims against

religious institutions.  She has handled the Archdiocese's claims since 2006.  She will

testify about handling of the four Underlying Claims and past Archdiocese claims,

information she did and did not request, information she received, and other claims

made by other dioceses.

10. James Hanson
Gallagher Bassett Services, Inc.
Two Pierce Place
Itasca, IL 60143

Mr. Hanson employed by Gallagher Bassett Services, Inc., the third party administrator for claims under the so-called Bishops Plan for dioceses around the country. Mr. Hanson will testify (by videotape deposition) as to certain information provided to him and to the insurers regarding abuse claims brought against the Hartford Archdiocese, settlements of abuse claims by the Hartford Archdiocese and other dioceses, settlements of coverage claims with Lloyds by the Hartford Archdiocese and other dioceses, and the specific excess and aggregate excess insurance that Lloyds provided.

11. Mary E. Santi
Chancellor
Archdiocese of Seattle
710 9th Ave
Seattle, WA 98104-2017

Ms. Santi is the Chancellor of the Corporation of the Catholic Archbishop of Seattle (the "Archdiocese of Seattle"). She will testify (by videotape deposition) as to the efforts of the Archdiocese of Seattle to obtain coverage for its abuse claims under its policies with Interstate, actions taken by Interstate to delay, reduce or avoid reimbursement of those claims, and coverage litigation between the Archdiocese of Seattle and Interstate.

12. Martha Kipp
    JMK Risk Consulting
    9 Evert Street
    Londonderry NH 03053

Martha Kipp is the former Director of Risk Management for the Diocese of Manchester, New Hampshire. She will testify as to the efforts of the Diocese of Manchester to obtain coverage for its abuse claims under its policies with Interstate, actions taken by Interstate to delay, reduce or avoid reimbursement of those claims, and coverage litigation between the Diocese of Manchester and Interstate.

13. William J. Berglund
    4 Kerry Way
    Palos Heights, Illinois 60463

Mr. Berglund serves as an expert witness. He has spent his career in claims handling for various insurance companies and doing audits of companies' claims handling. He will testify as to the claims handling here, particularly as it relates to the common law bad faith and CUIPA/CUTPA claims.

**Interstate's Witnesses:**

1. Deborah Sons
   San Francisco Reinsurance (ARM US)
   Allianz Resolution Management (ARM)
   33 West Monroe Street- 12th Floor
   Chicago, IL 60603

Ms. Sons was the claim representative for Interstate for the claims at issue in this litigation. She will testify regarding the insurance program at issue. She will testify regarding efforts to obtain relevant information and documentation about these claims and certain prior claims from the Archdiocese. She will testify about her

communications with Gallagher Bassett, the Archdiocese's Third Party Administrator (TPA), who administered these claims on behalf of the Archdiocese. Ms. Sons will testify that without receiving critically relevant information about these claims, she could not complete her coverage analysis.

Ms. Sons will testify regarding her claim handling in connection with these claims. If the Court determines that Interstate violated CUIPA in connection with its handling of these claims, and the Archdiocese is permitted to introduce evidence regarding other Archdioceses' experiences with Interstate, Ms. Sons will also testify regarding her claim handling on the other Archdiocese claims as necessary to rebut any claim of unfair insurance practices in connection with those claims.

2.     Mark Darling
       Litchfield Cavo LLP
       6 Kimball Lane, Suite 200
       Lynnfield, MA 01940-2682

Mr. Darling acted as Interstate's counsel and assisted Ms. Sons in the investigation of the claims at issue in this litigation. Mr. Darling will testify regarding Litchfield Cavo's attempts to secure relevant documents regarding the claims. He will testify regarding his previous negotiations with Jack Sitarz regarding Fr. Ferguson's claims and the unwillingness of the Archdiocese to share critical files, including the Canon files, personnel files, deposition transcripts and other discovery. He will testify regarding his communications with Attorney Seth Tucker, the Archdiocese's counsel, regarding these files and the Archdiocese's failure to produce critical documents as well as its lack of cooperation. Mr. Darling's testimony will be

limited to information not protected by the attorney-client privilege or work product doctrine.

3. Kathleen Adams
   Litchfield Cavo LLP
   82 Hopmeadow Street, Suite 210
   Simsbury, CT 06089-9637

Ms. Adams acted as Interstate's counsel and assisted Ms. Sons and Mr. Darling in the investigation of the claims. Ms. Adams will testify regarding Litchfield Cavo's attempts to secure relevant documents regarding the claims and the inability to obtain all of the documents needed by Interstate. She will testify as to her review of certain files related to the underlying claims at Mr. Sitarz' office in July 2008 and December 2011. She will also testify regarding her efforts to obtain trial exhibits and motions in connection with Jacob Doe v. Hartford Roman Catholic Diocesan Corporation. Ms. Adams' testimony will be limited to information not protected by the attorney-client privilege and work product doctrine.

4. James Hanson
   Gallagher Bassett Services, Inc.
   2455 W Gunnison St.
   Chicago, IL 60625

Mr. Hanson is employed by Gallagher Bassett Services, which served as the Archdiocese's third party administrator and acted as an agent of the Archdiocese in communicating with Interstate and the other insurers in connection with the claims at issue in the litigation. Mr. Hanson will testify via videotaped deposition. Mr. Hanson will testify concerning his efforts to obtain information about the claims to

communicate to Interstate and the other insurers. Mr. Hanson will testify concerning any requests for reimbursement by Gallagher Bassett in connection with the claims. Mr. Hanson will testify about the categories of documents that the insurers always requested with respect to these types of claims, including the personnel and Canon 489 files, the litigation files including deposition transcripts, and other categories of documents that both Interstate and Lloyds requested in connection with the claims at issue in this case. Mr. Hanson will also testify that the Archdiocese and Lloyds needed to reach an agreement on the Ultimate Net Loss before a request for reimbursement could be provided to Interstate, which did not occur until after this lawsuit was filed.

5.   KC
     Maplewood NJ 07040-2607

KC is a prior claimant who was abused by Father Ferguson from 1975 to 1978 while Fr. Ferguson was assigned to St. Bernard's Parish. KC is expected to testify that in April or May of 1978 he told Father Joseph Donohue, the co-pastor of St. Bernard's Parish, of the abuse and that Father Thomas Shea regularly saw him in the rectory with Father Ferguson. KC will testify regarding his claim against the Archdiocese and the settlement of that claim.

6.   Thomas F. Segalla, Esq.
     Goldberg Segalla
     665 Main Street, Suite 400
     Buffalo, NY  14203-1425

Attorney Segalla is a nationally recognized insurance coverage expert who founded and co-authored *Couch on Insurance.* Mr. Segalla will testify as an expert witness on behalf of Interstate. He will testify as to Interstate's claim handling with respect to the claims at issue in this case. He will also testify about the Archdiocese's conduct with respect to its provision of information and documentation to Interstate and its responses to Interstate's requests, as well as the Archdioceses' dealing with Lloyds in connection with these claims. Mr. Segalla will rebut the testimony of William Berglund, the Archdiocese's expert witness on claim handling, common law bad faith and CUIPA/CUTPA.

**(b)    Exhibits:**

See Attachments.

The parties reserve the right to use demonstrative exhibits not included in the lists during trial, as well as to present additional documents not included in the list for impeachment or as rebuttal exhibits.

**9.    STIPULATIONS AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

**(a)    Stipulated Findings of Fact:**

Count One – Breach of Contract

The Archdiocese's Insurance Program

1.    The Hartford Roman Catholic Diocesan Corporation is a Connecticut non -profit, charitable corporation that serves Catholics and others within Hartford, New Haven and Litchfield counties.

2.      Interstate is an insurance company organized under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois, and was previously acquired by Fireman's Fund Insurance Company.  Fireman's Fund Insurance Company is currently owned by Allianz Global Corporate & Specialty.

3.      The Archdiocese was insured under a series of excess level liability indemnity policies issued by Interstate during the period of September 1, 1978 through September 1, 1985 (the "Interstate Policies").  These policies were as follows:

| Dates | Policy Number |
|---|---|
| September 1, 1978  - September 1, 1979 | 83 -0152623 |
| September 1, 1979  - September 1, 1980 | 83 -0152623/1 |
| September 1, 1980  - September 1, 1981 | 83 -0152623/2 |
| September 1, 1981  - September 1, 1982 | 83 -0152623/3 |
| September 1, 1982  - September 1, 1983 | 83 -0169767 |
| September 1, 1983  - September 1, 1984 | 83 -0169767/1 |
| September 1, 1984  - September 1, 1985 | 83 -0169767/2 |

(Exhibits 1 and 2, Deborah Sons).

4.    The Interstate Policies were part of a multi-layered insurance program commonly referred to as the Bishop's Plan and procured by the Archdiocese through Arthur J. Gallagher & Co. (Illinois) in order to provide, among other things, excess liability indemnity coverage against third-party claims. The Bishop's Plan, at all relevant times, insured various Archdioceses and Dioceses around the country. Interstate began writing policies for the Dioceses nationally in 1978. (Sons, Exhibit 239).

5.    During the relevant policy periods under the Bishop's Plan, the Interstate Policies were excess to not only a self-insured retention maintained by the Archdiocese ("SIR"), but also a first layer excess insurance policy provided by Underwriters at Lloyds London ("Lloyds") and various other insurers and Centennial Insurance Company ("Centennial"). (Sons, Exhibits 1-6).

6.    For the policy periods at issue, the combined SIR and first layer of excess insurance coverage was $200,000. (Id.)

7.    From September 1, 1978 – August 31, 1981, the Archdiocese SIR was $60,000, and the first layer of excess insurance coverage was $140,000. From September 1, 1981 – September 1, 1985, the Archdiocese's SIR was $100,000, and the primary layer of insurance was $100,000. (Exhibit 1).

8.    The Archdiocese paid the premiums for the Interstate Policies. (Matthew Byrne).

9.    Since both the Interstate and Lloyds policies are occurrence policies, they only cover occurrences during the policy period. For purposes of this litigation,

that means that for those claims that allege abuse over multiple policy periods, any Loss under the policy (including any settlement or judgment as well as any defense expenses), are allocated over the applicable number of policy periods. (Id.).

10.    In order to calculate whether any claim reaches Interstate's layer, the amount of the Loss must first be allocated across the number of policy periods relevant to each claim. The Archdiocese's SIR, and the first layer excess insurance layer, which combined total $200,000, are then applied to each claim. Only if the total amount of the claim in each policy year exceeds $200,000 does Interstate's policy attach. (Id.).

The Terms Of The Interstate Policies

11.    The terms of the Interstate Policies relevant to the issues in the present litigation are, unless otherwise noted, the same across the relevant policy years.

12.    Interstate's indemnity obligations do not arise until after the Archdiocese has paid the claim settlement or judgment amounts. (Sons, James Hanson, Exhibit 2).

13.    The Interstate Policies do not include a duty to defend the Archdiocese or its priests. Similarly, the Lloyds policies are not duty to defend policies. (Exhibits 2-6, and 694).

14.    Under the terms of the Interstate Policies, Part I - INSURING AGREEMENTS, 1. Excess Liability Indemnity, the Interstate Policies "indemnify the insured for the amount of loss which is in excess of the applicable limits of liability of the underlying insurance . . . in the declarations . . . ." The declarations in turn refer

to Endorsement No. 2, entitled Company Limits, which it defines as the "difference between underlying including self insured retention (combined total of which $200,000.00 General Liability and Auto Liability any one occurrence . . . ) and $5,000,000.00 General Liability and Auto Liability . . . ."  (Sons, Exhibit 2 at Interstate 004495 and 004499).

15.    "Loss" is defined in Endorsement No. 3 and later in the Diocese Amendatory Endorsement of the Interstate Policies to include "the sums paid as damages in settlement of a claim" and the costs of defense:

> "Loss" means the sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the insured is legally liable, after making deductions for all recoveries, salvages and other insurances (whether recoverable or not) other than the underlying insurance and excess insurance purchased specifically to be in excess of this policy.  "Loss" includes investigation, adjustment, defense or appeal costs, and expenses, costs and expenses incident to any of the same, notwithstanding that the underlying insurance may provide insurance for such costs and expenses.

(Exhibit 2 at Interstate 004503, 004507).

16.    The Interstate Policies follow form to the Lloyds policies below them except to the extent that the provisions in the underlying policy are inconsistent with the provisions of the Interstate Policies.  Specifically, they provide in Part I - INSURING AGREEMENTS, 1.  Excess Liability Indemnity:

> The provisions of the immediate underlying policy or incorporated as part of this policy except for any obligation to investigate and defend and pay for costs and expenses incident to same, the amount of the limits of liability, any "other insurance" provision and any other provisions

therein which are inconsistent with the provisions of this policy.

(Sons, Exhibit 2 at Part I, ¶ 1 (Interstate 004495)).

17.    In the Diocese Amendatory Endorsement of the Interstate Policies for periods covering September 1, 1983 to September 1, 1985, Interstate also agrees that "[i]n the event that the insured suffers a loss which is covered by the underlying insurance set out in the schedule attached to this policy the excess of which would be payable under this policy except for terms and conditions of this policy which are not consistent with the underlying insurance then notwithstanding anything in this policy to the contrary this policy is amended to follow and be subject to the terms and conditions of such underlying insurance in respect of loss." (Sons, Exhibit 2 at Interstate 004516 and 004521).

18.    The terms of the Lloyds Policies relevant to the issues in the present litigation are, unless otherwise noted, the same across the relevant policy years. (Sons, Exhibits 3-6, and 694).

19.    The Insuring Agreement in the Lloyds Policies, which the Interstate Policies follow in form, includes SECTION II – CASUALTY INSURANCE, INSURING AGREEMENTS, which states:

> AGREEMENT C  - GENERAL LIABILITY:  Underwriters hereby agree, subject to the limitations, terms and conditions hereunder mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability imposed upon the Assured by law or assumed by the Named Assured under contract or agreement, for damages direct or consequential, and expenses, all as more fully defined by the term "ultimate

net loss", on account of personal injuries … arising out of any occurrence happening during the period of Insurance.

(Exhibit 3 at HRCD0062996).

\* \* \*

The DEFINITIONS provide:

     4.    ULTIMATE NET LOSS – The term "ultimate net loss" shall mean the total sum which the Assured becomes obligated to pay by reason or personal injury or property damage claim, either through adjudication or compromise, after making proper deductions for all recoveries and salvages, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons and for litigation, settlement, adjustment and investigation of claims and suits which are paid as consequence of any occurrence covered hereunder, excluding only the salaries of the Named Assured's permanent employees.  Fees, charges and expenses for Gallagher Bassett Insurance Service are specifically excluded, and are to be paid by the Assured.

(Exhibit 3 at HRCD0062998).

\* \* \*

SECTION IV – GENERAL CONDITIONS provide:

     12.    LOSS PAYMENTS – When it has been determined that Underwriters are liable under this insurance, Underwriters shall thereafter promptly reimburse the Assured for all payments made in excess of the amounts stated in PART I (AGGREGATE AGREEMENT) and PART II (SPECIFIC EXCESS AGREEMENT) of the Limits Agreement.  All adjusted claims shall be paid or made good to the Assured within thirty days after their presentation to Arthur J. Gallagher & Co., and acceptance by Underwriters of satisfactory proof of interest and loss.

(Exhibit 3 at HRCD0063005).

20.    The Lloyds Policies, which the Interstate Policies follow in form, define

"occurrence" as follows in SECTION II - DEFINITIONS:

> The term "occurrence" wherever used herein shall mean
> an accident or a happening or event or a continuous or
> repeated exposure to conditions which unexpectedly and
> unintentionally results in personal injury, or damage to
> property during the policy period. All such exposure to
> substantially the same general conditions existing at or
> emanating from one location shall be deemed one
> occurrence.

(Exhibit 3 at HRCD0062998).

21.    Neither the Interstate nor the Lloyds policies define the term "proof of

interest or loss." (Sons).

22.    Interstate did not participate in the defense of the Archdiocese in any of

these Underlying Claims. (Sons, John Sitarz)

23.    The Interstate Policies provide that insureds are required to comply with

all of the terms of the policies as a condition precedent to coverage, and provide, in

PART V. - CONDITIONS, 3. Action Against Company:

> No action shall lie against the company unless, as a
> condition precedent thereto, the insured shall have fully
> complied with all the terms of this policy.

(Exhibit 2)

24.    The Lloyds Policies, to which the Interstate Policies follow form,

provide, at SECTION IV, GENERAL CONDITIONS, 3. INSPECTIONS, AUDITS, AND

VERIFICATIONS OF VALUES:

> Underwriters or their duly authorized representatives shall
> be permitted at all reasonable times during the
> continuance of this Insurance to inspect the premises
> used by the Assured and to examine the Assured's book
> or records so far as they relate to coverage afforded by
> this Insurance.

(Exhibit 3 at Section IV, ¶ 3 (HRCD0063003)).

25.     The Lloyds Policies further provide at SECTION IV, GENERAL

CONDITIONS, ¶4. RECORDS provides "[i]t is hereby understood and agreed that the

records and books as kept by the Assured shall be acceptable to Underwriters in

determining the amount of loss or damage covered hereunder." (Exhibit 3 at Section

IV, ¶ 4 (HRCD0063003)).

26.     The Lloyds Policies, which the Interstate Policies follow in form, contain

an Assault and Battery Exclusion, which provides:

> THIS INSURANCE DOES NOT APPLY –
>
> (a)     to liability of any Assured for assault and battery
> committed by or at the direction of Such Assured except
> for Personal Injury or Death resulting from any act alleged
> to be assault and battery for purpose of preventing injury
> to persons or damage to property; . . .

(Exhibit 3 at Section II(a) (HRCD0062998)

27.     Mary Casey was the Interstate claims handler responsible for the

Archdiocese's claims until 2006. (Sons).

28.     In 2006, Deborah Sons took over as the Interstate claims handler.

(Sons).

29.     Interstate uses outside counsel on its sexual misconduct claims to

assist its claims handlers. (Sons).

30.  At all relevant times, Interstate's lead national oversight counsel on the sexual misconduct claims has been Timothy McNamara of the Onebane Law Firm. (Sons).

31.  In addition, Interstate engages local counsel to assist its claims handlers on sexual misconduct claims.  (Sons).

32.  Until 2006, that local counsel for the Archdiocese of Hartford claims was Morrison, Mahoney and Miller.  (Sons, Sitarz).

33.  In 2006, Mark Darling of Litchfield Cavo became that local counsel. (Exhibit 94, Mark Darling, Sons, Sitarz).

Prior Claims

34.  Over a number of years, claims for damages have been asserted against the Archdiocese in which the claimant alleged sexual abuse by priests of the Archdiocese, and various claims against the Archdiocese.  Attorney John Sitarz of the law firm Cooney, Scully and Dowling defended those claims against the Archdiocese which are at issue in this litigation.  (Sitarz).

35.  On March 15, 2006, the Archdiocese, through its attorney, Mr. Sitarz, received a letter from Attorney Cindy L. Robinson advising of four individuals who were claiming to have been sexually abused as children by priests within the Archdiocese of Hartford.  Two of those claimants, EGC and CL, claimed to have been abused by Father Ivan Ferguson.  (Sitarz, Exhibit 60).

36.    Both EGC and CL claimed to have been abused in and around 1979 to 1980, when EGC was about 10 years old and CL was approximately 13 years old. (Id.).

37.    The Archdiocese, through its attorney, Mr. Sitarz, notified Lloyds, Gallagher Bassett, Interstate, and Atlantic Mutual/Centennial Insurance Company ("Atlantic Mutual") of the claims by way of letter dated March 27, 2006, enclosing the letter from EGC and CL's counsel.  (Id.).

38.    On April 10, 2006, Interstate responded to the notification of the EGC claim by advising the Archdiocese of potentially applicable coverage issues and its reservation of rights in some of those issues.  Interstate specifically stated that it was not denying coverage.  (Darling, Exhibit 61).

39.    On January 8, 2007, Mr. Sitarz sent Gallagher Bassett, with copies to Lloyds, Interstate, and the other carriers, a copy of his interview report of EGC.  The interview confirmed an alleged abuse date of 1979.  (Sitarz, Exhibit 62).

40.    On July 24, 2008, Mark Darling, counsel for Interstate, requested the following information:

> 1.    A list of all pending Hartford Diocese clergy abuse claims or suits for which the Diocese is seeking indemnification from Interstate, including the dates when any such matters have been scheduled for trial and the name(s) of the priests who are alleged to have committed abuse in the matter, and all underlying discovery materials and pleadings for each matter, or if only in a claim stage, all documents, correspondence, statements and any other documents in each claim file;

2.      The history of settlements and/or trial results in Diocese clergy abuse claims for the past ten (10) years, including the amount of the result, a full description of the nature and frequency of the abuse, and the name of the accused abusers (whether involving IFC coverage periods or not);

3.      The entire personnel file of Fr. Foley, Fr. Ferguson, John Brooks, Fr. Paturzo, Msgr. Lacey, Fr. Perrault, Joseph Rozint, Fr. Primavera and Fr. Shines. These requests include, but should not be limited to, any and all records of any complaints made against each person, and disciplinary warnings or actions taken against each person, any transfers, any psychiatric and/or psychological evaluations of each person, and any other document relating to each such individual contained in any record of the Archdiocese;

4.      The entire "secret archives" file(s) relating to any of the above -named individuals, including all notes, correspondence or documents of whatever nature made or received by any Bishop or priest of the Archdiocese relating to any individual accused of sexual abuse from 1940 to the present.

5.      Any and all deposition transcripts, answers to interrogatories or statements from any of the individuals listed in paragraph 3 from any claim or suit.

(Darling, Exhibit 66).

41.     The Archdiocese ultimately settled the EGC case for $325,000.

(Darling, Sitarz, Exhibit 626).

42.     On September 25, 2008, Mr. Sitarz left this voicemail for Mr. Darling:

Mark, its Jack Sitarz calling on Tuesday the 23rd  - it's a little before 2  - sorry it took me so long to get back to you especially on the Cerritelli claim  - as a matter of fact um in the meantime I did finally have to pull the trigger on the 325 settlement so I wanted to let you know that but um I had ended up playing telephone tag with my guy over at the chancellery office, the finance man, um and it was to

much pressure being brought to bear by the claimant's attorney so I did pull the trigger um on that um and I just didn't think it would be worth it to anybody on our side to have that be put into suit and then word has been around the country is that when these things hit the press there are more that tend to come out of the woodwork so in any event I did seal it off at 325  - I finally did speak to the finance guy about the dilemma that you and I have been talking about and he is as frustrated by all of that as you and I are that is our inability to provide everything that your company would like us to provide in order to resolve some of these coverage concerns and but I did explain to him that this is the dilemma that you and I are facing at the moment  - - having understood that I think he made a proposal which I'll simply pass along to you which was that he would be willing to compromise your contribution at a level of 50% — I had originally suggested 60 which you've indicated is not going to fly  - he'll go along with 50% recognizing that we're presently unable if you will to give the company everything that it wants to receive in terms of review for the reasons that you and I have discussed which seem legitimately real especially when you put it into the context of these lawyers that we're dealing with down here and there discovery aggressiveness um and um so let me know if you can recommend that —if you think that that will fly but you did mention that to me so I pass it on to you  - incidentally, in the meantime I was able to pick off another one of these claims that's on your list I think  - it's the Decrosta claim for a total sum of $90,000.00 which obviously gets nowhere near your limits so although the settlement papers haven't yet been even drawn up let alone executed  - we do have an agreement to resolve that one at that low level so I will continue to use my best efforts to try to pick these off for as little money as I can but get back to me on Cerritelli case if you will I would appreciate it um if . . . .

(Darling, Sitarz, Exhibit 626).

43.    On August 31, 2009, Mr. Sitarz, on behalf of the Archdiocese, agreed to

settle the EGC, CL, and WN Claims at fifty percent with Interstate.  Interstate

reimbursed the Archdiocese for that fifty percent in May, 2010. (Darling, Exhibits 71, 72 and 73).

The JA Claim

44.    On May 30, 2008, JA's attorney sent a demand letter to Mr. Sitarz, the Archdiocese's counsel, alleging that JA had been sexually abused on multiple occasions by Fr. Robert Ladamus while attending St. Mary's Church and School in Milford, CT . (Sitarz, Exhibit 7).

45.    The "RE" line of the May 2008 JA Demand Letter stated "JA v. Archdiocese of Hartford, et al." (Id.).

46.    The Archdiocese, through Mr. Sitarz, notified Gallagher Bassett of this new claim alleging "abuse" by way of a letter dated June 5, 2008, enclosing the letter received from JA's counsel. Copies of Mr. Sitarz's June 5, 2008 letter were sent to Lloyds, Atlantic Mutual, Interstate, and Gallagher Bassett. (Sons, Exhibit 7).

47.    On August 18, 2008, Interstate responded to the notification of the JA claim by advising the Archdiocese of potentially applicable coverage issues and its reservation of rights in some of those issues. Interstate specifically stated that it was not denying coverage. (Sons, Exhibit 75).

48.    Based upon the allegations in the Demand Letter, Interstate opened claims files for three policy periods:  9/l/80 -9/1/81; 9/1/81 -9/1/82; and 9/1/82 -9/1/83. (Sons, Exhibit 75, 644, and 645).

49.    On June 17, 2010, Edward Ryan of Gallagher Bassett emailed Mr. Sitarz asking if the claimant had been interviewed yet, and requesting a detailed

report related to that interview.  Mr. Ryan also inquired if anyone else had been interviewed to date, the results of those interviews, and what settlement figures were proposed.  (Sitarz, Exhibit 191).

50.     On August 16, 2010, Mr. Sitarz sent Gallagher Bassett, with copies to Interstate and Atlantic Mutual, a copy of his interview summary for the August 12, 2010 interview of JA. (Sitarz, Exhibit 190).

51.     On August 20, 2010, Mr. Sitarz responded to Mr. Ryan's June 17, 2010 email, with copies to the carriers, advising that the claimant had been interviewed on August 12, 2010, and that no other interviews had taken place.  Mr. Sitarz stated that he had requested additional treatment records, and that he would provide an update after he heard back from JA's attorney.  (Sitarz, Exhibit 191).

52.     On October 20, 2010, Ms. Sons emailed Mr. Ryan of Gallagher Bassett. She noted that based upon the interview summary provided by Mr. Sitarz, it "appears this abuse occurred over a longer period of time than originally reported."  She further noted that although the Archdiocese initially reported that the abuse began in 1981 or 1982, it appeared from the interview that the abuse continued until the summer of 1985.  (Sons, Exhibit 678).

53.     On October 21, 2010, Mr. Ryan forwarded on Ms. Sons' email regarding the policy periods to Mr. Sitarz, asking whether Mr. Sitarz agreed with the analysis.  Mr. Sitarz responded that it was difficult to determine when the alleged sexual abuse occurred versus the times when the priest simply acted "weird."  He stated that it appeared the abuse was either in 1984 or 1985 but that additional

clarification was needed on the dates. Mr. Ryan forwarded on this response to Ms. Sons on October 22, 2010. In response, Ms. Sons asked what "acting weird" meant, and advised that she needed more clarification regarding when Mr. Sitarz was going to obtain additional information and how; whether depositions were scheduled; and whether "acting weird" was part of the grooming process. (Sitarz, Sons, Exhibit 678).

54.     On December 2, 2010, Mr. Sitarz emailed Lloyds, Atlantic Mutual, and Interstate, with a copy to Gallagher Bassett, advising that he had just spoken with JA's counsel about the possibility of settling the claim. Mr. Sitarz stated that both parties had agreed to take another look at the claim, and then speak again next week. (Sitarz, Exhibit 658).

55.     On December 29, 2010, Ms. Sons emailed Mr. Sitarz, with copies to Gallagher Bassett, Lloyds, Atlantic Mutual, Ms. Adams, and Mr. Smith, regarding his December 2, 2010 email, and asked if any further negotiations took place. On January 13, 2011, Mr. Sitarz responded to just Ms. Sons, stating that there not been anything but that he suspected that there would be some further discussions in the future. (Sitarz, Sons, Exhibit 658).

56.     A year later, on January 12, 2012, Mr. Hanson of Gallagher Bassett emailed Mr. Sitarz, noting that that he had not seen a status report on the JA Claim in a while. Mr. Hanson requested that Mr. Sitarz review the file and provide a status report. (Sitarz, Exhibit 683).

57.     On January 19, 2012, Mr. Sitarz emailed the carriers and Gallagher Bassett reporting that he had engaged in settlement discussions "for many months

now," and that he had just received JA's "rock bottom, non -negotiable settlement figure of $299,000," which Mr. Sitarz was recommending. Ms. Sons responded via email on January 26, 2012, stating that there were five polices triggered based upon the prior reporting of the claim, and not just one. (Sitarz, Exhibit 684)

58.    On January 19, 2012, Ms. Metz of Lloyds also responded to Mr. Sitarz's email regarding settlement, noting that she had reviewed the file and there appears to be some question regarding the dates of abuse and the policy period triggered. Ms. Metz noted that prior to Mr. Sitarz's email, they had not heard anything regarding this claim since 2010. Ms. Metz requested that Mr. Sitarz confirm when the sexual abuse occurred and also provide information about what transpired in this case between December of 2010 and his recent discussions with plaintiff's counsel. (Sitarz, Exhibits 195 and 685).

59.    On February 14, 2012, Mr. Sitarz responded to this email, advising that the claim had now been settled, and that it was "his understanding from the claimant that the actual sexual molestation occurred either in the summer of 1984 or the summer of 1985." Mr. Sitarz stated that he would follow up with plaintiff's counsel regarding the issue. Mr. Sitarz sent a similar email to Ms. Sons regarding the claimed dates of loss that same day. (Sitarz, Exhibits 195 and 685).

60.    On February 15, 2012, JA signed a general release, whereby JA agreed, in exchange for $299,000, to "release and forever discharge The Hartford Roman Catholic Diocesan Corporation ("Archdiocese of Hartford") and all of its past, present and future Archbishops, Bishops, Auxiliary Bishops, Priests, including but not

limited to Rev. Robert Ladamus, . . . , from any and all manner of liability . . . in any way connected with certain alleged incidents of clergy sexual misconduct and assaults allegedly occurring in the State of Connecticut in and about the 1980's." (Sitarz, Sons, Exhibit 8).

61.     Fr. Ladamus was specifically named in the release.  (Sitarz, Sons, Exhibit 8).

62.     On February 17, 2012, Mr. Sitarz emailed Lloyds and Interstate, with copies to Gallagher Bassett, attaching the copy of the executed General Release. Mr. Sitarz stated that he had inquired further about the timing of the sexual abuse, and would provide an update when he heard back from JA's counsel.  (Sitarz, Exhibit 659).

63.     On March 13, 2012, Mr. Sitarz emailed JA's counsel to inquire whether "the trip to Florida during which the explicit sexual misconduct took place occurred most likely during the summer of 1984 or summer 1985."  (Sitarz, Exhibit 599).

64.     On March 19, 2012, Mr. Sitarz wrote to Gallagher Bassett, with copies to Lloyds, Guaranty Fund Management Services, Interstate, Mr. Byrne, and Mr. Tucker, advising that the settlement check had been mailed and requesting that the settlement be processed.  Mr. Sitarz also noted that he had asked JA's attorney to confirm in an email that the sexual assault likely occurred in the summer of 1985. (Sitarz, Exhibit 661).

65.    The Archdiocese defended the JA Claim and incurred defense expenses of $6,805.00.  (Byrne, Sitarz, Exhibit 113)  Interstate 56a(2) Statement at 34.

66.    Those defense costs were reasonable.

67.    Mr. Sitarz informed the insurers that the Archdiocese had settled the JA Claim and paid the settlement amount to JA and his attorneys on or about March 16, 2012.  (Sitarz, Exhibit 9).

68.    The total amount paid by the Archdiocese on the JA claim was $305,805.00.  (Byrne, Sitarz, Exhibit 177).

69.    As of November 2012, Interstate had not affirmed or denied coverage on the JA Claim.  (Sons)

70.    Interstate has not reimbursed the Archdiocese for the JA Claim.  (Sitarz, Byrne).

71.    After in camera review by this Court, the Archdiocese produced certain documents ordered by the Court from Ladamus' personnel file and Review Board file on July 2, 2014.

The KS Claim

72.    On October 15, 2007, KS's attorney sent a demand letter to Sitarz, alleging that KS had been sexually abused by Fr. Stephen Crowley during the 1981-82 school year at St. Francis of Assisi School.  (Sons, Exhibit 11).

73.    The "RE" line of the October 15, 2007, KS Demand Letter stated "[KS] v. Archdiocese of Hartford, et al."  (Sons, Exhibit 11).

74.     On October 31, 2007, the Archdiocese, through Mr. Sitarz, notified Gallagher Bassett, with copies to Interstate and other insurers, of a "new, clergy sexual-abuse claim" by enclosing the letter received from KS's counsel.  (Sons, Exhibit 11).

75.     On November 6, 2007, Mr. Sitarz sent a letter to Gallagher Bassett, with copies to Lloyds, Atlantic Mutual, Interstate, and Gallagher Bassett, providing copies of KS's school records indicating that KS only attended the St. Francis of Assisi School from fall of 1981 to spring of 1982.  (Sitarz, Exhibit 30).

76.     KS only was at the St. Francis School where the alleged abuse occurred during the 1981-82 school year.  (Exhibits 30, 31).

77.     Mr. Sitarz informed the insurers that the alleged conduct occurred during the September 1, 1981-September 1, 1982 policy period.  (Exhibits 15, 30, 31, Sitarz).

78.     On December 3, 2007, Interstate responded to the notification of the KS claim, with a copy to Gallagher Bassett, by advising the Archdiocese of potentially applicable coverage issues and its reservation of rights on some of those issues. Interstate specifically stated that it was not denying coverage.  (Sons, Exhibit 76).

79.     On April 10, 2008, Mr. Sitarz interviewed KS regarding his claim. (Sitarz, Exhibit 31).

80.     On April 15, 2008, Mr. Sitarz forwarded his summary of his interview of KS to Gallagher Bassett with copies to Gallagher Bassett, Lloyds, Atlantic Mutual, and Interstate.  (Id.).

81.     On April 21, 2008, Ms. Sons from Interstate emailed Gallagher Bassett and Mr. Sitarz seeking additional details on claimant KS, including verifying his date of birth and when his family joined the parish at issue. (Witnesses: Sons, Hanson; Trial Exh. 639)

82.     On December 2, 2008, Interstate's counsel Kathleen Adams emailed Mr. Sitarz with a list of claim materials that Interstate wanted to review, including KS. (Adams, Sitarz, Exhibit 12).

83.     On December 9, 2008, Mr. Sitarz wrote to Gallagher Bassett enclosing a copy of KS's First Communion Record. Copies were provided to Gallagher Bassett, Lloyds, Atlantic Mutual, and Interstate. (Sitarz, Exhibit 649)

84.     On December 22, 2008, Mr. Sitarz sent Ms. Adams copies of certain records from his files regarding the KS claim. Mr. Sitarz noted in a cover letter that he was excluding documents he claimed were protected as work product or attorney client privilege. (Sitarz, Exhibit 13).

85.     On September 15, 2009, Mr. Sitarz wrote to Gallagher Bassett enclosing copies of KS's medical records. Copies were provided to Interstate, Lloyds, and Atlantic Mutual. (Sitarz, Exhibit 545).

86.     On March 19, 2010, Gallagher Bassett wrote to Mr. Sitarz and stated: "I am also waiting for updates on all the Hartford Claims. Edward Ryan is giving 5 days for a response to him." Mr. Sitarz responded regarding a number of claims, including KS. Gallagher Bassett then forwarded that information to Lloyds, Atlantic Mutual, and Interstate. (Sitarz, Exhibit 675)

87.     On May 5, 2010, Mr. Sitarz wrote to Gallagher Bassett enclosing additional copies of KS's medical records.  Copies were provided to Gallagher Bassett, Lloyds, Atlantic Mutual, and Interstate.  Mr. Sitarz noted in his letter that he was planning to speak with KS's attorney on May 14, 2010, to begin to discuss the settlement of the claim.  (Sitarz, Exhibit 551).

88.     On May 28, 2010, Ms. Adams, acting as counsel for Interstate, emailed Mr. Sitarz and stated:  "It's my understanding that settlement negotiations are underway in relation to [the KS] claim. I have limited information regarding this claim. Do you believe that this claim will implicate [Interstate's] coverage? If so would you be able to provide me with additional information regarding the nature of the allegations, the nature of the alleged injuries, your evaluation, and the status of settlement negotiations."  (Sitarz, Exhibit 322)

89.     On September 30, 2010, Mr. Sitarz emailed the insurance carriers, including Interstate, to advise that the KS claim had been settled.  (Adams, Sitarz, Exhibit 251).

90.     On October 5, 2010, KS signed a general release, whereby KS agreed, in exchange for a settlement amount of $295,000, to "release and forever discharge The Hartford Roman Catholic Diocesan Corporation ("Archdiocese of Hartford") and all of its past, present and future Archbishops, Bishops, Auxiliary Bishops, Priests, including but not limited to Rev. Stephen Crowley, . . . , from any and all manner of liability . . . in any way connected with certain alleged incidents of clergy sexual

misconduct and assaults allegedly occurring in the State of Connecticut in and about the fall of 1981 to the Spring of 1982." (Sitarz, Exhibit 14).

91.    Fr. Crowley was specifically named in the release. (Sitarz, Exhibit 14).

92.    On December 20, 2010, Mr. Sitarz emailed Lloyds, Atlantic Mutual, and Interstate attaching a copy of the executed release in the KS claim, and stating that he would let them know when the settlement check was sent to plaintiff's counsel. (Sitarz, Exhibit 15).

93.    On February 18, 2011, Mr. Sitarz emailed Gallagher Bassett, with copies to Lloyds, Atlantic Mutual, and Interstate, stating that the settlement check to the KS's counsel had been sent on January 26th, 2011, and providing information regarding the amount of the fees and expenses to date. Mr. Sitarz requested that Gallagher Bassett "proceed to collect the insurance reimbursement on this claim." (Sitarz, Exhibit 16).

94.    On May 22, 2012, Mr. Sitarz emailed Mr. Hanson of Gallagher Bassett to inquire whether Gallagher Bassett had sought collection on outstanding claims that extended into Interstate's layer, including the KS claim. (Exhibit 98; Sitarz, Hanson).

95.    The Archdiocese defended the KS Claim and incurred defense expenses of $11,774.75. (Exhibit 175, Sitarz, Byrne).

96.    Those defense costs were reasonable.

97.    The total amount paid by the Archdiocese on the KS Claim was $306,774.75. (Exhibit 178, Byrne).

98.     As of November 2012, Interstate had not affirmed or denied coverage on the KS Claim.  (Sons).

99.     Interstate has not reimbursed the Archdiocese for the KS Claim. (Sitarz, Byrne).

<u>The Richard Mallory Case</u>

100.    On July 25, 2006, Richard Mallory's attorney sent a demand letter to Mr. Sitarz, claiming that Richard Mallory had been abused from November 1977 to October 1978 by Fr. Ivan Ferguson.  (Sons, Exhibit 17).

101.    The Archdiocese, through its attorney, Mr. Sitarz, notified Gallagher Bassett, Lloyds, Atlantic Mutual, and Interstate of "a new sexual abuse claim on behalf of Richard Mallory" by way of a letter dated August 30, 2006, enclosing the July 25, 2006 letter from Richard Mallory's counsel.  (Sitarz, Exhibit 17).

102.    On September 12, 2006, Interstate responded to the notification of the Richard Mallory claim by advising the Archdiocese of potentially applicable coverage issues and its reservation of rights on some of those issues.  Interstate specifically stated that it was not denying coverage.  (Sons, Exhibit 79).

103.    On February 7, 2007, Mr. Sitarz wrote a letter to Gallagher Bassett, with copies to Gallagher Bassett, Lloyds, Atlantic Mutual, and Interstate, advising that he had interviewed Richard Mallory and attaching a copy of his interview summary. (Sitarz, Exhibit 528).

104.    On or about February 21, 2007, Richard Mallory's counsel sent a demand letter for $3 million.  (Exhibit 15, Sitarz).

105.    On May 17, 2007, Ms. Sons emailed Mr. Sitarz, and requested an update on several outstanding claims, including Richard Mallory.  (Sons, Exhibit 637).

106.    On May 29, 2007, Mr. Sitarz responded to Ms. Sons email, advising that mediation had been scheduled for Richard Mallory on May 31, 2007.  (Id).

107.    On October 7, 2007, Richard Mallory filed a two-count Complaint against the Archdiocese, alleging negligence and reckless and wanton conduct. (Sitarz, Exhibit 19).

108.    On December 2, 2008, Interstate's counsel Kathleen Adams emailed Mr. Sitarz, requesting information on a number of claims, including Richard Mallory, and attempted to set up a time to review files at Mr. Sitarz's office.  (Adams, Exhibit 12).

109.    On December 22, 2008, Mr. Sitarz sent Ms. Adams copies of certain records from his files regarding the Richard Mallory claim.  Mr. Sitarz noted in a cover letter that he was excluding documents he claimed were protected as work product or attorney client privilege.  (Sitarz, Exhibit 13).

110.    On February 24, 2009, the trial court ruled on the Archdiocese's Motion for Protective Order in the Richard Mallory suit, and issued an Order regarding the dissemination of information.  The order provided that until further order of the court, "all information, documents and transcripts which the parties may obtain from or through discovery addressed to the Defendant or its representatives shall not be disseminated, shown, disclosed, divulged or transmitted to any person or organization other than the parties to this lawsuit and their attorneys and to any other

person, disclosure to whom is necessary for that party or attorney to prepare for the trial of this case." (Sitarz, Exhibits 81).

111.    On March 11, 2009, Richard Mallory's filed his responses to the defendant's interrogatories. (Sons, 540).

112.    On June 19, 2009, Mr. Sitarz forwarded copies of Richard Mallory's May 29, 2009 supplemental compliance with the Archdiocese's Request for Interrogatories and Production to Gallagher Bassett with copies to Gallagher Bassett, Lloyds, Atlantic Mutual, and Interstate. (Sons, 541).

113.    On February 16, 2010, the Archdiocese filed a privilege log in the Richard Mallory case, asserting canon law confidentiality privilege and clergy confidential communications privilege on many of Fr. Ferguson's files. (Sitarz, Exhibit 82 and 618).

114.    On February 16, 2010, Mr. Sitarz wrote to Gallagher Bassett, with copies to Gallagher Bassett, Lloyds, Atlantic Mutual, and Interstate, attaching copies of the plaintiff's expert disclosures. (Sons, Exhibit 652).

115.    On August 4, 2010, the Archdiocese reached a settlement with Richard Mallory whereby, in exchange for $775,000, Richard Mallory signed a general release and agreed to "release and forever discharge The Hartford Roman Catholic Diocesan Corporation ("Archdiocese of Hartford") and all of its past, present and future Archbishops, Bishops, Auxiliary Bishops, Priests, including but not limited to Rev. Ivan Ferguson, . . . , from any and all manner of liability . . . including but not limited to all matters arising out of or relating to alleged sexual misconduct as alleged in a

certain civil action entitled: Richard Mallory v. The Hartford Roman Catholic Diocesan Corporation . . . ." (Sitarz, Exhibit 20).

116. Richard Mallory filed a withdrawal of the lawsuit on August 5, 2010. (Exhibit 21, Sitarz).

117. Mr. Sitarz provided the release and the withdrawal to Gallagher Bassett with copies to Interstate and the other insurers on August 25, 2010. He also reported that the check had been sent to the plaintiff that day. Mr. Sitarz asked Gallagher Bassett to "kindly proceed to obtain the full (100%) insurance reimbursement for the Archdiocese." (Exhibit 22, Sitarz).

118. On March 22, 2011, Mr. Sitarz emailed Gallagher Bassett, with copies to Lloyds, Atlantic Mutual, and Interstate, requesting an update on the reimbursement of a number of claims. (Sitarz, Exhibit 242).

119. On May 22, 2012, Mr. Sitarz emailed Mr. Hanson of Gallagher Bassett to inquire whether Gallagher Bassett had sought collection on outstanding claims that extended into Interstate's layer, including the Richard Mallory Claim. (Exhibit 98; Sitarz, Hanson).

120. On June 25, 2012, Interstate's outside counsel, Mark Darling, sent a letter to Mr. Sitarz and Seth Tucker, the Archdiocese's coverage counsel, captioned "Richard Mallory v. Archdiocese of Hartford." (Sitarz, Darling, Exhibit 84).

121. In the June 25, 2012 letter, Interstate outlined the following documents that it was still specifically seeking from the Archdiocese in order to evaluate coverage:

1. The entire personnel file of Fr. Foley, Fr. Ferguson, John Brooks, Fr. Paturzo, Msgr. Lacey, Fr. Perrault, Joseph Rozint, Fr. Primavera and Fr. Shiner. These requests include, but should not be limited to, any and all records of any complaints made against each person, and disciplinary warnings or actions taken against each person, any transfers, any psychiatric and/or psychological evaluations of each person, and any other document relating to each such individual contained in any record of the Archdiocese;

2. The entire "secret archives" file(s) relating to any of the above -named individuals, including all notes, correspondence or documents of whatever nature made or received by any Bishop or priest of the Archdiocese relating to any individual accused of sexual abuse from 1940 to the present;

3. Any and all deposition transcripts, answers to interrogatories or statements from any of the individuals listed in paragraph 1 from any claim or suit. In addition, to the extent not previously produced, we request the following information and materials:

    1. A list of all pending Hartford Diocese clergy abuse claims or suits for which the Diocese is seeking indemnification from Interstate, including the dates when any such matters have been scheduled for trial and the name(s) of the priests who are alleged to have committed abuse in the matter, and all underlying discovery materials and pleadings for each matter, or if only in a claim stage, all documents, correspondence, statements and any other documents in each claim file; and

    2. The history of settlements and/or trial results in Diocese clergy abuse claims for the past ten (10) years, including the amount of the result, a full description of the nature and frequency of the abuse, and the name of the accused abusers (whether involving [Interstate] coverage periods or not)

(Darling, Exhibit 84).

122.　On July 6, 2012, Mr. Tucker replied via letter to Interstate's June 25, 2012 letter, and offered an opportunity to view select documents in the Richard Mallory litigation file.　Mr. Tucker advised that the files would need to be reviewed by defense counsel beforehand to remove attorney -client privileged materials and attorney work product. Mr. Tucker maintained that the documents available for review would not include personnel files, and that it would violate Connecticut law for the Archdiocese to provide them.　(Tucker, Exhibit 77).

123.　The Archdiocese previously provided Interstate, Gallagher Bassett, and Lloyds copies of Father Foley's personnel file on September 16, 2003, in connection with the John Doe case, and Father Crowley's personnel file on April 24, 2004, in connection with the ML case.　(Sitarz, Exhibit 522, 524, 525).

124.　On October 1, 2012, Mr. Darling responded to Mr. Tucker's July 6, 2012 letter.　(Darling, Exhibit 78).

125.　On November 9, 2012, Mr. Darling wrote to Mr. Tucker regarding the documentation for the claims against the Archdiocese, including the Richard Mallory claim.　(Darling, Tucker, Exhibit 236).

126.　On November 12, 2012, Mr. Tucker responded to Mr. Darling's October 1, 2012 letter and his November 9, 2012 letter.　(Tucker, Exhibit 234).

127.　The Archdiocese defended the Richard Mallory claim and incurred defense expenses of $96,931.　(Exhibit 175, Sitarz, Byrne).

128.　Those defense costs were reasonable.

129.     The total amount paid by the Archdiocese on the Richard Mallory claim was $871,931.  (Byrne).

130.     The abuse alleged in the Richard Mallory Claim occurred in the first Interstate policy period, September 1, 1978-September 1, 1979 and a prior year of insurance (September 1, 1977-September 1, 1978) in which the second layer excess insurance carrier was Midland Insurance Company.  (Exhibit 1, Byrne).

131.     As of November 2012, Interstate had not affirmed or denied coverage on the Richard Mallory Claim.  (Sons).

132.     Interstate has not reimbursed the Archdiocese on the Richard Mallory Claim.

The Matthew Doe Case

133.     On or about May 28, 2008, a plaintiff using the pseudonym "Matthew Doe," filed suit in Connecticut Superior Court, detailing the sexual abuse Matthew Doe claimed to have suffered at the hands of Fr. Ivan Ferguson, and alleging mental and physical harm as a result of the Archdiocese's negligent and reckless failures to protect him (the "Matthew Doe Case").  (Exhibit 23,  Sitarz).

134.     The two-count Complaint alleged negligence and reckless and wanton conduct.  (Sitarz, Exhibit 23).

135.     On June 27, 2008, Mr. Sitarz, on behalf of the Archdiocese, sent a copy of the complaint to Gallagher Bassett with copies to Interstate and the other insurers.  (Exhibit 23, Sitarz).

136.    Matthew Doe alleged in his complaint that he had been abused from the Summer of 1981 to the Fall of 1982, implicating the September 1, 1980-September 1, 1981, September 1, 1981-September 1, 1982 and September 1, 1982-September 1, 1983 policy periods.  (Exhibit 23).

137.    In May 2008, Matthew Doe's childhood best friend also brought suit against the Archdiocese, using the pseudonym Jacob Doe, and making similar allegations.  Jacob Doe v. Hartford Roman Catholic Diocesan Corp., Superior Court, Judicial District of Waterbury, Docket No. CV085010702S ("Jacob Doe suit").  In that case, Matthew Doe was referred to as "R," which is the first initial of his surname. (Sitarz).

138.    On July 31, 2008, Mr. Sitarz wrote to Gallagher Bassett, with copies to Interstate, Lloyds, and Atlantic Mutual, enclosing a copy of the sacramental records of Matthew Doe.  (Sitarz, Exhibit 674).

139.    On August 22, 2008, Interstate responded to the notification of the Matthew Doe claim by advising the Archdiocese of potentially applicable coverage issues and its reservation of rights on some of those issues.  Interstate specifically stated that it was not denying coverage.  (Sons, Exhibit 85).

140.    On February 24, 2009, the trial court ruled on the Archdiocese's Motion for Protective Order in the Matthew Doe suit, and issued an Order regarding the dissemination of information.  The order provided that until further order of the court, "all information, documents and transcripts which the parties may obtain from or through discovery addressed to the Defendant or its representatives shall not be

disseminated, shown, disclosed, divulged or transmitted to any person or organization other than the parties to this lawsuit and their attorneys and to any other person, disclosure to whom is necessary for that party or attorney to prepare for the trial of this case." (Sitarz, Exhibits 86, 87).

141. On February 24, 2009, an identical Protective Order and identical Order regarding the dissemination of information were entered by the Court in the Jacob Doe case. (Sitarz, Exhibits 88, 89).

142. On October 15, 2010, Matthew Doe provided Supplemental Compliance with the Defendant's Request for Interrogatories and Requests for Production. (Sitarz, Sons, Exhibit 560)

143. On June 20, 2011, Mr. Sitarz emailed Lloyds and Interstate, with a copy to Gallagher Bassett, to advise that Matthew Doe's counsel was demanding $2 million. Mr. Sitarz wrote that he was planning on filing a defense offer of judgment for $450,000, and reminded the carriers that jury selection was scheduled to start on January 31, 2012. (Sitarz, Sons, Exhibit 570).

144. On September 30, 2011, Mr. Sitarz wrote to Gallagher Bassett, with copies to Gallagher Bassett, Lloyds, Interstate, and Atlantic Mutual, advising that the Archdiocese had received "postcard" notices from the court denying the Archdiocese's motions for summary judgment. (Sitarz, Exhibit 579).

145. On November 29, 2011, Mr. Sitarz emailed Gallagher Bassett, with copies to Lloyds, Atlantic Mutual, and Interstate, and attached a copy of his summary of the November 7 deposition of Fr. Doyle. Mr. Sitarz also informed them that there

"has been no indication that the plaintiffs wish to settle these claims," and that the Jacob Doe case was scheduled for jury selection on January 10, 2012, with the Matthew Doe case following right behind. (Sitarz, Exhibit 584).

146. On December 6, 2011, as the Jacob Doe case approached trial, Ms. Adams, Interstate's counsel, emailed Mr. Sitarz asking to review the Matthew Doe and Jacob Doe files. (Darling, Sitarz, Adams, Exhibit 92).

147. Mr. Sitarz allowed Ms. Adams to come to his office and Interstate's counsel had an opportunity to review documents from the Ferguson Canon 489 files and personnel files that had been produced to the plaintiffs in the Matthew Doe and Jacob Doe cases. (Darling, Adams, Sitarz).

148. On December 27, 2011, Mr. Sitarz provided Lloyds, Atlantic Mutual, Interstate, and Gallagher Bassett a copy of his memorandum summarizing the deposition testimony of Dr. Grove, the plaintiff's treating psychiatrist. (Sitarz, Exhibit 589).

149. On December 29, 2011, Mr. Sitarz wrote to Mr. Hanson of Gallagher Bassett, with copies to Gallagher Bassett, Lloyds, Interstate, and Atlantic Mutual to provide a "pre -trial evaluation" of Jacob Doe and Matthew Doe. In his report, Mr. Sitarz characterized these cases as "second generation" Fr. Ferguson claims, as these cases arose "after notice of sexual abuse by [Fr.] Ferguson was received by Archbishop Whealon in March of 1979." (Sitarz, Exhibit 590).

150. Mr. Darling's January 6, 2012 letter requested the following materials:

1. The entire personnel file of Fr. Foley, Fr. Ferguson, John Brooks, Fr. Paturzo, Msgr. Lacey, Fr. Perrault, Joseph Rozint, Fr. Primavera and Fr. Shiner. These requests include, but should not be limited to, any and all records of any complaints made against each person, and disciplinary warnings or actions taken against each person, any transfers, any psychiatric and/or psychological evaluations of each person, and any other document relating to each such individual contained in any record of the Archdiocese;

2. The entire "secret archives" file(s) relating to any of the above -named individuals, including all notes, correspondence or documents of whatever nature made or received by any Bishop or priest of the Archdiocese relating to any individual accused of sexual abuse from 1940 to the present.

3. Any and all deposition transcripts, answers to interrogatories or statements from any of the individuals listed in paragraph 3 from any claim or suit.

(Darling, Exhibit 95).

151.  On January 9, 2012, Mr. Tucker responded to Mr. Darling's January 6, 2012 letter.  (Tucker, Exhibit 231).

152.  The *Jacob Doe* case went to trial starting in January 2012, and, on February 10, 2012, the jury returned a verdict of $1 million in compensatory damages.  In so doing, the jury found, by a preponderance of the evidence, that the Hartford Roman Catholic Diocesan Corporation was negligent.  Moreover, the jury also found, by a preponderance of the evidence, that the Hartford Roman Catholic Diocesan Corporation was reckless.  (Sitarz, Exhibit 595).

153.  On March 15, 2012, Mr. Sitarz wrote to Gallagher Bassett, with copies to Lloyds, Interstate, Atlantic Mutual, and Gallagher Bassett, to advise that the

Matthew Doe case appeared to be scheduled for trial in April or early May, but those dates could change. Mr. Sitarz also advised that he had spoken to Matthew Doe's counsel regarding whether the case needed to be tried, and opposing counsel had indicated that it depended on whether the Archdiocese was willing to pay the same amount as the Jacob Doe verdict, exclusive of attorneys' fees. Mr. Sitarz stated that he would continue to keep the carriers advised. (Sitarz, Exhibit 600).

154. On May 4, 2012, Mr. Sitarz advised Gallagher Bassett, with copies to Lloyds, Interstate, and Atlantic Mutual, that the Matthew Doe claim had settled for $750,000, and requested that Gallagher Bassett "take whatever steps may be needed at this time to begin to process the Archdiocese's claim for insurance reimbursement." (Hanson, Exhibit 662).

155. On May 14, 2012, the Archdiocese formally reached a settlement with Matthew Doe whereby, in exchange for a settlement of $750,000, Matthew Doe agreed to "release and forever discharge The Hartford Roman Catholic Diocesan Corporation ("Archdiocese of Hartford") and all of its past, present and future Archbishops, Bishops, Auxiliary Bishops, Priests, including but not limited to Rev. Ivan Ferguson, . . . from any and all manner of liability . . . including but not limited to all matters arising out of or relating to alleged sexual misconduct as alleged in a certain civil action entitled: Matthew Doe v. The Hartford Roman Catholic Diocesan Corporation . . . ." (Sitarz, Exhibit 26).

156. On May 17, 2012, Matthew Doe filed a withdrawal of his action. (Sitarz, Exhibit 27).

157.     On May 17, 2012, Mr. Sitarz forwarded a copy of the executed Matthew Doe release to Lloyds, Gallagher Bassett, Interstate, and Atlantic Mutual.  Mr. Sitarz advised that he would let them know when the payment on the settlement went out. (Sitarz, Exhibit 604).

158.     On June 21, 2012, Mr. Sitarz emailed Mr. Hanson, with copies to Lloyds, Atlantic Mutual, Interstate, and Gallagher Bassett, to confirm that the settlement check in the amount of $750,000 was sent to Matthew Doe's counsel.  Mr. Sitarz advised that there were substantial additional expenses paid by the Archdiocese through Gallagher Bassett directly to the vendors, and asked what those totaled as they should be added to what was sought from the insurers.  Mr. Sitarz also requested that Mr. Hanson "follow up on all insurance reimbursements."  (Sitarz, Exhibit 29).

159.     The Archdiocese appealed the *Jacob Doe* verdict, and, on July 7, 2015, the Connecticut Supreme Court affirmed the trial court in *Doe v. Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357 (2015).

160.     The Matthew Doe settlement amount was reasonable.  (Philip Newbury).

161.     The Archdiocese incurred defense costs of $140,222.97 for the Matthew Doe Case.  (Sitarz, Exhibit 110).

162.     Those defense costs were reasonable.

163.     The total amount paid by the Archdiocese on the Matthew Doe claim was $890,222.97.  (Byrne).

164.  Interstate has not affirmed or denied coverage on the Matthew Doe Claim.  (Sons).

165.  Interstate has not reimbursed the Archdiocese on the Matthew Doe Claim.  (Sitarz).

Occurrence

166.  The Archbishop appointed Crowley as assistant pastor of St. Francis Parish on March 6, 1973 and pastor on January 8, 1974.  (Exhibits 121, 122, Msgr. John McCarthy).

167.  At the time of the misconduct alleged in the Richard Mallory Claim, Ferguson was teaching at Northwest Catholic High School and in residence at the rectory at St. Bernard's Church.  (Msgr. John McCarthy)  Interstate 56a(2) Statement at 81.

168.  On March 16, 1979, Fr. Donahue reported to Fr. Gianelli that Fr. Ferguson had not gone to the House of Affirmation, and did not want to leave Saint Bernard's Parish.  Fr. Gianelli informed Archbishop Whealon of this development. (McCarthy, Exhibits 142 and 145; *Jacob Doe*, 317 Conn. 357, 363).

169.  Letters from St. Luke supported Ferguson's return to a high school setting and to such a setting conditioned Fr. Ferguson's successful return on his continued sobriety and weekly attendance at Alcoholics Anonymous meetings. (McCarthy, Exhibit 142; *Jacob Doe*, 317 Conn. at 365 and n.8).

170.  On July 27, 1979, Archbishop Whealon formally appointed Fr. Ferguson to serve part-time as chaplain at Lauralton Hall, and it was arranged for him to reside

at a nearby rectory. (McCarthy, Exhibit 142 and 149; *Jacob Doe*, 317 Conn. 357, 365).

171. In November, 1979, Fr. Ferguson began to serve part-time as assistant pastor of Saint Mary's Parish in Derby, where he resided in the rectory. (McCarthy, Exhibit 142, 150, and 506; *Jacob Doe*, 317 Conn. 357, 365).

172. On June 8, 1981, Fr. Ferguson was assigned to serve full-time as assistant pastor of Saint Mary's Parish. (McCarthy, Exhibit 142 and 151; *Jacob Doe*, 317 Conn. 357, 365).

173. Archbishop Whealon assigned Ferguson to be the Assistant Pastor at St. Mary's Parish by letter dated June 8, 1981. (Fr. Gianelli, Msgr. John McCarthy, Exhibit 142 and 151).

Seventh and Thirteenth Affirmative Defenses

174. Ferguson was not named as a defendant in the two claims that went into suit: Richard Mallory and Matthew Doe. Ferguson was not alive at the time that those claims were filed. (John Sitarz).

Fourth, Sixth and Ninth Affirmative Defenses

175. In June of 2011, Lloyds and the Archdiocese entered into a Confidentiality Agreement. (Tucker, Exhibit 223).

176. JA never filed suit, and the parties never engaged in formal discovery. (John Sitarz).

177. KS never filed suit, and the parties never engaged in formal discovery. (John Sitarz).

178.   The Archdiocese filed this action on November 19, 2012.  Complaint (ECF No. 1).

(b)   **Agreed Statement of Contested Issues of Fact and Law**

1.   Whether there was an occurrence in the KS, Richard Mallory and Matthew Doe Claims.

| Archdiocese's Statement | Interstate's Statement |
|---|---|
| • Whether the Archbishop knew there was a substantial probability that Fr. Crowley would abuse male minors during the 1981-82 school year. <br><br> • Whether the Archbishop knew there was a substantial probability that Fr. Ferguson would abuse male minors during the period of time between November 1977 and October 1978. <br><br> • Whether the Archbishop knew there was a substantial probability that Fr. Ferguson would abuse male minors between the Summer of 1981 and the Fall of 1982. <br><br> • Whether knowledge of The Hartford Roman Catholic Diocesan Corporation requires knowledge of the Archbishop? | • Whether notice to or knowledge of priests, acting within the scope of their authority as agents of the Archdiocese, is notice to or knowledge of the Archdiocese. <br><br> • Whether the Archdiocese knew or should have known there was a substantial probability that Fr. Crowley would sexually abuse male minors during the 1981-82 school year. <br><br> • Whether exceptional circumstances exist such that a prima facie case of subjective intent is made out that sexual abuse of male minors by Fr. Crowley was expected or intended during the relevant time period or should be conclusively so presumed. <br><br> • Whether the Archdiocese knew or should have known there was a substantial probability that Fr. Ferguson would sexually abuse male minors during the period of time between November 1977 and October 1978. |

| | |
|---|---|
| | • Whether exceptional circumstances exist such that a prima facie case of subjective intent is made out that sexual abuse of male minors by Fr. Ferguson was expected or intended during the relevant time period or should be conclusively so presumed.<br><br>• Whether the Archdiocese knew or should have known there was a substantial probability that Fr. Ferguson would sexually abuse male minors between the Summer of 1981 and the Fall of 1982.<br><br>• Whether exceptional circumstances exist such that a prima facie case of subjective intent is made out that sexual abuse of male minors by Fr. Ferguson was expected or intended during the relevant time period or should be conclusively so presumed. |

2.      Whether All Conditions Precedent to Coverage were satisfied for each

of the Four Underlying Claims.

| Archdiocese's Statement | Interstate's Statement |
|---|---|
| • Whether the Archdiocese breached the books and records condition precedent of the policies by not providing to Interstate the contents of its priests' personnel and Canon 489 files other than those portions ordered to be produced by a court. | • Whether the Archdiocese failed to provide a satisfactory and acceptable Proof of Interest and Loss in connection with the Richard Mallory, JA, KS and Matthew Doe claims (collectively the "Underlying Claims"). |

| | |
|---|---|
| • If the Archdiocese is found to have breached the books and records provision, whether Interstate suffered material prejudice from that breach. | • Whether and when the Underlying Claims were submitted to Interstate for reimbursement.<br><br>• Whether, in light of the Court's ruling that the "books or records" provision of the Policies necessarily includes Canon 489 and personnel files, which contain certain documents that "would be critical to making coverage determinations," the Archdiocese breached the books and records condition precedent of the policies by not providing to Interstate the contents of the abusing priests' personnel files and Canon 489 files.<br><br>• Whether, in light of the Court's ruling that the "books or records" provision of the Policies necessarily includes Canon 489 and personnel files, which contain certain documents that "would be critical to making coverage determinations," the Archdiocese violated its duty to cooperate and its implied duty of good faith and fair dealing by not providing Interstate documents critical to making coverage determinations, including but not limited to the abusing priests' Canon 489 files, the abusing priests personnel files, the Archdiocese's own responses to discovery, full deposition transcripts and information regarding its production of materials to the underlying claimants and insurers. |

3.      Whether the settlements of the JA, KS and Mallory claims were reasonable.

4.      Whether the Archdiocese satisfied its burden of proving that the JA claim falls within the terms and conditions of coverage.

5.      Whether the Archdiocese satisfied its burden of proving that the KS claim falls within the terms and conditions of coverage.

6.      Whether the Archdiocese satisfied its burden of proving that the Mallory claim falls within the terms and conditions of coverage.

7.      Whether the Archdiocese satisfied its burden of proving that the Matthew Doe claim falls within the terms and conditions of coverage.

8.      Whether the Seventh Affirmative Defense bars the Archdiocese from recovering on any of the Underlying Claims.

| Archdiocese's Statement | Interstate's Statement |
|---|---|
| • Whether claims against the Archdiocese are separate causes of action from claims against individual priests for sexual misconduct. | • Whether, as a result of the claims against the Archdiocese being derivatively and inextricably intertwined with the sexual abuse perpetrated by Frs. Crowley, Ladamus and Ferguson, Interstate is not obligated to pay under the Policies. |
| | • Whether Interstate is obligated to pay under the Policies for the KS and JA claims as no claims were affirmatively asserted or detailed against the Archdiocese. |

9. Whether the Thirteenth Affirmative Defense bars the Archdiocese from recovering on the Underlying Claims.

| Archdiocese's Statement | Interstate's Statement |
|---|---|
| • Whether any of the settlements or defense costs should be allocated to individual priests who were not defendants in the Underlying Claims. | • Whether all of the settlement amounts and defense costs in the JA and KS claims should be allocated to the uncovered claims against the priests.<br><br>• Whether Interstate is entitled to a reduction in the amounts allocable to the uncovered claims, which includes settlement amounts and costs for the release of the priests. |

10. Whether the Ninth Affirmative Defense bars the Archdiocese from recovering on any of the Underlying Claims.

| Archdiocese's Statement | Interstate's Statement |
|---|---|
| • Whether the Archdiocese breached the implied covenant of good faith and fair dealing by not providing Interstate with the contents of its priests' personnel and Canon 489 files other than those portions ordered to be produced by a court.<br><br>• Whether the Archdiocese breached the implied covenant of good faith and fair dealing by "colluding" with Lloyds and other London Market Insurers to obtain 100 percent reimbursement for these four Underlying Claims. | • Whether the Archdiocese engaged in inequitable conduct and/or breached the implied covenant of good faith and fair dealing by refusing to produce the requested documentation to Interstate and intentionally withholding documents that impacted coverage for the Underlying Claims, thereby impeding Interstate's ability to investigate the Underlying Claims for liability and damages and make a coverage determination regarding the Underlying Claims. |

| | |
|---|---|
| | • Whether the Archdiocese engaged in inequitable conduct and/or breached the implied covenant of good faith and fair dealing by negotiating with Lloyds to obtain 100 percent reimbursement for the four Underlying Claims and a reduced amount on claims that did not reach Interstate's layer in order to trigger Interstate's coverage. |

11.    Whether and how much the Archdiocese was damaged as a result of Interstate's failure to indemnify it in connection with the four Underlying Claims.

12.    Whether Interstate breached the implied covenant of good faith and fair dealing.

| Archdiocese's Statement | Interstate's Statement |
|---|---|
| • Whether Interstate breached the implied covenant of good faith and fair dealing by imposing conditions that went beyond the terms of the policies. | • Whether Interstate can be found to have breached the implied covenant of good faith and fair dealing if the Court determines that it did not breach the Policies. |
| • Whether Interstate breached the implied covenant of good faith and fair dealing by not timely asking for documents or otherwise investigating to determine coverage after the settlements and the amounts of the "loss" were reported. | • Whether Interstate breached the implied covenant of good faith and fair dealing by requesting Canon 489 files, personnel files, and additional information regarding the Underlying Claims. |
| • Whether Interstate breached the implied covenant of good faith and fair dealing by not handling the claims consistently with industry practice or the prior course of | • Whether Interstate breached the implied covenant of good faith and fair dealing and acted with a dishonest purpose, design to mislead or deceive, actual or constructive fraud or sinister motive |

| | |
|---|---|
| dealing between the parties. | by not timely asking for documents or otherwise investigating to determine coverage after a satisfactory and acceptable Proof of Interest and Loss was provided and the claim was submitted for reimbursement. |

13. Whether Interstate engaged in unfair claims handling practices that constituted general business practices that violated CUIPA as asserted through CUTPA.

| Archdiocese's Statement | Interstate's Statement |
|---|---|
| • Whether Interstate failed to acknowledge and act with reasonable promptness to communications regarding sexual misconduct claims of the Archdiocese, the Diocese of Portland Maine, and the Diocese of Manchester New Hampshire. | • Whether Interstate can be liable for violations of CUTPA/CUIPA if the Court determines that it did not breach the Policies. |
| • Whether Interstate engaged in the unfair claims handling practice of failing to acknowledge and act with reasonable promptness to communications regarding the abuse claims with sufficient frequency to indicate that it is a general business practice. | • Whether CUTPA and CUIPA were violated with respect to the four Underlying Claims by Interstate engaging in a pattern or practice that (1) without necessarily having been considered unlawful, offends public policy as it has been established by statutes, the common law or otherwise; (2) is immoral, unethical, oppressive or unscrupulous; and/or (3) causes substantial injury to consumers. |
| • Whether Interstate failed to affirm or deny coverage within a reasonable time after proofs of loss were completed with respect to the abuse claims of the Archdiocese, Diocese of Portland Maine, Diocese of Manchester New Hampshire, the Archdiocese of Seattle Washington, | • Whether Interstate failed to acknowledge and act with reasonable promptness to communications regarding sexual misconduct claims of the Archdiocese in the four Underlying Claims and other policyholders (1) under circumstances that are |

| | |
|---|---|
| and the Diocese of Phoenix Arizona. | substantially similar to those in the present case; (2) with sufficient frequency to indicate that it is a general business practice; and (3) in which a decision maker has made a determination that a similar unfair insurance practice occurred. |
| • Whether Interstate engaged in the unfair claims handling practice of failing to affirm or deny coverage within a reasonable time after proofs of loss have been completed with respect to the abuse claims with sufficient frequency to indicate that it is a general business practice. | |
| | • Whether Interstate failed to affirm or deny coverage within a reasonable time after proofs of loss were completed with respect to the four Underlying Claims and other policyholders (1) under circumstances that are substantially similar to those in the present case; (2) with sufficient frequency to indicate that it is a general business practice; and (3) in which a decision maker has made a determination that a similar unfair insurance practice occurred. |
| • Whether Interstate did not attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear with respect to the abuse claims of the Archdiocese, the Diocese of Manchester New Hampshire, the Archdiocese of Seattle Washington, the Diocese of Portland Maine, and the Archdiocese of Sacramento California. | |
| | • Whether Interstate did not attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear with respect to the four Underlying Claims and other policyholders (1) under circumstances that are substantially similar to those in the present case; (2) with sufficient frequency to indicate that it is a general business practice; and (3) in which a decision maker has made a determination that a similar unfair insurance practice occurred. |
| • Whether Interstate engaged in the unfair claims handling practice of not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear with respect to the abuse claims with sufficient frequency to indicate that it is a general business practice. | |
| • Whether Interstate compelled policyholders to institute litigation to recover amounts due under its policies with respect to the abuse claims of the Archdiocese, the Diocese of Manchester New Hampshire, the Archdiocese of | • Whether Interstate compelled the Archdiocese in connection with the four Underlying Claims and other policyholders to institute litigation to |

| | |
|---|---|
| Seattle Washington, the Diocese of Sacramento California, the Diocese of Springfield Massachusetts, and the Archdiocese of Milwaukee Wisconsin, among others.<br><br>• Whether Interstate engaged in the unfair claims handling practice of compelling policyholders to institute litigation to recover amounts due under its policies with respect to the abuse claims with sufficient frequency to indicate that it is a general business practice. | recover amounts due under their policies (1) under circumstances that are substantially similar to those in the present case; (2) with sufficient frequency to indicate that it is a general business practice; and (3) in which a decision maker has made a determination that a similar unfair insurance practice occurred. |

14.    Whether because of any unfair claims handling practices by Interstate, the Archdiocese sustained an ascertainable loss because (1) the Archdiocese was forced to bring coverage litigation and incur the expense of that litigation, and or (2) there was a delay in the payment of moneys owed by Interstate under its policies and a loss of investment return for the Archdiocese.

15.    Whether the Archdiocese is entitled to compensatory damages on its CUIPA/CUTPA claim.

| Archdiocese's Statement | Interstate's Statement |
|---|---|
| • Whether because of its breach of the implied covenant of good faith and fair dealing and its violation of CUIPA/CUTPA, Interstate caused damages to the Archdiocese in the amounts of $136,959.61 for the Richard Mallory claim, $40,330.99 for the KS claim, $27,576.16 for the JA claim, and $84,868.62 for the | • Whether because of its breach of the implied covenant of good faith and fair dealing and its violation of CUIPA/CUTPA, Interstate caused damages to the Archdiocese for lost earnings. |

| | |
|---|---|
| Matthew Doe claim, representing the lost earnings on the amounts of "loss" that should have been reimbursed through December 31, 2015. | |

16.    Whether the Archdiocese is entitled to punitive damages on its

CUIPA/CUTPA claim.

| Archdiocese's Statement | Interstate's Statement |
|---|---|
| • Whether Interstate's unfair claims handling practices were not merely negligent, but involved a conscious decision to disregard acknowledged business norms, and therefore the Archdiocese is entitled to punitive damages. | • Whether the Archdiocese has established any unfair claims handling practices by Interstate that were not merely negligent, but involved wanton and malicious conduct, evil motive and violence and therefore the Archdiocese is entitled to punitive damages. |

17.    Whether the Archdiocese is entitled to attorneys' fees on its common

law bad faith and CUIPA/CUTPA claims should they be proven.

**(c)    Plaintiff's Proposed Findings of Fact:**

See Attachment.

**(d)    Plaintiff's Proposed Conclusions of Law:**

See Attachment.

**(e)    Defendant's Proposed Findings of Fact:**

See Attachment.

**(f)**     **Defendant's Proposed Conclusions of Law:**

<u>See</u> Attachment.


**10.**     <u>**OBJECTIONS TO PROPOSED CONCLUSIONS OF LAW:**</u>

**(a)**     **Plaintiff's Objections:**

<u>See</u> Attachment.

**(b)**     **Defendant's Objections:**

<u>See</u> Attachment.

Respectfully submitted,

PLAINTIFF – THE HARTFORD ROMAN
CATHOLIC DIOCESAN CORPORATION

DEFENDANT – INTERSTATE FIRE &
CASUALTY COMPANY

By: /s/ Elizabeth J. Stewart
Elizabeth J. Stewart
Marilyn B. Fagelson
Melissa A Federico
MURTHA CULLINA LLP
265 Church Street, 9th Floor
New Haven, CT 06510
Tel:   203-772-7700
Fax:  203-772-7723
estewart@murthalaw.com
mfagelson@murthalaw.com
mfederico@murthalaw.com

By: /s/ Rhonda J. Tobin
Rhonda J. Tobin
Stephen O. Clancy
Jessica A.R. Hamilton
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103
Tel:   860-275-8200
Fax:  860-275-8299
rtobin@rc.com
sclancy@rc.com
jhamilton@rc.com

Its Attorneys

Its Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 4, 2016, the foregoing Joint Trial Memorandum was filed electronically. Notice of this filing will be sent by e-mail to all Parties by operation of the Court's electronic filing system.

/s/ Elizabeth J. Stewart
Elizabeth J. Stewart