UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

THE HARTFORD ROMAN CATHOLIC
DIOCESAN CORPORATION,

               Plaintiff,

v.

INTERSTATE FIRE & CASUALTY
COMPANY

               Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION
NO. 3:12-cv-01641-JBA

MARCH 28, 2016

**PLAINTIFF'S REVISED PROPOSED FINDINGS OF FACT
FOR JOINT TRIAL MEMORANDUM § 9(c)**

In addition to the Stipulated Facts in the Joint Trial Memorandum, Plaintiff The

Hartford Roman Catholic Diocesan Corporation (the "Archdiocese") submits the

following Proposed Findings of Fact with revised Paragraphs 4, 16 and 59.

1.      The geographical areas of Hartford, New Haven and Litchfield Counties

comprise the territory known as the Archdiocese of Hartford, which is under the

ecclesiastical authority of the Archbishop of Hartford.

Count One – Breach of Contract

Occurrence

2.      The Hartford Roman Catholic Diocesan Corporation was the defendant

in each of the Underlying Claims.  (John Sitarz)

3.      The Archbishop is the President of The Hartford Roman Catholic

Diocesan Corporation. (Msgr. John J. McCarthy)

4.      Prior to and at the time of the alleged abuse in the KS Claims, there is no evidence that any supervisory or management-level personnel of The Hartford Roman Catholic Diocesan Corporation had actual knowledge that there was a substantial probability that Fr. Crowley would engage in future abuse.  Prior to and at the time of the alleged abuse in the Mallory and Matthew Doe Claims, there is no evidence that any supervisory or management-level personnel of The Hartford Roman Catholic Diocesan Corporation had actual knowledge that there was a substantial probability that Fr. Ferguson would engage in future abuse.  (Exhibits 120-172;  Msgr. John McCarthy, Fr. Barry, Fr. Gianelli)

5.      The Archbishop is the person who makes the final assignment decisions for priests to parishes, schools and rectories.  (Msgr. John McCarthy)

6.      The Archdiocese did not intend any of the abuse alleged by the Underlying Claimants.  (Msgr. John McCarthy, Fr. Gianelli, Fr. Barry)

JA Claim

7.      The JA Claim was the first claim to make allegations of sex abuse against Ladamus.  Summary Judgment Ruling at 16 n.11.

8.      The Archdiocese did not expect the abuse alleged by JA because the Archbishop did not know in 1985 that there was a substantial probability of future abuse by Ladamus.  Summary Judgment Ruling at 16 n.11.

KS Claim

9.      The Archbishop appointed Crowley as assistant pastor of St. Francis Parish on March 6, 1973 and pastor on January 8, 1974.  (Exhibits 121, 122; Msgr. John McCarthy).

10.     There is no evidence that the Archbishop was on notice of any sexual misconduct by Crowley prior to March 1983.  (Exhibits 32-41, 127-139; Msgr. John McCarthy, John Sitarz, Fr. Thomas Barry).

11.     The Archbishop did not know during the 1981-82 school year that there was a substantial probability of abuse of boys at St. Francis such as KS by Crowley. Id.

Richard Mallory Claim/Matthew Doe Claim

12.     In the Roman Catholic Church, incardination is the process by which a member of the clergy is formally placed under the jurisdiction of a particular bishop or other ecclesiastical superior.  Incardination is governed by Canon law.  The purpose of incardination is to ensure that no cleric, whether deacon or priest, is "freelance," without a clear ecclesiastical superior to whom he is responsible.  (Exhibit 118; Msgr. John McCarthy).

13.     Ferguson was not incardinated as a priest of the Archdiocese until February 9, 1979.  (Exhibit 144, Msgr. John McCarthy, Exhibits 332 and 333 at ¶ 81).

14.     Prior to that date, he had been incardinated with the Diocese of St. Joseph of the Amazon, Peru.  (Exhibit 143; Msgr. John McCarthy, Fr. Gianelli).

15.     At the time of the misconduct alleged in the Richard Mallory Claim, Ferguson was teaching at Northwest Catholic High School and in residence at the rectory at St. Bernard's Church.  (Msgr. John McCarthy, Exhibits 332 and 333 at ¶ 81).

16.     There is no evidence that the Archbishop was on notice of allegations that Ferguson had abused boys prior to March 7, 1979, after the alleged abuse of Richard Mallory ended.  On that date, he learned of the abuse of two boys in St. Bernard's parish.  The parties stipulated to this in the Jacob Doe Case.  (Exhibits 42, 43, Msgr. John McCarthy, John Sitarz, Exhibits 332 and 333 at ¶ 82).

17.     In March 1979, the Archbishop and his priest secretary, Fr. Gianelli, arranged for Ferguson to be admitted to St. Luke's for treatment.  The medical director at St. Luke's was Michael Peterson, who was both a psychiatrist and an ordained Catholic priest.  (Exhibits 45, 145-148, 156, 157; Fr. Gianelli, Msgr. John McCarthy).

18.     When Ferguson was admitted to St. Luke's, he was treated for alcoholism and pedophilia.  (Exhibits 45, 147; Msgr. John McCarthy, Fr. Gianelli).

19.     In his March 21, 1979 memorandum to the Archbishop about admitting Ferguson to St. Luke's, Fr. Gianelli said "The program will first work with the chemical dependence Father Ivan experiences then will work on the emotional and psychological problems.  The program is four to six months."  (Exhibit 147; Fr. Gianelli).

20.     The correspondence between St. Luke's and the Archbishop did not just refer to treatment for alcoholism.  The letters included references to an "open discussion about Fr. Ferguson's current problems," the "sensitive nature of the

episodes which brought Fr. Ferguson to this rehabilitation facility," and "the other issues." (Exhibits 148, 152, 158; Msgr. John McCarthy, Fr. Gianelli).

21.     The St. Luke's staff expected that if Ferguson's alcoholism was controlled, his pedophilia issues would be controlled, and they communicated that to the Archbishop. (Id.).

22.     Ferguson remained in treatment at St. Luke's until July 1979, at which time Archbishop Whealon assigned him to be the Chaplain at Lauralton Hall, a girls school, and to reside at St. Mary's Parish in Derby. (Exhibits 149, 158-162; Fr. Gianelli, Msgr. John McCarthy).

23.     Ferguson continued out-patient treatment with St. Luke's until at least mid-1982. (Exhibits 163-172; Fr. Gianelli).

24.     Dr. Peterson of St. Luke's wrote to the Vicar for Priests on June 24, 1980 and recommended that Ferguson be considered for a high school teaching position. (Exhibit 164; Fr. Gianelli).

25.     He wrote again on June 22, 1981 to confirm a telephone conversation he had a month earlier with Archbishop Whealon about Ferguson changing teaching assignments and taking on a more active role in the St. Mary's Parish. (Exhibit 152; Fr. Gianelli; Msgr. John McCarthy).

26.     Archbishop Whealon assigned Ferguson to be the Assistant Pastor at St. Mary's Parish by letter dated June 8, 1981. (Exhibit 151; Fr. Gianelli, Msgr. John McCarthy).

27.     At no time prior to or during the period of abuse alleged by Matthew Doe was the Archbishop given any information that suggested that Ferguson was not complying with his alcoholism program or that Ferguson was engaging in sexual misconduct.  (Exhibits 152, 163, 164-168, 170-172; Fr. Gianelli).

28.     There is no evidence that Archbishop Whealon was notified that Ferguson engaged in sexual misconduct in the late 1970s as alleged by KC prior to the time periods of the sexual misconduct alleged by Richard Mallory or Matthew Doe. (Msgr. John McCarthy, Fr. Gianelli, KC).

29.     On or about March 5, 1993, three former Northwest Catholic High School students from the 1970s brought suit against the Archdiocese and Northwest Catholic High School Corporation, alleging sexual misconduct by Ferguson while they were students.  One of those students was KC.  (Exhibit 44, Msgr. John McCarthy, John Sitarz).

30.     On March 10, 1993, Ferguson was placed on administrative leave by Archbishop Cronin.  (Exhibit 155, Msgr. John McCarthy).

Reasonableness

31.     The JA settlement amount was reasonable.  (Exhibit 182; Philip Newbury).

32.     The KS settlement amount was reasonable.  (Exhibit 182; Philip Newbury).

33.     The Richard Mallory settlement amount was reasonable.  Interstate did not dispute this in its opposition to the Archdiocese's Motion for Summary Judgment. (Exhibit 182; Philip Newbury, Exhibits 332 and 333 at ¶ 73).

<u>Conditions Precedent/Fourth, Sixth and Ninth Affirmative Defenses</u>

34.     The Lloyds policies designated Arthur J. Gallagher & Co. as the entity through which the Archdiocese should provide notice of claims and submit proofs of loss.  By the time of these claims, a related company, Gallagher Bassett, was fulfilling that role. (Exhibit 3 at § IV. ¶¶ 10, 11 (HRCD0063005), Deborah Sons, James Hanson) Interstate 56a(2) Statement at 28.

35.     "Proof of interest and loss" means documentation to substantiate the settlement, the payment to the claimant and the payment of defense costs.  (John Sitarz, Deborah Sons).

36.     The references to "proof of interest and loss" appear in the General Conditions section of the Lloyds policies, which also apply to first party property coverage.  (<u>See, e.g.</u>, Exhibit 3 at HRCD0063005)).

37.     "Proofs of loss" typically are used in first party property coverage evaluations.  (Berglund).

38.     This is a breach of contract claim based on certain insurance policies issued by Interstate and Lloyds to the Archdiocese.  Nothing in those policies requires a formal reimbursement request to be made by a policyholder.  (Exhibits 2-6).

39.     Interstate does its own investigation and analysis of coverage.  It does not depend on any investigation done by first layer excess carriers, and those first layer excess carriers owe no duty to Interstate to investigate for it.  (Deborah Sons).

40.     Throughout each of the four Underlying Claims, Mr. Sitarz kept Interstate and the other insurers updated as to the status of the claim by sending pleadings, documents relating to his investigation of the Underlying Claimants, interview summaries, deposition summaries, expert information and important correspondence from the Underlying Claimants' counsel. (John Sitarz, Deborah Sons).

41.     At no time did Deborah Sons, Interstate's claims handler, complain to Mr. Sitarz that she was not being kept informed.  (John Sitarz, Deborah Sons).

42.     It has been Mr. Sitarz's custom and practice to summarize depositions for his insurance claims handlers.  (John Sitarz).

43.     It is a custom and practice in the industry for claims handlers to use deposition summaries from insurance defense counsel.  (Berglund).

44.     At no time did Deborah Sons complain to Mr. Sitarz about receiving deposition summaries rather than deposition transcripts.  Although representatives of other insurance carriers asked for specific deposition transcripts when they received summaries, no one from Interstate did this.  (John Sitarz, Deborah Sons).

45.     When Interstate's counsel made general requests for deposition transcripts in its letters dated July 24, 2008 (Exhibit 67), January 6, 2012 (Exhibit 95) and June 25, 2012 (Exhibit 84), the Archdiocese invited Interstate's counsel to review them, and in the case of the January 6, 2012 letter during the Jacob Doe trial, had just

permitted Interstate's counsel to review the files.  (Exhibits 68, 77, 231, 92, 93, 94; John Sitarz, Seth Tucker, Mark Darling, Kate Adams).

46.     The Archdiocese maintains personnel files on all priests that are incardinated with the Archdiocese.  In addition, if there is sensitive information on a priest, such as an allegation that a priest abused a minor, the Archdiocese creates and maintains files known as Canon 489 files, to house that sensitive information.  (Msgr. John McCarthy).

47.     Canons 489 and 490 set forth very strict rules for the safekeeping of the Canon 489 files.  The Archdiocese has not produced the contents of these Canon 489 files unless ordered by a court to do so.  Under the Code of Canon Law for 1917, which was in effect at the time of some of these claims, what is now Canon 489 under the 1983 Code was Canon 379.(Exhibit 119, John Sitarz, Msgr. John McCarthy).

48.     There is no Canon 489 file for Ladamus.  (Msgr. John McCarthy).

49.     There are no documents that allege sexual misconduct by Crowley in the Crowley personnel or Canon 489 files that are dated before or during the KS claimed period of abuse of the 1981-82 school year.  (Exhibits 30-41, 120-137).

50.     During the course of his lawsuit, Richard Mallory served discovery requests seeking, among other things, the personnel and Canon 489 files for Ferguson.  The Archdiocese objected.  The court issued two orders on February 24, 2009 – one that limited the scope of what needed to be produced and allowed the Archdiocese to create a privilege log for those documents it believed should be protected, and a second that held: "[u]ntil further order of the court, all information,

documents and transcripts which the parties may obtain from or through discovery addressed to the Defendant or its representatives shall not be disseminated, shown, disclosed, divulged or transmitted to any person or organization other than the parties to this lawsuit and their attorneys and to any other person, disclosure to whom is necessary for that party or attorney to prepare for trial of this case." (Exhibits 80, 81; John Sitarz).

51.     Matthew Doe and Jacob Doe's counsel also sought discovery of the Ferguson personnel and Canon 489 files. The court issued orders on February 24, 2009, almost identical to those in the Mallory case, limiting the scope of that production and limiting the parties to whom that information could be produced. (Exhibits 86, 87, 88, 89, John Sitarz).

52.     As the Jacob Doe case approached trial in late 2011, Interstate's outside counsel asked to review documents. Mr. Sitarz agreed to that request. (Exhibits 92, 93, John Sitarz).

53.     During that December 2011 review, Interstate's counsel had an opportunity to review the documents from the Ferguson personnel and Canon 489 files that were produced to the plaintiffs in the Matthew Doe and Jacob Doe cases. These documents included those that were ordered produced in the Richard Mallory case. (Exhibit 94, John Sitarz).

54.     The Archdiocese requested that Interstate enter into a confidentiality agreement before providing copies of the Ferguson personnel and Canon 489 file documents to Interstate. (Exhibit 94, John Sitarz, Seth Tucker, Mark Darling).

55.     That proposed confidentiality agreement stated that Interstate could use the documents for evaluating the Archdiocese's claims for coverage in matters on which Interstate had not made payment but that it could not use the documents to reopen past paid claims.

56.     Lloyds had signed a similar confidentiality agreement in June 2011. (Exhibit 223, Seth Tucker).

57.     Interstate refused to sign that proposed confidentiality agreement, and instead proffered a confidentiality agreement of its own with different terms, along with a letter requesting documents for numerous other priests and lay employees.  The Archdiocese declined to agree to Interstate's proposed confidentiality agreement, which would have allowed Interstate to reopen past claims.  Interstate has refused to enter into confidentiality agreements proposed by other policyholders, such as the Diocese of Kansas City/St. Joseph.  (Exhibits 94, 95, 231, 232, 295; Mark Darling, Seth Tucker, Deborah Sons).

58.     Interstate's outside counsel attended each day of the Jacob Doe trial. During the course of that trial in January 2012, as documents from the Ferguson personnel and Canon 489 files were marked as exhibits, Interstate's counsel made copies of them.  (Exhibits 96, 241, Mark Darling, John Sitarz).

59.     The Ferguson documents Interstate reviewed in December 2011 and copied in January 2012 encompassed all documents prior to 1986 that this Court ordered produced from the Canon 489 file in its in camera review in this case except two documents (ICR0294), which was an April 18, 1979 note from Ferguson to Fr.

-11-

Gianelli, and (ICR0072), which was a January 30, 1981 letter from Dr. Peterson at St. Luke's.  (Exhibits 142, 142A, 241; Msgr. John McCarthy, Deborah Sons, Mark Darling).

60.    The Lloyds policies refer to the amount of coverage between the Archdiocese's self-insured retention and Lloyds' limit as "specific excess."  (Exhibits 3-6; James Hanson, John Sitarz, Seth Tucker).

61.    The Lloyds policies also have an "aggregate excess" program whereby once the Archdiocese has paid a certain amount of self-insured retentions into a "loss fund," Lloyds returns some of those self-insured retentions in the form of "aggregate excess" payments on individual claims.  The amount of "aggregate excess" that can be paid depends in part on the amount of the loss fund available for each policy year. The "aggregate excess" has no bearing on whether the Lloyds policies have exhausted by payment.  (Exhibits 3-6; James Hanson, John Sitarz).

62.    On September 27, 2011, Lloyds and the Archdiocese reached agreement on what the amounts of specific excess would be for Richard Mallory and KS if Lloyds paid 100 percent of those claims.  (Exhibit 106; John Sitarz).

63.    The issue that Gallagher Bassett could not resolve was the amount of the loss fund available for aggregate excess payments on those claims.  (Exhibits 106, 108, 109, 110; John Sitarz).

64.    Starting in the Fall of 2011, Lloyds and the Archdiocese negotiated what percentage of specific excess Lloyds should pay on 11 claims, including Richard Mallory and KS.  Once JA and Matthew Doe settled, they were added to those negotiations.  (Exhibits 107-109, 224-228, 230; John Sitarz, Seth Tucker).

65.     In October 2012, Lloyds and the Archdiocese reached agreement on the total amount of specific excess to pay on all pending claims and agreement on how much Lloyds would pay for specific excess for these four Underlying Claims.  (Exhibits 229, 230, 173; Seth Tucker).

66.     With the exception of the Richard Mallory reservation of rights letter, the Interstate reservation of rights letters did not expressly request priest personnel files. Mr. Sitarz had no recollection of seeing the Richard Mallory reservation of rights letter until Interstate re-sent that letter on October 1, 2012.  (Exhibits 77, 78; Compare Exhibit 79 with Exhibits 75, 76 and 85; Deborah Sons, John Sitarz).

67.     The Archdiocese and its counsel did not understand that the language "all pertinent correspondence and pleadings filed or served" referred to the priest files. (Exhibits 75, 76, 79, 85; John Sitarz, Seth Tucker).

68.     The language "all pertinent correspondence and pleadings filed or served" appears in other reservation of rights letters sent by Interstate that do not relate to sexual misconduct claims against religious institution policyholders.  (Deborah Sons).

69.     At no time did JA's counsel request the Ladamus personnel file.  (John Sitarz).

70.     Mr. Sitarz has no recollection of reviewing the Ladamus personnel file during the life of the JA Claim. (John Sitarz).

71.     At no time did KS's counsel request the Crowley personnel or Canon 489 files.  (John Sitarz).

72.     Mr. Sitarz has no recollection of reviewing the Crowley personnel or Canon 489 files during the life of the KS Claim.  (John Sitarz).

73.     The Connecticut personnel records statute, Conn. Gen. Stat. § 31-128f, blocks the release of personnel records except under certain circumstances enumerated by that statute.  (Exhibit 97).

74.     The Archdiocese and its counsel believe that the Connecticut personnel records statute applied to the priests' personnel and Canon 489 files.  (John Sitarz, Seth Tucker).

75.     If priests were still alive, Mr. Sitarz wrote letters to them or their counsel seeking release of their files if they were requested.  (John Sitarz).

76.     Mr. Sitarz did not do this for Fr. Crowley in the KS claim or Fr. Ladamus in the JA claim because the files were not requested by the claimants and because he did not understand that their files were being requested by Interstate.  (John Sitarz).

77.     The Archdiocese and its counsel did not believe that they needed to explain how the Connecticut personnel statute worked to Interstate's lawyers.  (John Sitarz, Seth Tucker).

78.     Richard Mallory did conduct discovery seeking the priest files.  The Archdiocese produced some documents on February 16, 2010 and provided the entire Ferguson personnel and Canon 489 file documents and a privilege log to the court for in camera review.  The court ordered some of those produced on June 2, 2010, and the Archdiocese complied with that order.  (Exhibits 82, 83; John Sitarz).

79.     Matthew Doe and Jacob Doe also sought discovery of the priest files. Pursuant to the orders in the Matthew Doe and Jacob Doe cases, the Archdiocese submitted a privilege log and the entire Ferguson personnel and Canon 489 files to the court for in camera review on June 25, 2010, and the court ordered some of those documents produced on September 8, 2010.  (Exhibits 90, 91, John Sitarz).

80.     Mr. Sitarz did not send Interstate subsequent discovery responses that discussed these documents because Interstate was not a party to the protective orders.  (John Sitarz).

81.     Interstate asked for, and was given the opportunity to review various defense counsel files, including the files for KS, Richard Mallory and Matthew Doe during 2008.  The only documents withheld were those subject to the attorney-client or work product privileges.  The Canon 489 files and personnel files documents were not in those defense counsel files in 2008 and were not withheld on these grounds. (Exhibits 12, 13, 24 and 25, John Sitarz).

82.     In the earlier GC, WN and CL claims, Mr. Darling requested numerous documents, including the files for the priests involved.  The Archdiocese provided access to its defense files, but Mr. Sitarz indicated that he could not provide the files on the priests.  (Exhibits 64, 66, 67, 68, 69; Mark Darling, John Sitarz).

83.     Interstate was not prejudiced by not receiving additional priest file documents.  Those documents arguably were relevant to only one issue – did the Archbishop know there was a substantial probability of sexual misconduct by those priests before or during the periods of abuse alleged by the Underlying Claimants.

The Ladamus and Crowley files did not contain any documents dated before or during the periods of abuse alleged here that put the Archbishop on notice of potential abuse. Interstate had copies by January 2012 of all but one pre-1986 Ferguson document. The one document that this Court ordered produced, ICR0072, was a January 30, 1981 Dr. Peterson letter that added no relevant information.  (Ruling on Motion for Summ. J. at 16 n.11; Exhibits 30-43, 120-172, 241; Msgr. John McCarthy, John Sitarz, Deborah Sons, Mark Darling, Kate Adams).

84. Despite the fact that Interstate and its counsel had all but one pre-1986 Ferguson file document by January 2012, they either did not review those documents or they did not find enough in those documents to deny coverage for the Richard Mallory and Matthew Doe claims.  (Exhibits 142, 241; Deborah Sons, Mark Darling, Kate Adams).

85. The additional documents ordered produced by this Court did not establish a basis to deny coverage on any of the Underlying Claims.  (Deborah Sons, Mark Darling, Kate Adams).

86. Interstate was not prejudiced by not receiving additional priest file documents because it never affirmed nor denied coverage and did not change its position on coverage to its detriment.  (Deborah Sons, Mark Darling, Kate Adams).

Seventh and Thirteenth Affirmative Defenses

87. The Archdiocese did not defend any of the three priests who were the alleged perpetrators in the four Underlying Claims.  (John Sitarz).

88. Mr. Sitarz exclusively represents the Archdiocese.  (John Sitarz).

89.     It would be a conflict of interest for him to represent an individual priest in claims such as the Underlying Claims.  (John Sitarz).

90.     When priests are sued in these cases, they retain their own counsel at their expense.  (John Sitarz).

91.     Jason Tremont represented JA and KS.  Attorney Tremont did not send demand letters to Frs. Crowley or Ladamus.  He only addressed his demand letter to the Archdiocese, through its counsel.  (John Sitarz).

92.     Crowley and Ladamus did not participate in the defense or settlement of these Underlying Claims.  (John Sitarz).

93.     Ferguson was not named as a defendant in the two claims that went into suit:  Richard Mallory and Matthew Doe.  Ferguson was not alive at the time that those claims were filed.  (John Sitarz).

94.     Interstate's reservation of rights letters each referred only to the Archdiocese as the Insured and acknowledged that Mr. Sitarz was the representative of the Archdiocese.  (Exhibits 75, 76, 79, 85; Deborah Sons).

95.     Interstate did not send reservation of rights or denial of coverage letters to Crowley or Ladamus, even though they were both alive and were "insureds" under its policies.  (Deborah Sons).

96.     There was a mediation before Richard Mallory filed suit with Richard Mallory and the Archdiocese as the only participants.  It was not successful.  (John Sitarz).

97.    The Archdiocese did not incur any defense costs on behalf of any of these priests in the Underlying Claims.  (John Sitarz).

98.    In the four Underlying Claims, the Archdiocese did not pay any consideration to obtain releases of its individual priests, and it did not allocate any of the settlements to those priests.  The Underlying Claimants did not look to the priests for compensation; their settlement demands were addressed only to the Archdiocese through its counsel, and settlement discussions were only between the Underlying Claimants and the Archdiocese, through counsel.  (John Sitarz).

99.    Over a number of years, claims have been asserted against the Archdiocese for allegedly failing to prevent mental and physical harm from sexual misconduct by certain of its clergy.  Prior to these four Underlying Claims, when those claims reached Interstate's coverage layer, Interstate paid something on those claims. When it did so, it required the Archdiocese to enter into confidential settlement agreements and releases.  Those releases defined the "Archdiocese" as including its individual priests, and "Interstate" as including its "directors, officers, shareholders, agents, servants, employees and representatives."   (Deborah Sons, Exhibits 50, 56, 106, 107)  Interstate 56a(2) Statement at 25.

Payments By Other Insurers

100.   Midland, the second-layer excess insurer for the two policy years prior to inception of the Interstate policies, was in liquidation during the entire pendency of the Richard Mallory claim.  The Archdiocese submitted a claim to the New York Liquidation Bureau to recover one half of the $871,931 amount that was above the self-insured

retention and the Lloyds layer, or $235,965.50.  The New York Liquidation Bureau ultimately paid $143,282.50 for the Midland policy year on the Richard Mallory claim, with no explanation for how it arrived at that amount. (Exhibit 177, John Sitarz, Matthew Byrne).

101.    After Lloyds and the other London Market insurers entered into a confidentiality agreement with the Archdiocese in June 2011, Mr. Sitarz provided Lloyds' counsel with certain Ferguson file documents that had been ordered produced by the Superior Court after its in camera review and that Lloyds counsel had requested.  Lloyds did not pursue, and the Archdiocese did not provide, documents from the Ladamus or Crowley files.  (Exhibit 223, John Sitarz).

102.    After entering into an agreement in principle in October 2012, Lloyds and the Archdiocese negotiated a written settlement agreement.  Lloyds and the other solvent London Market insurers wired certain monies in December 2014 to the Archdiocese to reimburse it for 14 claims, including these four Underlying Claims. (Exhibit 173, Seth Tucker, Matthew Byrne).

Damages

103.    The "loss" attributable to the Interstate policy for the JA Claim is $105,805.  (Matthew Byrne, John Sitarz).

104.    The "loss" attributable to the Interstate policy for the KS Claim is $106,774.75.  (Exhibit 175, Matthew Byrne, John Sitarz).

105.    The "loss" attributable to the Interstate policy for the Richard Mallory Claim is $235,965.50.  (Exhibit 176, Matthew Byrne, John Sitarz).

106.    The "loss" attributable to the Interstate policy for the Matthew Doe Claim is $290,222.97.  (Matthew Byrne, John Sitarz).

107.    Interstate has wrongfully detained the monies owed to reimburse the Archdiocese for "loss" on these four Underlying Claims.

108.    The Archdiocese lost earnings it otherwise would have earned on these monies if they had been paid by Interstate within 30 days of receipt of the proof of loss. Specifically, it has lost $136,959.61 on the Mallory claim, $40,330.99 on the KS Claim, $27,576.16 on the JA Claim, and $84,868.62 on the Matthew Doe Claim.  (Exhibits 180, 181; Matthew Byrne).

Count Two – Breach of the Implied Covenant of Good Faith and Fair Dealing

Imposition of Conditions Beyond the Terms of Interstate's Policies

109.    Interstate took the position that "proof of interest and loss" required production of full priest personnel and Canon 489 files even though "proof of interest and loss" was not defined by the Lloyds policies and "loss" was defined by Interstate's policies to refer to the amount of the settlement and defense costs.  (Exhibits 2, 3; Deborah Sons, Mark Darling).

110.    Interstate is taking the position now that there must be a formal "request for reimbursement" in addition to a proof of loss before it needs to begin its investigation and analysis of coverage.  There is no basis for this requirement in the language of the policies or in the course of dealing between the parties on earlier claims.  (Thomas Segalla, John Sitarz).

111.    Interstate conditioned starting its coverage analysis on the production of other priests' files and other information not pertinent to the issue of whether the Archbishop knew there was a substantial probability of future abuse by the particular priests at issue in the Underlying  Claims.  (Exhibits 84, 95; Mark Darling).

112.    Interstate conditioned starting its coverage analysis on the production of entire priest personnel and Canon 489 files in violation of Conn. Gen. Stat. § 31-128f. (Exhibits 77, 84, 95, 97, 231; Mark Darling, Seth Tucker).

113.    Interstate conditioned starting its coverage analysis on the production of entire Canon 489 files in spite of the Archdiocese's good faith belief that those files were protected from disclosure by Canon law.  (Exhibits 77, 84, 95, 231; Mark Darling, Seth Tucker).

114.    Interstate conditioned starting its coverage analysis on the production of the entire Ferguson Canon 489 file even though it already had all but one of the documents from the relevant time periods.  (Exhibits 84, 95, 241; Mark Darling, Kate Adams).

Course of Dealing in Earlier Claims

115.    The first priest sexual misconduct claim to reach Interstate's layer was a claim by a woman named GR, who made a claim against the Archdiocese for misconduct by a priest not at issue in these Underlying Claims.  (John Sitarz).

116.    Interstate paid the full amount of the GR claim that was in its layer. (Exhibits 46, 47, 48; John Sitarz, Deborah Sons).

117.   Thereafter, Magistrate Judge Garfinkel conducted a "mass mediation" of many claims, and Interstate paid 50 percent of its total exposure on claims asserted by four claimants whose settlement amounts reached its layer:  PS,  PG (a/k/a David Doe), RB and PC.  Interstate did not review any files on the priests involved and did not wait for the Archdiocese or Lloyds to pay.  Gallagher Bassett was not involved. (Exhibits 49, 50, 51, John Sitarz, Deborah Sons).

118.   Interstate next paid $75,000 of its 1/3 share of $250,000 to reimburse the Archdiocese for a claim made by WM 20 days after the Archdiocese paid WM. Interstate did not wait for the Lloyds layer to pay, and Gallagher Bassett was not involved.  (Exhibits 52, 53, 54, 55, 56, 57, 58; John Sitarz).

119.   The next claims to reach the Interstate layer were claims by EGC, WN and CL.  (Exhibits 60, 61, 62; Mark Darling, John Sitarz).

120.   The Archdiocese settled these cases in July 2008.  (Exhibits 63, 65, 69; John Sitarz, Mark Darling).

121.   Interstate reimbursed the Archdiocese for 50 percent of the EGC, WN and CL claims in May 2010.  The Archdiocese did not provide priest files for Interstate to review, and Gallagher Bassett was not involved in obtaining this reimbursement. (Exhibits 70, 71, 72, 73; Mark Darling, John Sitarz).

Claims Handling of the Four Underlying Claims

122.   Interstate has a document entitled "Surplus Lines Diocese Claims – Best Practices and Claim Handling Guidelines" that was created specifically for diocese

abuse claims and that governed the claims handling of these four Underlying Claims. (Exhibit 238; Deborah Sons).

123.   It requires claims handlers on sexual misconduct claims to do a coverage analysis, a liability analysis and a settlement evaluation.  (Id.).

124.   Interstate did an initial coverage analysis on each of the Underlying Claims before issuing its reservation of rights letters.  It never updated those analyses. (Deborah Sons).

125.   The Archdiocese provided notice to Interstate of the settlement of the Richard Mallory Claim on August 25, 2010.  Interstate reviewed the relevant priest personnel and Canon 489 documents in December 2011 and copied them in January 2012.  (Exhibits 22, 92, 93, 96, 241, 114; John Sitarz, Kate Adams).

126.   The Archdiocese provided notice to Interstate of the JA settlement on March 14, 2012.  At no time after that settlement did Interstate request documents relevant to this claim or engage in any coverage analysis of this claim.  (Exhibits 8, 9, 177, 246, 115; John Sitarz, Deborah Sons).

127.   The Archdiocese provided notice to Interstate of the KS settlement on February 18, 2011.  Other than a May 3, 2011 call to Gallagher Bassett about the proof of loss, and a February 17, 2012 email to Gallagher Bassett for an update, Interstate did not request documents relevant to this claim or engage in any coverage analysis of this claim.  (Exhibits 178, 249, 116; John Sitarz, Deborah Sons).

128.   The Archdiocese provided notice to Interstate of the Matthew Doe settlement on June 21, 2012.  Interstate reviewed the relevant priest personnel and

Canon 489 documents in December 2011 and copied them in January 2012.  (Exhibits 29, 92, 93, 96, 241, 117; John Sitarz, Kate Adams).

129.   The Lloyds policies to which Interstate's policies follow form require payment within 30 days of receipt of the "proof of interest and loss," and therefore, Interstate should have done its coverage investigation and requested documents before the settlements were reported.  (Exhibit 3, Berglund).

130.   The protective orders governing the Matthew Doe and Richard Mallory cases required keeping the documents produced from the priest files confidential. Interstate would not enter into a confidentiality agreement for those documents without the right to reopen settlements of past claims.  (Exhibits 80, 81, 86, 87, 94, 95, 231; John Sitarz, Seth Tucker).

131.   On March 22, 2011, Mr. Sitarz followed up to ask about the status of reimbursement on a number of outstanding claims, one of which was Richard Mallory, which had settled in August 2010.  Deborah Sons of Interstate was on that email.  Ms. Sons made a notation in her claims file of the request.  (Exhibits 240, 242; Deborah Sons, John Sitarz).

132.   On February 17, 2012, Gallagher Bassett asked Ms. Sons what additional information Interstate needed to complete its coverage evaluation of the KS Claim.  Ms. Sons did not respond.  (Exhibit 254; Deborah Sons).

133.   On May 22, 2012, Mr. Sitarz asked James Hanson of Gallagher Bassett about the status of Interstate's reimbursement was for the Richard Mallory and KS Claims.  That day, Mr. Hanson sent his spreadsheet of the settlement amounts and

defense costs totals for 11 claims, including the Richard Mallory and KS claims to

Deborah Sons.  (Exhibits 98, 175; Deborah Sons, John Sitarz, James Hanson).

134.    On June 19, 2012, Mr. Sitarz emailed James Hanson again, asking

about the status of collection efforts from Interstate.  (Exhibit 111; John Sitarz).

135.    Two days later, on June 21, 2012, Mr. Hanson forwarded Mr. Sitarz's

May 22 email to Deborah Sons and asked her for a "shopping list" of items she wants.

(Exhibit 243; Deborah Sons).

136.    On June 25, 2012, Interstate's outside counsel, Mark Darling, sent a

letter to Mr. Sitarz and Seth Tucker, the Archdiocese's coverage counsel, captioned

"Richard Mallory v. Archdiocese of Hartford," and seeking the following documents:

> 1.    The entire personnel file of Fr. Foley, Fr. Ferguson, John Brooks, Fr. Paturzo, Msgr. Lacey, Fr. Perrault, Joseph Rozint, Fr. Primavera and Fr. Shiner.  These requests include, but should not be limited to, any and all records of any complaints made against each person, and disciplinary warnings or actions taken against each person, any transfers, any psychiatric and/or psychological evaluations of each person, and any other document relating to each such individual contained in any record of the Archdiocese;
>
> 2.    The entire "secret archives" file(s) relating to any of the above-named individuals, including all notes, correspondence or documents of whatever nature made or received by any Bishop or priest of the Archdiocese relating to any individual accused of sexual abuse from 1940 to the present.
>
> 3.    Any and all deposition transcripts, answers to interrogatories or statements from any of the individuals listed in paragraph 1 from any claim or suit.
>
> In addition, to the extent not previously produced, we request the following information and materials:

> 1.    A list of all pending Hartford Diocese clergy abuse claims or suits for which the Diocese is seeking indemnification from Interstate, including the dates when any such matters have been scheduled for trial and the name(s) of the priests who are alleged to have committed abuse in the matter, and all underlying discovery materials and pleadings for each matter, or if only in a claim stage, all documents, correspondence, statements and any other documents in each claim file; and
>
> 2.    The history of settlements and/or trial results in Diocese clergy abuse claims for the past ten (10) years, including the amount of the result, a full description of the nature and frequency of the abuse, and the name of the accused abusers (whether involving IFC coverage periods or not).

Mr. Darling admits that, other than Frs. Ferguson and Foley, he was not aware of any of the people listed in his letter being involved in claims that reached Interstate's layer. (Exhibit 84, Mark Darling, John Sitarz, Exhibits 332 and 333 at ¶ 84).

137.   Interstate already had collected copies of the Ferguson documents ordered produced in January 2012.  (Exhibit 241; John Sitarz, Mark Darling, Kate Adams).

138.   Interstate wanted documents from the entire Ferguson personnel and Canon 489 files, and not just those that had not been ordered produced by the Superior Court pursuant to its in camera review under Conn. Gen. Stat. § 31-128f. (John Sitarz, Seth Tucker, Mark Darling).

139.   Mr. Tucker replied to the June 25, 2012 letter on July 6, 2012, and among other things, he offered an opportunity to review Richard Mallory documents. After numerous attempts to elicit a response to that July 6, 2012 letter, Mr. Tucker wrote again on September 14, 2012, cataloguing his efforts to get a response.  Mr.

Darling finally replied on October 1, 2012, accepting that offer to review the Richard Mallory documents.  Mr. Darling acknowledged the delay in responding.  (Exhibits 77, 78, 233, Seth Tucker, Mark Darling, Exhibits 332 and 333 at ¶ 86).

140.    By October 1, 2012, the Archdiocese was concerned that the 27-month period for bringing suit for coverage on the Richard Mallory Claim was about to expire. That 27-month period started running on August 25, 2010.  Although Lloyds entered into a tolling agreement, Interstate refused.  Interstate has refused to enter into tolling agreements with other policyholders, such as the Diocese of Kansas City/St. Joseph. (Exhibits 229, 235, 236, 237, 291-294; Deborah Sons, John Sitarz, Seth Tucker, Mark Darling).

141.    Mr. Sitarz also sent followup emails in early October 2012 attempting to collect reimbursement on the JA and Matthew Doe Claims.  The only action taken by Interstate on the JA Claim after it settled was to close extra years of claims files.  It did not request documents.  Interstate did not take any steps after settlement of the Matthew Doe Claim.  (Exhibits 110,113, 246, 256; John Sitarz, Deborah Sons).

142.    All of Interstate's actions or failures to act described above were done with a dishonest purpose and a desire to put Interstate's interests ahead of the Archdiocese's interests.  (Sons, Darling)

143.    The Archdiocese filed this action on November 19, 2012.  Complaint (ECF No. 1).

Count Three – CUIPA/CUTPA

144.     As part of the court-ordered production in this case, Interstate produced a list of 1700 sexual misconduct claims against religious institution policyholders since 2000.  Although the Court ordered the production of all 1700 claims files, the parties agreed to limit production to samples selected by Interstate of 25 paid claims, 25 unpaid claims and 7 more specific claims.  "Claims" refers to policy years implicated by an individual claimant, not claimants.  Of these claims, 101 had been paid, 318 were pending (including those for these four Underlying Claimants), and the remainder were closed without payment.  (Exhibit 262).

145.     Interstate failed to acknowledge and act with reasonable promptness to communications regarding the settlements of the abuse claims against the Archdiocese.(Exhibits 2, 3, 8-10, 14-16, 20-22, 26-29, 69-72, 77-78, 98, 110-113, 231-238, 240-261; John Sitarz, Seth Tucker, Deborah Sons and Mark Darling).

146.     Interstate failed to acknowledge and act with reasonable promptness to communications regarding the abuse claims of the Diocese of Portland Maine. (Deborah Sons, Exhibits 265-266 (showing that after October 20, 2009, when the Diocese complied with Interstate's last documentation request, Interstate did not communicate with the Diocese again until April 16, 2010)).

147.     Interstate failed to acknowledge and act with reasonable promptness to communications regarding the abuse claims of the Diocese of Manchester New Hampshire.  (Martha Kipp and Deborah Sons and Exhibits 283, 286 and 296-308 (showing that the Diocese sent letters regarding four claims sent on January 31, 2003

and follow-up letters dated February 21, 2003, March 28, 2003, April 3, 2003 and April 10, 2003 but did not receive acknowledgments of claims until April 15, 2003 on one claim and April 22, 2003 on the remaining three claims and that, despite its May 7, 2003 agreement to reimburse the Diocese on the KM claim, Interstate did not pay anything towards this claim until the settlement of the Diocese's coverage action in June, 2004)).

148.   Interstate's practice of failing to acknowledge and act with reasonable promptness to communications regarding the abuse claims occurs with sufficient frequency to indicate that it is a general business practice.(John Sitarz, Seth Tucker, Deborah Sons, Mark Darling and Martha Kipp and Exhibits 2, 3, 8-10, 14-16, 20-22, 26-29, 69-72, 77-78, 98, 110-113, 231-238, 240-261, 265-266, 283, 286 and 296-308).

149.   Interstate failed to affirm or deny coverage within a reasonable time after proofs of loss have been completed with respect to the abuse claims of the Archdiocese.  (Exhibits 2, 3, 8-10, 14-16, 20-22, 26-29, 69-72, 77-78, 98, 110-113, 231-238, 240-261; John Sitarz, Seth Tucker, Deborah Sons and Mark Darling).

150.   Interstate failed to affirm or deny coverage within a reasonable time after proofs of loss have been completed with respect to the abuse claims of the Diocese of Portland Maine.(Deborah Sons, Exhibits 264 – 267 (showing, that notwithstanding its offer to contribute to the underlying settlement in March 2009, proofs of loss submitted in June 2009, and fulfillment of Interstate's last documentation request on October 20, 2009, Interstate did not agree to coverage until April 16, 2010)).

151.   Interstate failed to affirm or deny coverage within a reasonable time after proofs of loss have been completed with respect to the abuse claims of the Diocese of Manchester New Hampshire.  (Martha Kipp and Deborah Sons and Exhibits 283, 286 and 296-308 (showing no affirmation or denial of coverage with regard to the KM claim until its May 7, 2003 agreement to reimburse that claim and no affirmation or denial at all for the other claims)).

152.   Interstate failed to affirm or deny coverage within a reasonable time after proofs of loss have been completed with respect to the abuse claims of the Archdiocese of Seattle Washington.  (Deborah Sons and Mary Santi and Exhibits 279, 311, 314 and 318 (showing that, after the submission of the proof of loss for the RH and John Doe claims on August 27, 2010, Interstate made numerous requests for voluminous numbers of documents, much of which had been previously provided and some of which had no apparent connection to the claims for which reimbursement had been sought (letters from William Crowley dated 10/14/10 [318], 1/14/11 [311] & 4/13/11 [311]) but, as of June 2011, when the Archdiocese of Seattle filed its coverage action, Interstate had not yet affirmed or denied coverage); Exhibit  312 (showing Interstate did not affirm or deny coverage for the CM claim in the more than 6 months from the time when all requested records were received on April 4, 2012 until Interstate accepted the Archdiocese's offer of settlement in October 2012); and Exhibit 313 (showing Interstate made repeated requests for information, much of which had been previously provided but did not affirm or deny coverage for the GK claim in the

year between the original submission of the proof of loss on April 9, 2012 through the settlement of the claim in August 2013)).

153.   Interstate failed to affirm or deny coverage within a reasonable time after proofs of loss have been completed with respect to the abuse claims of the Diocese of Phoenix Arizona.  (Deborah Sons and Exhibits 287-290 (showing that priest file was received in November 2005 indicating the Diocese had no notice of prior abuse, that proof of loss was received by Interstate by February 2009 and that Interstate did not affirm or deny coverage prior to serving its declaratory judgment action in September 2009, even though it planned to bring that action as early as February 2009)).

154.   Interstate's practice of failing to affirm or deny coverage within a reasonable time after proofs of loss have been completed with respect to the abuse claims occurs with sufficient frequency to indicate that it is a general business practice. (John Sitarz, Seth Tucker, Deborah Sons, Mark Darling, Mary Santi and Martha Kipp and Exhibits 2, 3, 8-10, 14-16, 20-22, 26-29, 69-72, 77-78, 98, 110-113, 231-238, 240-261, 264-267, 279, 283, 286-290, 296-308, 311-314 and 318).

155.   Liability had become reasonably clear in the JA Claim by March 14, 2012.  (John Sitarz, Philip Newbury).

156.   Liability had become reasonably clear in the KS Claim by January 21, 2011.  (John Sitarz, Philip Newbury).

157.   Liability had become reasonably clear in the Richard Mallory Claim by August 25, 2010.  (John Sitarz, Philip Newbury).

158.   Liability had become reasonably clear in the Matthew Doe case by June 20, 2012.  (John Sitarz, Philip Newbury).

159.   Interstate did not attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear with respect to the abuse claims of the Archdiocese.  (Exhibits 2, 3, 8-10, 14-16, 20-22, 26-29, 69-72, 77-78, 98, 110-113, 231-238, 240-261; John Sitarz, Seth Tucker, Deborah Sons and Mark Darling).

160.   Interstate did not attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear with respect to the abuse claims of the Diocese of Manchester New Hampshire.(Martha Kipp and Deborah Sons and Exhibits 283, 286 and 296-308 (showing that, despite its May 7, 2003 agreement to reimburse the Diocese on the KM claim, Interstate did not pay prior to the settlement of Diocese's coverage action in June 2004 when it paid less than the full amount of the KM reimbursement to which it had agreed)).

161.   Interstate did not attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear with respect to the abuse claims of the Archdiocese of Seattle Washington.  (Deborah Sons and Mary Santi and Exhibits 310 and 319 (showing that Interstate brought a declaratory action regarding the BB claim for the purpose of negotiation); Exhibits 279, 311-314 and 318 (showing that, after the submission of the proof of loss, Interstate made numerous requests for voluminous numbers of documents, much of which had been previously provided and some of which had no apparent connection to the claims

for which reimbursement had been sought, delaying reimbursement for nearly a year or more)).

162.    Interstate did not attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear with respect to the abuse claims of the Diocese of Portland Maine. (Deborah Sons, Exhibits 264 – 267 (showing, that notwithstanding its offer to contribute to the underlying settlement in March 2009, proofs of loss submitted in June 2009, Interstate's acknowledgement in October 2009 that there was no evidence of prior notice of abuse and its acknowledgement on April 15, 2010 that there were no clear defenses with which to negotiate with the Diocese, Interstate attempted to negotiate a reduced reimbursement on April 16, 2010)).

163.    Interstate did not attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear with respect to the abuse claims of the Diocese of Sacramento California.  (Deborah Sons and Exhibits 268 – 276 and 278 (showing that Interstate acknowledged in May of 2005 that there was no evidence in the James Doe claim that Diocese had prior notice of abuse, that Interstate argued that the lack of notice was grounds for denial of coverage, that Interstate refused to enter into confidentiality agreement, that Interstate requested documentation previously provided; that Interstate received proof of payment and settlement agreement in June 2005, and that, although Interstate internally acknowledged exposure with regard to the James Doe claim and the Archdiocese of Sacramento periodically inquired about reimbursement of its various

claims, Interstate did not provide coverage before settlement of coverage case in January 2009 because it claimed the Archdiocese had failed to make a formal demand with respect to the James Doe claim)).

164.    Interstate's practice of not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear with respect to the abuse claims occurs with sufficient frequency to indicate that it is a general business practice.  (John Sitarz, Seth Tucker, Deborah Sons, Mark Darling, Mary Santi and Martha Kipp and Exhibits 2, 3, 8-10, 14-16, 20-22, 26-29, 69-72, 77-78, 98, 110-113, 231-238, 240-261, 264-276, 278-279, 283, 286, 296-308, 310-314 and 318-319).

165.    Interstate compelled the Archdiocese to institute litigation to recover amounts due under its policies with respect to its abuse claims.  (Exhibits 2, 3, 20-22, 235-237; Seth Tucker, Mark Darling, Deborah Sons).

166.    Interstate compelled the Diocese of Manchester New Hampshire to institute litigation to recover amounts due under its policies with respect to its abuse claims.(Martha Kipp and Deborah Sons and Exhibits 283, 286 and 296-308 (showing that the Diocese brought a coverage actions against Interstate based upon Interstate's lack of response to communications from the Diocese and failure to provide the reimbursement it promised on the KM claim)).

167.    Interstate compelled the Archdiocese of Seattle Washington to institute litigation to recover amounts due under its policies with respect to its abuse claims.(Deborah Sons and Mary Santi and Exhibits 279, 310-312 and 318-319

(showing that Interstate's tactics of bringing declaratory judgment actions and making numerous requests for voluminous numbers of documents, much of which had been previously provided and some of which had no apparent connection to the claims for which reimbursement had been sought, delaying reimbursement for nearly a year was the reason for the Archdiocese of Seattle's coverage action)).

168.   Interstate compelled the Diocese of Sacramento California to institute litigation to recover amounts due under its policies with respect to its abuse claims. (Deborah Sons and Exhibits 268-276 and 278 (showing that despite the facts that Interstate acknowledged in May of 2005 that there was no evidence in the James Doe claim that Diocese had prior notice of abuse, that Interstate internally acknowledged exposure with regard to the James Doe claim, and that the Archdiocese of Sacramento periodically inquired about reimbursement of its various claims, Interstate did not provide coverage on the James Doe claim before the before the Archdiocese of Sacramento filed its coverage case in September of 2007, which Interstate noted was just 2 months shy of the contractual limitations period)).

169.   More than 75% of the abuse claims paid by Interstate were paid in the settlement of coverage litigation initiated by policyholders, as part of a bankruptcy proceeding, or as counterclaims to declaratory judgment actions brought by Interstate. (Deborah Sons, Martha Kipp and Mary Santi and Exhibits 262-263, 277 and 280-285 (showing payments made by Interstate in 77 out of 101 paid claims were pursuant to coverage litigation with the Dioceses or Archdioceses of Sacramento, Seattle, Springfield, Portland OR, Kansas City – St. Joseph, Manchester and Milwaukee).)  In

addition, other claims were paid as the result of Interstate's participation in mediation for the settlement of the underlying abuse claims.  (Deborah Sons and Exhibits 329-330 (showing Interstate's agreement to pay for settlement of abuse claims brought against the Diocese of Santa Rosa pursuant to a mass mediation of numerous claims)).

170.    Interstate's practice of compelling policyholders to institute litigation to recover amounts due under its policies with respect to the abuse claims occurs with sufficient frequency to indicate that it is a general business practice.(John Sitarz, Seth Tucker, Deborah Sons, Mark Darling, Mary Santi and Martha Kipp and Exhibits 2, 3, 20-22, 235-237, 262-286, 296-308, 310-314, 318-319 and 329-330).

171.    Interstate's practices of

    a.    failing to acknowledge and act with reasonable promptness to communications regarding claims;

    b.    failing to affirm or deny coverage of claims within a reasonable time after proofs of loss have been completed;

    c.    not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; and

    d.    compelling policyholders to institute litigation to recover amounts due under its policies.

were not merely negligent, but involved a conscious decision to disregard acknowledged business norms.

172.    As a result of Interstate's practice of failing to acknowledge and act with reasonable promptness to communications regarding the abuse claims of the Archdiocese, the Archdiocese was damaged because (1) the Archdiocese was forced

to bring coverage litigation and incur the expense of that litigation, and (2) there was a delay in the payment of moneys owed by Interstate under its policies, which otherwise would have been invested by the Archdiocese.

173.   As a result of Interstate's practice of failing to affirm or deny coverage within a reasonable time after proofs of loss have been completed with respect to the abuse claims of the Archdiocese, the Archdiocese was damaged because (1) the Archdiocese was forced to bring coverage litigation and incur the expense of that litigation, and (2) there was a delay in the payment of moneys owed by Interstate under its policies, which otherwise would have been invested by the Archdiocese.

174.   As a result of Interstate's practice of not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear, the Archdiocese was damaged because (1) the Archdiocese was forced to bring coverage litigation and incur the expense of that litigation, and (2) there was a delay in the payment of moneys owed by Interstate under its policies, which otherwise would have been invested by the Archdiocese.

175.   As a result of Interstate's practice of compelling policyholders to institute litigation to recover amounts due under its policies, the Archdiocese was damaged because (1) the Archdiocese was forced to bring coverage litigation and incur the expense of that litigation, and (2) there was a delay in the payment of moneys owed by Interstate under its policies, which otherwise would have been invested by the Archdiocese.

176.   By its refusal to timely reimburse the Archdiocese for the "loss," Interstate caused additional damages to the Archdiocese in the amounts of $136,959.61 for the Richard Mallory claim, $40,330.99 for the KS claim, $27,576.16 for the JA claim, and $84,868.62 for the Matthew Doe claim, representing the lost earnings on those amounts that should have been reimbursed.  (Exhibits 180-181; Matthew Byrne)

177.   By its refusal to timely reimburse the Archdiocese for the "loss," Interstate caused damages to the Archdiocese by virtue of requiring the Archdiocese to institute the instant litigation in an amount to be determined.

PLAINTIFF – THE HARTFORD ROMAN
CATHOLIC DIOCESAN CORPORATION

By   /s/ Elizabeth J. Stewart
      Elizabeth J. Stewart – ct01316
      estewart@murthalaw.com
      Marilyn B. Fagelson – ct17202
      mfagelson@murthalaw.com
      Melissa A. Federico – ct28278
      mfederico@murthalaw.com

Murtha Cullina LLP
265 Church Street
New Haven, Connecticut 06510
Telephone: 203.772.7700
Facsimile:   203.772.7723
Its Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2016, the foregoing Plaintiff's Revised

Proposed Findings of Fact for Joint Trial Memorandum § 9(c) was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's

electronic filing system.


 /s/ Elizabeth J. Stewart
Elizabeth J. Stewart