UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| THE HARTFORD ROMAN CATHOLIC DIOCESAN, CORP.<br>    *Plaintiff,*<br>        *v.*<br>INTERSTATE FIRE AND CASUALTY CO.<br>        *Defendant.* | Civil No. 3:12cv1641(JBA)<br><br>July 28, 2016 |

**MEMORANDUM OF DECISION**

# Table of Contents

I.   Findings of Fact ................................................................................................2

   A.   The Insurance Policies ..................................................................................3

      1.   Structure of the Policies ...........................................................................3

      2.   The "Occurrence" Clause .........................................................................4

      3.   Conditions Precedent ...............................................................................4

      4.   Time for Filing Suit ..................................................................................5

   B.   The Underlying Claims ..................................................................................5

   C.   Evidence of Notice .........................................................................................7

      1.   Father Crowley ..........................................................................................7

      2.   Father Ferguson .........................................................................................9

   D.   **The Claims Handling Process** ...................................................................13

      1.   JA .............................................................................................................13

      2.   KS .............................................................................................................18

      3.   Doe ............................................................................................................22

      4.   Mallory .....................................................................................................27

II.   Conclusions of Law ........................................................................................36

   A.   **Breach of Contract** ......................................................................................36

      1.   The Archdiocese's Performance ...........................................................36

      2.   Whether Interstate Breached the Contract ..........................................55

      3.   Ninth Affirmative Defense (the Archdiocese's own Conduct) ...........65

    B.    Covenant of Good Faith and Fair Dealing ...............................................................68

        1.   JA and KS ....................................................................................................69

        2.   Doe and Mallory........................................................................................70

    C.    CUIPA/CUTPA ...................................................................................................71

        1.   Unfair Practices in Handling the Four Claims at Issue Here ................73

        2.   General Business Practices........................................................................77

        3.   The Final Analysis .....................................................................................92

    D.    Damages ...............................................................................................................93

III.    Conclusion .....................................................................................................................97

The Court held a bench trial from April 7, 2016 to April 28, 2016 on claims by Plaintiff the Hartford Roman Catholic Diocesan Corporation (the "Archdiocese") that Defendant Interstate Fire and Casualty Company ("Interstate") is liable for breach of contract (Count One), breach of the covenant of good faith and fair dealing (Count Two), and unfair trade practices, in violation of the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. § 38a-815 *et seq.*, and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b (Count Three), arising from Interstate's failure to indemnify the Archdiocese for monies it paid to four victims of three of its priests' sexual abuse. For the reasons that follow, judgment is entered in the Archdiocese's favor on Count One, and in Interstate's favor on Counts Two and Three.

## I.  Findings of Fact

Based on the evidence presented during the bench trial, the Court makes the following findings of fact with respect to: (1) the nature of the insurance policies at issue in this case; (2) the underlying claims of sexual abuse; (3) the Archdiocese's knowledge, if any, of the accused priests' pedophilic tendencies prior to the claims of abuse by the underlying claimants; and (4) the claims handling process.

### A. The Insurance Policies

#### 1. Structure of the Policies

Between September 1, 1978 and September 1, 1985, the Archdiocese of Hartford, a Connecticut non-profit, charitable corporation encompassing Hartford, New Haven, and Litchfield counties (Jt. Trial Mem., Stip. Findings of Facts ("Stip. Facts") [Doc. # 171] ¶ 1), purchased excess indemnity insurance policies from Interstate as part of its participation in the "Bishops Plan," which was brokered by Arthur J. Gallagher & Co., later Gallagher Bassett Insurance Service ("Gallagher Bassett"), the Archdiocese's third-party insurance administrator (*id.* at ¶ 3; *see* Bishops Plan, Pl.'s Trial Ex. 239). Under this plan, the Archdiocese maintained a Self-Insured Retention ("SIR") for the first layer of coverage; underwriters Lloyds of London and other London Market insurers (collectively "Lloyds") and Centennial Insurance Company provided the first layer of excess insurance; and Interstate provided the final layer of excess coverage.[1] (Stip. Facts ¶ 5.) Interstate's policies followed the form of Lloyds' policies except to the extent that the provisions in the underlying policies were inconsistent with the provisions in Interstate's policies. (*See* Interstate's Policy, Pl.'s Trial Ex. 2, Part I ¶ 1.) As third-party administrator, Gallagher Bassett facilitated the flow of information from the Archdiocese to its insurers, notifying the excess

---

[1] From September 1, 1978, to August 31, 1981, the SIR was $60,000, Lloyds provided 90 percent of the next layer of $140,000, and Centennial Insurance Company provided the remaining 10 percent. (Stip. Facts ¶ 7; Insurance Coverage Chart, Pl.'s Trial Ex. 1.) From September 1, 1981, to September 1, 1985, the SIR increased to $100,000, Lloyds provided 80 percent of the next layer of $100,000, and Centennial Insurance Company provided the remaining 20 percent. (*Id.*) Interstate provided the final layer of insurance above $200,000, up to $5 million. (*See* Stip. Facts ¶ 14; *see* Insurance Coverage Chart.)

insurance providers when claims had been opened and keeping them apprised of correspondence or events that might affect their coverage analysis and liability. (*See* Bishops Plan at 15.)

### 2.   The "Occurrence" Clause

Under the policies, Interstate agreed to indemnify the Archdiocese "for all sums" that it was obligated to pay "arising out of any occurrence or happening during the period of insurance." (Lloyds' Policy, Pl.'s Trial Ex. 3 § II: Casualty Insurance, Agmt. C.)  "Occurrence" was defined as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, or damage to property during the policy period." (*Id.* § II: Definitions (3).)

In its summary judgment ruling, the Court interpreted these provisions to mean that Interstate was obligated to indemnify the Archdiocese for all sums paid (**a**) arising out of the Archdiocese's placement of the accused priests in environments where they had the opportunity to abuse children *if* (**b**) the Archdiocese did not *subjectively know* that it was (**c**) *substantially probable* that the priests would abuse children. (Ruling on Cross-Mots. Summ. J. [Doc. # 160] at 16–22.)

### 3.   Conditions Precedent

Before the Archdiocese can recover under the insurance policies, it is obligated to satisfy certain conditions precedent outlined in the policies. (*See* Interstate's Policy § V.) These include, as relevant here: (1) the "books or records" provision; and (2) the "proof of loss" provision.

Under the books or records provision, "the Underwriters or their duly authorized representatives shall be permitted at all reasonable times during the continuance of this Insurance to . . . examine the Assured's *books or records* so far as they relate to coverage afforded by this Insurance." (Lloyds' Policy § IV.3.) In its summary judgment ruling, the Court interpreted "books

or records" to include personnel and Canon 489 files[2] and not solely financial documents. (Ruling on Cross-Mots. Summ. J. at 28–29.)

The "proof of loss" provision provides: "When it has been determined that Underwriters are liable under this insurance, Underwriters shall thereafter promptly reimburse the Assured . . . . All adjusted claims shall be paid or made good to: the Assured within thirty days after their presentation to Arthur J. Gallagher & Co., and acceptance by Underwriters of *satisfactory proof of interest and loss*." (Stip. Facts ¶ 19; Lloyds' Policy § IV.11.) Neither Interstate's nor Lloyds' policies define the phrase "proof of loss." (Stip. Facts ¶ 21; *see* Interstate's Policy; Lloyds' Policy.)

### 4.  Time for Filing Suit

Finally, a section of the Lloyds' policies entitled "Litigation Proceedings" provides: "No suit to recover on account of loss under this insurance shall be brought until 90 days after proof of loss shall have been furnished, nor at all unless commenced within twenty seven months from the date upon which loss occurred, if such loss, is within the knowledge of the Assured; if not, the twenty seven months shall begin upon notice to the Assured of such loss or claim." (Lloyds' Policy § IV.13.)

### B.  The Underlying Claims

Between August 2010 and May 2012, the Archdiocese settled four claims by individuals (JA, KS, Matthew Doe, and Richard Mallory) alleging that they had been sexually abused by three

---

[2] As Monsignor John McCarthy, Chancellor for the Archdiocese from 2005–2012, testified at trial, the Archdiocese creates and maintains Canon 489 files, also known as "secret archive files," for the purpose of keeping a confidential record of sensitive information regarding priests, including allegations of sexual abuse. (*See* McCarthy Test., Trial Tr. Vol. 2 AM at 90.)

Archdiocesan priests (Fathers Robert Ladamus, Stephen Crowley, and Ivan Ferguson) when they were children, between 1977 and 1984 or 1985.

JA reported that he was sexually abused by Father Robert Ladamus when he was a student at St. Mary's Church and School in Milford, Connecticut. (Stip. Facts ¶ 44; *see* JA Demand Ltr., Pl.'s Trial Ex. 7 at 2.) He alleged that the abuse began when he was in 6th or 7th grade, sometime in 1981 or 1982, in Connecticut as well as on trips to Vermont and Florida, and consisted of "fondling, tickling, . . . wrestling," and exposure. (JA Demand Ltr. at 2)

KS reported that he was sexually abused by Father Stephen Crowley when he was approximately eight years old and a student at St. Francis of Assisi School in Torrington, Connecticut during the 1981–82 school year. (*See* Stip. Facts ¶ 72; KS Demand Ltr., Pl.'s Trial Ex. 11 at 3.) The abuse included fondling, mutual masturbation and oral sex. (KS Demand Ltr. at 3–4.)

Both Richard Mallory and Matthew Doe reported abuse by Father Ivan Ferguson. Mr. Mallory claimed that between November 1977 and October 1978, when Father Ferguson was a teacher at Northwest Catholic High School and was in residence at the rectory at St. Bernard's Church in Tariffville, Connecticut, Father Ferguson fondled him, ejaculated in front of him, and attempted to sodomize him. (*See* Stip. Facts ¶ 100; Mallory Demand Ltr., Pl.'s Trial Ex. 17 at 4.) Mr. Doe alleged that Father Ferguson abused him from the summer of 1981 to the fall of 1982, when Mr. Doe was approximately 13–14 years old, and Father Ferguson was the Assistant Pastor at St. Mary's Parish in Derby, Connecticut. (*See* Stip. Facts ¶ 133; Doe Claim Notification, Pl.'s Trial Ex. 23 at 2.)

### C.  Evidence of Notice

Interstate asserts that the Archdiocese was on notice that Fathers Crowley and Ferguson had abused children prior to their abuse of KS, Mr. Doe, and Mr. Mallory.[3] The Court's factual findings with respect to notice are detailed here.

#### 1.  Father Crowley

The trial record contains evidence that Father Crowley began to abuse children as early as 1975. (*See* ML Abuse Report, Pl.'s Trial Ex. 39.) However, there is little evidence that anyone at the Archdiocese was made aware of this abuse until March 1983, when a group of parents wrote to Archbishop John Whealon[4] accusing Father Crowley of having abused their children. (*See* 1983 Ltrs., Pl.'s Trial Ex. 127.).

While Interstate points to a report of abuse in Father Crowley's Canon 489 file prepared by victim ML's counsel, in which ML alleges that he "believe[d] that the school teachers knew about Crowley's abuses" when he was being abused between 1975 and 1978 (ML Abuse Report), there is no record evidence to corroborate this claim, nor any evidence of who exactly knew what and when.

Interstate also seeks to draw the Court's attention to an undated letter in Father Crowley's Canon 489 file from the parents of victim DR to Archbishop Whealon, in which the parents claim that Father Crowley abused DR (*see* 1983 Ltrs. at 1), as well as a 2004 interview report of DR, in

---

[3] There is no dispute that the Archdiocese had no notice of Father Ladamus's pedophilia before he abused JA.

[4] Whealon was the Archbishop from 1969 to 1991.

which DR claimed the abuse occurred between 1982 and 1983[5] (*see* DR Interview Report, Pl.'s Trial Ex. 33 at 1). However, absent any indication on the letter of when the letter was written, and because it appears that the letter was one of several letters written by concerned parents following the March 1983 meeting with Archbishop Whealon (*see* Whealon's Mar. 1983 Mtg. Notes, Pl.'s Trial Ex. 129 (noting parents of DR as attendees)), the Court cannot conclude that the DR letter provided notice to Whealon prior to March 1983.

Finally, Interstate highlights a 2004 interview report of victim CB by Archdiocese counsel John W. Sitarz, in which he wrote:

> [I]n about 1982 or 1983, [CB's] parents, who had been speaking to parents of another student at St. Francis School, asked him whether he had ever been spanked by Fr. Crowley and/or had to pull down his pants for Fr. Crowley. In that context, he told his parents about his experiences with Fr. Crowley. CB's father then began to call the parents of other students to see whether the same type of conduct had occurred with their children. . . . His father and the parents of the other students contacted Archbishop Whealon and actually visited Archbishop Whealon in 1983 to complain about this conduct on the part of Fr. Crowley.

(CB Interview Report, Pl.'s Trial Ex. 36 at 1.) This report, however, offers no evidence that the Archdiocese had notice of Father Crowley's abuse prior to March 1983, as it appears more likely than not that the meeting CB referred to was the March 1983 meeting described above. (*See* 1983 Ltrs. at 10 (March 27, 1983 letter from CB's parents to Whealon); Whealon's Mar. 1983 Mtg. Notes (noting parents of CB as attendees).)

---

[5] A 2002 letter by DR's attorney claims the abuse occurred between 1983 and 1984. (*See* Pl.'s Trial Ex. 138.)

### 2.  Father Ferguson

The Archdiocese claims to have first learned of Father Ferguson's abuse in March 1979. Unlike with Father Crowley, however, the record regarding Father Ferguson does contain sufficient evidence to permit the Court to conclude that several other individual priests had notice of Father Ferguson's child abuse prior to the date claimed by the Archdiocese. Whether that knowledge can be imputed to the Archdiocese is taken up in the Court's conclusions of law below.

Richard Mallory's mother, Jacqueline Mallory, claims that she told Reverend Thomas Shea, the pastor at St. Bernard's, that Father Ferguson had "made sexual abuses to her son" in the fall of 1978, but that Father Shea told her "not to say anything to anybody." (Interstate Notes re Doe, Pl.'s Trial Ex. 256 at 7; *see also* Mallory Responses to Interrogs., Def.'s Trial Ex. 540 ¶ 42.) Also in 1978, victim KC, who alleges that Father Ferguson abused him hundreds of times between 1975 and 1978, told his girlfriend, TJ, that Father Ferguson had molested him. (*See* Rosazza Memo, Def.'s Trial Ex. 727; KC Dep. Summary, Def.'s Trial Ex. 554 at 2–4.) Thereafter, TJ told her mother, Mrs. Carolyn Jolly, what had happened, and Mrs. Jolly brought KC to meet with Father Joseph Donahue, then co-pastor of St. Mary church in Simsbury, Connecticut, so that he could "tell him about the incident." (Rosazza Memo; KC Dep. Summary at 2.) It is unclear from the record exactly what KC told Father Donahue, and there is no evidence that Donahue shared the information gleaned from the meeting with anyone else.

KC also alleged that Father Shea had observed him and Father Ferguson together on numerous occasions, including on the stairs leading to Father Ferguson's bedroom. (*See* KC Dep. Summary at 3.) However, he admitted that Father Shea had never witnessed any actual sexual encounters between him and Father Ferguson, and that he never told Father Shea about the abuse. (*Id.*)

In early 1979, upon learning that her son had been abused by Father Ferguson, victim BTL's mother called Archbishop Whealon's office "to discuss the matter." (BTL Interview Report, Def.'s Trial Ex. 726.) However, "she never spoke with the Archbishop." (*Id.*) "She called three times and was finally told by someone at the Chancery to speak to Fr. Joseph Donahue, a priest from St. Mary's in Simsbury, about it." (*Id.*) Thus, in early 1979, BTL and his mother "went to St. Mary's and told Fr. Donahue about the molestation." (*Id.*)

It appears that shortly thereafter, on March 7, 1979, at 6:05 in the morning, Father Ferguson called Father Gene Gianelli, secretary to Archbishop Whealon from 1972 to 1982, and told him that a woman (BTL's mother) had accused him of molesting two boys from St. Bernard Parish in Tarriffville and that the charges were true. (Gianelli Memo Mar. 7, 1979, Pl.'s Trial Ex. 43.) Several hours later, Father Donahue called Father Gianelli to report the same. (*Id.*) Archbishop Whealon's notes from his conversations with Fathers Donahue and Ferguson the same day state in part: "[Father Ferguson] has been homosexual of nature, has had overt expressions of it intermittently since age 10, has made many promises and has failed. Now alcohol has entered the picture." (*Id.*)

Father Gianelli testified that Archbishop Whealon instructed him to contact the House of Affirmation, a rehabilitation facility that treated sexual dysfunction, and get Father Ferguson admitted. (Gianelli Test., Trial Tr. Vol. 2 AM at 148.) However, when he called the House of Affirmation, he learned that it was full. (*Id.* at 148–49, 154.) He began to call around to various dioceses in the region, seeking recommendations regarding where to obtain treatment for a priest who had molested children in the parish. (*Id.* at 154–55.) Then-Father (now Bishop) Tom Daly recommended that he contact St. Luke Institute, as did the House of Affirmation. (*Id.* at 155–56.)

As recorded in a March 21, 1979 memorandum by Father Gianelli to Archbishop Whealon, Father Gianelli next spoke with Father Dr. Michael Peterson at St. Luke. (*See* Ltr. re Ferguson Mar.

21, 1979, Pl.'s Trial Ex. 147.) He told him that Father Ferguson had admitted to molesting two boys, that he needed treatment, and that he had been drinking heavily. (Gianelli Test., Trial Tr. Vol. 2 AM at 156–57.) Dr. Peterson agreed to admit Father Ferguson, beginning on March 26, 1979, into a "program [that would] first work with the chemical dependence Father [Ferguson] experiences [and] then w[ould] work on the emotional and psychological problems"[6] (Ltr. re Ferguson Mar. 21, 1979), because as Father Gianelli explained at trial, Dr. Peterson believed that the alcoholism brought about Father Ferguson's child molestation (Gianelli Test., Trial Tr. Vol. 2 AM at 163).

During Father Ferguson's inpatient treatment, he kept Archbishop Whealon apprised of his progress, writing to him in May 1979 to tell him that the program was "excellent" and that he felt "much progress ha[d] been made in recovery and healing." (Ferguson Canon File Part 1, Pl.'s Trial Ex. 142A a 45.) Dr. Peterson also wrote to Archbishop Whealon, stating that he "certainly appreciate[d] the sensitive nature of the episodes which brought Fr. Ferguson to this rehabilitation facility" while indicating that Father Ferguson had been "working hard on his many problems related to chemical dependency." (Ltr. from Peterson to Whealon Apr. 3, 1979, Pl.'s Trial Ex. 148.)

When his inpatient treatment ended on July 12, 1979, Archbishop Whealon reassigned Father Ferguson to Laurelton Hall, an all-girls school, where he was to serve as chaplain while residing in the rectory of St. Mary's Parish in Derby, Connecticut. (Ferguson Reassignment Ltr., Pl.'s Trial Ex. 149.) Prior to this reassignment, Archbishop Whealon directed Father Gianelli to disclose to the rectory priests, school principal, and supervisors at Laurelton Hall that Father

---

[6] Father Gianelli testified that he intended "emotional and psychological problems" to be an allusion to Father Ferguson's pedophilia. (Gianelli Test., Trial Tr. Vol. 2 AM at 158.)

Ferguson was an alcoholic and that he had just completed a rehabilitation program for alcohol dependency, with no mention to be made about the past child molestations. (*See* Ferguson Canon File Part 1 at 48.) Father Gianelli testified that he told Father Charles Kennedy, vicar for priests, what he had been instructed to say and could not remember if he mentioned anything about the abuse, nor did he tell Father Fanelli, the superintendent of Laurelton Hall, about Father Ferguson's history of child abuse. (Gianelli Test., Trial Tr. Vol. 2 AM at 167–68.) He also testified that he reassured Father Kvedas, an Archdiocesan priest, that Father Ferguson would enter into a support group. (*Id.* at 169.)

While Father Ferguson served as Chaplain at Laurelton Hall, he attended outpatient treatment at St. Luke as well as local sobriety meetings. In January 1980, after returning from his first aftercare workshop, he wrote to Archbishop Whealon to tell him that "[t]hrough God's grace, the program at St. Luke, and the support and understanding of yourself, Fr. Gianelli, and Fr. Joe Donahue, I have been restored to health and sanity. The Resurrection has never been more real." (Ferguson Canon File Part 1 at 53.) On June 24, 1980, Dr. Peterson and an alcoholism counselor at St. Luke Institute wrote Father Kennedy with Archbishop Whealon copied on the letter, to express enthusiastic support for Father Ferguson returning to work in a high school environment. (*Id.* at 68.)

Dr. Peterson wrote to Archbishop Whealon again in June 1981 (memorializing a conversation he had had with Whealon a month prior), again expressing his full support for Father Ferguson's reassignment to "a more exciting teaching assignment," and stating that "it [wa]s his professional opinion that the other issues that brought Father Ferguson to us for treatment will be in control as long as the disease of alcoholism is in control." (*Id.* at 78.) On June 8, 1981 (effective

June 15, 1981), Archbishop Whealon appointed Father Ferguson a full-time Assistant Pastor of St. Mary Parish in Derby, Connecticut. (*Id.* at 77.)

### D. The Claims Handling Process

After the victims came forward, the Archdiocese settled each of their claims. Those settlements, as well as the claims handling process as it unfolded between the Archdiocese and Interstate, are detailed below.

#### 1. JA

In May 2008, JA's attorney sent a demand letter entitled "JA v. Archdiocese of Hartford et al" to Attorney Sitarz, alleging that JA had been sexually abused on multiple occasions by Father Robert Ladamus. (Stip. Facts ¶¶ 44, 45; *see* JA Demand Ltr. at 2.) The letter did not assert a claim against the Archdiocese specifically, focusing solely on Father Ladamus's sexual misconduct. (*See* JA Demand Ltr. at 2.) On June 5, 2008, Mr. Sitarz forwarded this demand letter to Gallagher Bassett (copied to Interstate and other insurers), asking it to open a new claim, and stating that he would "attempt to obtain as much background information . . . as possible and keep [it] posted." (*Id.* at 1.) He also indicated that based on the allegations, the abuse likely began in 1981 or 1982. (*Id.*)

Several months later, on July 24, 2008, Mark Darling, Interstate's local counsel, sent Mr. Sitarz a letter entitled, "EGC v. Archdiocese of Hartford" in which he wrote, in relevant part:

> I wish to respond to your email . . . in regard to the EGC matter. . . . Initially, our information was that this claim involved perhaps only a single instance of fondling when the plaintiff was 9 years old, although we understand he has given subsequent statements in which he made vague references to a couple of other fondling incidents in the Rectory. . . . We request that you make your entire file in the EGC matter available to use for review and copying . . . .
>
> This brings to the forefront what we believe is another significant issue beyond just this particular case, i.e., not providing us with information about the priests involved in these allegations, their records, and the Archdiocese records concerning

abuse claims going back before the time of these particular claims through the present. I understand that Mike [Dugan] has asked you for such records concerning Fr. Ferguson, who is the alleged abuser in this and numerous other pending matters, as well as for other alleged abusers.

(Ltr. re EGC Jul. 24, 2008, Pl.'s Trial Ex. 66 at 1–2.) The letter went on to list a variety of documents Interstate sought pertaining to not only Father Ferguson but many other priests as well. (*See id*. at 2.)

Interstate asserts, based on Mr. Darling's testimony, that this letter was a request for documents with respect to not only EGC but all claimants, including JA, KS, Matthew Doe, and Richard Mallory. (*See* Darling Test., Trial Tr. Vol. 13 AM at 2485–87, 2488, 2491–92; Darling Test., Trial Tr. Vol. 13 PM at 2517.) The Court does not agree. The letter is titled "Re: EGC v. Archdiocese of Hartford" and it is replete with references to the EGC claim. (*See* Ltr. re EGC Jul. 24, 2008.) Indeed, the only part of the letter that references other claims ("[t]his brings to the forefront what we believe is another significant issue beyond just this particular case") specifies that the letter is in regard to a "particular case," namely the EGC claim. (*Id.* at 1.) As such, although there is some ambiguity in the letter, the Court finds that the EGC letter is a request for documents with respect to the EGC claim only, and not, as Interstate argues, with respect to the JA claim or any of the other claims at issue here.

Returning to the JA claim, on August 18, 2008, Interstate sent Mr. Sitarz a reservation of rights ("ROR") letter, stating that "[b]ased on the information provided, it is [Interstate's] opinion that if the allegations are proven, Fr. Robert Ladamus was acting outside the course and scope of his priestly duties" and therefore "would not qualify as an insured under [the] policy." (JA ROR, Pl.'s Trial Ex. 75 at 2.) The letter went on to reiterate that the "intentional infliction of physical and/or emotional injury falls outside the scope of coverage under the definition of 'occurrence'

which generally requires that any such injury or damage for which coverage is claimed neither be expected or intended" and should it be shown that the Archdiocese was on notice of Ladamus's proclivities, this knowledge would void coverage. (*Id.*) Although it did not ask for any specific documentation, it requested that the Archdiocese keep it "fully informed and apprised of developments as this matter proceeds" and that it be "copied on all pertinent correspondence and pleadings filed and served." (*Id.* at 4.) Based on the allegations in JA's demand letter, Deborah Sons, Interstate's claims handler, opened claims for three policy periods (Sept. 1980 to 1981, Sept. 1981 to 1982, and Sept. 1982 to 1983). (Stip. Facts ¶ 48; *see* Emails re JA Oct. 2010, Defs.' Trial Ex. 678 at 3.)

On April 9, 2010, Mr. Sitarz sent Ms. Sons copies of JA's records from his psychiatrist and his psychologist. (Interstate Notes re JA, Pl.'s Trial Ex. 246 at 5.) In August 2010, he sent Gallagher Bassett, Interstate, and other insurers copies of his interview report of JA (following his August 12, 2010 interview of JA), as requested by Edward Ryan of Gallagher Bassett on June 17, 2010. (Stip. Facts ¶¶ 49–51; *see* JA Interview Report, Pl.'s Trial Ex. 190; Emails re JA Oct. 2010 at 2–3.) Ms. Sons notified Mr. Ryan in October 2010 that upon reviewing the interview report, she had determined that five policy periods were implicated, and accordingly, she had opened claims for the Sept. 1983 to 1984 and Sept. 1984 to 1985 periods, in addition to the three policy periods she had already opened. (Emails re JA Oct. 2010 at 3.) Mr. Ryan forwarded this email to Mr. Sitarz, who disagreed with Ms. Sons's conclusion but suggested that they "wait until further clarification on the dates" could be obtained. (*Id.* at 2.)

More than a year later, on January 19, 2012, Mr. Sitarz emailed Lloyds, Interstate, and Gallagher Bassett informing them that after "many months" of negotiations with JA's counsel, he had received an offer to settle for $299,000, which, by email dated February 14, 2012, he notified

them the Archdiocese had accepted. (*See* Stip. Facts ¶ 57; Emails re JA Jan.–Feb. 2012, Pl.'s Trial Ex. 195 at 1–2.) When Ms. Sons responded by reiterating her belief that five policy periods were implicated,[7] Mr. Sitarz clarified that only the conduct that took place between either September 1983 and 1984 or September 1984 and 1985 was "abuse" (as opposed to simply "weird" behavior), but that he would "make further inquiry of" JA's counsel regarding the dates of abuse "and let [Ms. Sons] know what he says." (Emails re JA Jan.–Feb. 2012 at 1.)

JA signed a general release on February 15, 2012, in which he agreed to release the Archdiocese "and all of its past, present and future Archbishops, Bishops, Auxiliary Bishops, Priests," and other affiliated individuals and entities "from any and all manner of liability, action and actions, cause and causes of action, suits, damages, judgments, executions, obligations, [and] claims . . . as a result of or in any way connected with certain alleged incidents of clergy sexual misconduct and assaults allegedly occurring in the State of Connecticut in and about the 1980's." (JA General Release, Pl.'s Trial Ex. 8 at 1; *see* Stip. Facts ¶ 60.) Mr. Sitarz emailed the release to Lloyds and Interstate, with copies to Gallagher Bassett, on February 17, 2012. (Stip. Facts ¶ 62; Sitarz Email re JA Feb. 17, 2012, Defs.' Trial Ex. 659.)

A month later, on March 19, 2012 Mr. Sitarz wrote to Gallagher Bassett, Interstate, and Lloyds informing them that according to JA's attorney, the sexual assault "most likely occurred on the trip to Florida during the summer of 1985 rather than the summer of 1984"; notifying them that the settlement check to JA had been mailed; and requesting that the settlement be

---

[7] For reasons that are not apparent from the record, on the same day Ms. Sons told Mr. Sitarz five policy periods were implicated, she noted in the claims notes that "While Jack [Sitarz] hasn't indicated the dates of the abuse, we have 3 files open for this [plaintiff]." (Interstate Notes re JA at 2.)

"process[ed]" and that "insurance reimbursement checks" be sent "asap." (*See* Stip. Facts ¶ 64; Email re JA Mar. 19, 2012, Pl.'s Trial Ex. 9.) On April 2, 2012, Mr. Sitarz emailed Gallagher Bassett, Interstate, and Lloyds again, reiterating that the abuse "most likely occurred on the trip to Florida during the summer of 1985 rather than the summer of 1984" and again asking that the settlement be processed and that "insurance reimbursement checks" be sent "asap." (Email re JA Apr. 2, 2012, Pl.'s Trial Ex. 10 at 1.) Presumably in response to these emails, on May 18, 2012, Ms. Sons closed all of the policy periods with the exception of the 1983 to 1984 and 1984 to 1985 periods.[8] (*See* Interstate Notes re JA at 1.)

The parties dispute whether, because Ms. Sons kept two policy periods open, JA's claim should be deemed to have implicated multiple policy periods (such that Interstate's layer was not reached). The Court finds that in light of Mr. Sitarz's emails stating that according to JA's attorney the abuse occurred in *either* the summer of 1984 *or* the summer of 1985 (but likely in the summer of 1985), and Ms. Sons's concession at trial that by May 18, 2012, Interstate had been informed that the abuse was alleged to have occurred only in the summer of 1985 (Sons Test., Trial Tr. Vol. 4 AM at 562), JA's claim did not implicate multiple policy periods; it implicated only one policy period, and as such, Interstate's layer was reached.

On October 3, 2012 and again on October 11, 2012, Mr. Sitarz emailed James Hanson of Gallagher Bassett, asking for an update on "where things st[oo]d" with respect to requesting reimbursement and collecting payments from all insurers. (Oct. 2012 Emails re JA, Pl.'s Trial Ex. 113 at 2.) Mr. Hanson responded on October 11, 2012, notifying Mr. Sitarz that reimbursement

---

[8] Ms. Sons clarified at trial that she in fact left three policy periods open, but she only left the 1979–1980 period open because it was the master file where all of her claims notes were kept. (Sons Test., Trial Tr. Vol. 6 AM at 966.)

had not been requested, due to "ongoing issues with Lloyds," but that the insurers were "aware of the resolution" of the claims. (*Id.* at 1.) Mr. Sitarz replied the same day asking if there was "any reason why a claim for reimbursement to all of the insurers should not be made at this time." (*Id.*) The record does not reveal any response to this email. A little over a month later, on November 19, 2012, the Archdiocese filed this suit. The Archdiocese reached a settlement agreement with Lloyds on the JA claim and thirteen other claims in November 2014. (*See* Settlement Agreement, Pl.'s Trial Ex. 229.)

### 2.   KS

On October 31, 2007, Mr. Sitarz wrote to Gallagher Bassett, with copies to Interstate and other insurers, to inform it that he had received a demand letter from KS's attorney entitled "KS v. Archdiocese of Hartford et al.," alleging that Father Crowley had sexually abused KS. (*See* Stip. Facts ¶¶ 72–74; KS Demand Ltr.) The letter did not assert a claim against the Archdiocese specifically, focusing solely on Father Crowley's sexual misconduct. On November 6, 2007, Mr. Sitarz sent Gallagher Bassett, Interstate, and other insurers copies of KS's school records. (Stip. Facts ¶ 75; *see* KS School Records, Pl.'s Trial Ex. 30.) Thereafter, on December 3, 2007, Interstate sent Mr. Sitarz its ROR letter, which was substantively identical to the ROR it issued with respect to JA. (*See* KS ROR, Pl.'s Ex. 76.)

Several months later, on April 15, 2008, Mr. Sitarz forwarded his interview report of KS to Gallagher Bassett, Interstate, and the other insurers, detailing the nature of the abuse and Mr. Sitarz's impressions of KS as a potential plaintiff. (*See* Stip. Facts ¶ 80; KS Interview Report, Pl.'s Trial Ex. 31.) On December 2, 2008, Interstate's counsel from Litchfield Cavo, Kathleen Adams, emailed Mr. Sitarz with a list of claimants whose defense files Interstate wanted to review, including KS. (*See* Stip. Facts. ¶ 82; Email re Files to Review Dec. 2, 2008, Pl.'s Trial Ex. 12.) At some point

18

during the following weeks, as Mr. Sitarz testified, Ms. Adams went to Mr. Sitarz's office, reviewed the files, and flagged several items in the files of which she desired copies. (Sitarz Test., Trial Tr. Vol. 11 PM at 2034–35.) Mr. Sitarz responded by letter dated December 22, 2008, enclosing the copies requested by Ms. Adams. (*See* Stip. Facts. ¶ 84; Sitarz Email re Files Dec. 22, 2008, Pl.'s Trial Ex. 13.)

In January 2009, Mr. Sitarz sent Interstate KS's first communion record. (*See* Interstate Notes re KS, Pl.'s Trial Ex. 249 at 32.) In addition, in August, September, and November 2009, and May 2010, he sent Ms. Sons medical records and bills from various treatment providers for KS. (*See id.* at 35, 37; Ltrs. re KS May 2010 & Sept. 2009, Def.'s Trial Ex. 551.) In March 2010, Mr. Sitarz notified Gallagher Bassett that he was "still gathering background treatment records" for KS and planned to "initiate settlement discussions in the near future." (Ltrs. re KS May 2010 & Sept. 2009 at 16.)

By email dated May 28, 2010, Ms. Adams, noting that settlement negotiations were "underway in relation to [the] KS claim," requested that Mr. Sitarz send her "additional information regarding the nature of the allegations, the nature of the alleged injuries, [Mr. Sitarz's] evaluation, and the status of settlement negotiations." (Emails re KS May & Sept. 2010, Pl.'s Trial Ex. 322 at 2; Stip. Facts ¶ 88.) The record does not reflect whether or not Mr. Sitarz responded to this email, though it is evident that Ms. Adams already had the information she was purportedly seeking.

Several months later, on September 30, 2010, Mr. Sitarz informed Interstate and the other insurance carriers that the Archdiocese had entered into a settlement agreement with KS for $295,000. (Emails re KS May & Sept. 2010 at 3; Sitarz Email re KS Sept. 30, 2010, Pl.'s Trial Ex. 251; *see* Stip. Facts ¶ 89.) KS signed a general release on October 5, 2010, in which he agreed to release

the Archdiocese "and all of its past, present and future Archbishops, Bishops, Auxiliary Bishops, Priests," and other affiliated individuals and entities "from any and all manner of liability, action and actions, cause and causes of action, suits, damages, judgments, executions, obligations, [and] claims . . . as a result of or in any way connected with certain alleged incidents of clergy sexual misconduct and assaults allegedly occurring in the State of Connecticut in and about the fall of 1981 to the spring of 1982." (KS General Release, Pl.'s Trial Ex. 14 at 1; *see* Stip. Facts ¶ 90.) Mr. Sitarz forwarded the release to Interstate (and Lloyds) on December 20, 2010 (*see* Emails re KS Dec. 20, 2010, Pl.'s Trial Ex. 15 at 1; Stip. Facts ¶ 92), but it was not until January 26, 2011 that the settlement check was sent out[9] (*see* GB Notes re KS, Def.'s Trial Ex. 670 at 12).

Mr. Sitarz notified Gallagher Bassett (copying Lloyds and Interstate) on February 18, 2011 that the settlement check had been sent to KS and that fees and expenses to date totaled $11,367 and $188.75, respectively, and requested that Gallagher Bassett "collect the insurance reimbursements" and "send those payments to [him] asap" (Email re KS Feb. 18, 2011, Pl.'s Trial Ex. 16 at 1; *see* Stip. Facts ¶ 93). On May 5, 2011, John Smith of Gallagher Bassett emailed Mr. Sitarz to inform him that "[t]he claim has not yet been submitted to the carriers" because Gallagher Bassett did not know whether or not the tiered settlement formula ("TSF") agreement that the Archdiocese had reached with Lloyds[10] should be applied to the KS claim. (GB Notes re KS at 12;

---

[9] Mr. Hanson explained in his deposition that Mr. Sitarz had been negotiating with KS's counsel regarding outstanding issues relating to Medicare, and that until these issues had been resolved, the settlement check could not be sent. (Hanson Dep. at 123.)

[10] Seth Tucker, the Archdiocese's outside coverage counsel, testified that a TSF was an agreement between Lloyds and the Archdiocese under which Lloyds paid 50% on the specific excess and 70% on the aggregate excess, and the Archdiocese would accept those payments as meeting Lloyds' obligations. (Tucker Test., Trial Tr. Vol. 7 AM at 1131–32.)

Misc. GB Files re KS, Def.'s Trial Ex. 680 at 1.) Mr. Sitarz responded the following day requesting that Gallagher Bassett seek full reimbursement. (Misc. GB Files re KS at 1.)

On February 17, 2012, Mr. Hanson emailed Ms. Sons, noting that negotiations with Lloyds were ongoing but that Interstate's layer was likely to be pierced by around $106,744.75, and asking what Ms. Sons needed "to finish [her] coverage evaluation and render a final opinion." (Email re Doe Feb. 17, 2012, Pl.'s Trial Ex. 254 at 1.) Ms. Sons confirmed at trial that she never responded to that email. (Sons Test., Trial Tr. Vol. 4 AM at 577–78.)

A month later, on May 22, 2012, Mr. Sitarz contacted Mr. Hanson (of Gallagher Bassett) to ascertain whether Gallagher Bassett had yet sought collection on the KS claim. (Emails re KS & Mallory May 22, 2012, Pl.'s Trial Ex. 98 at 2; *see* Stip. Facts ¶ 94.) When Mr. Hanson responded that the reimbursement request had not yet been sent to Interstate and that Interstate would "ask for a full document production/prove up for each claim," Mr. Sitarz insisted that he had already "tried to send Ms. Sons copies of whatever [he] sen[t] to [Gallagher Bassett]" and that she should therefore "already have what [Gallagher Bassett] ha[d]." (Email re KS & Mallory May 22, 2012 at 1.) Mr. Hanson forwarded this entire exchange to Ms. Sons a month later on June 21, 2012, asking her for "a shopping list" of documents she wanted. (Email re KS & Mallory Jun. 21, 2012, Pl.'s Trial Ex. 243.) There is no response from Ms. Sons on the record.

Four months passed with little to no activity on the KS claim. On October 2 and 3, 2012, Mr. Sitarz emailed Mr. Hanson three times requesting "copies of the insurance reimbursement request documents sent to Interstate on the Richard Mallory and KS claims." (Emails re KS & Mallory Oct. 2012, Pl.'s Ex. 112 at 2.) When Mr. Hanson responded on October 4, 2012, he informed Mr. Sitarz that he had sent Ms. Sons a spreadsheet of outstanding claims on May 22, 2012 (*see* Claims Spreadsheet, Pl.'s Trial Ex. 175), and was waiting to hear back from her (*see* Emails

re KS & Mallory Oct. 2012 at 1). Mr. Sitarz then asked whether sending Ms. Sons a spreadsheet of outstanding claims was "the usual method of requesting insurance reimbursement" (Emails re KS & Mallory Oct. 2012 at 1), but Mr. Hanson apparently did not respond. Mr. Hanson did testify, however, at his deposition, that this was not the typical method of requesting reimbursement, but that he had used it because he felt it was an efficient way to manage the large number of claims at issue. (Hanson Dep. at 150.) The Archdiocese reached a settlement agreement with Lloyds on the KS claim and thirteen other claims in November 2014. (*See* Settlement Agreement.) As of the date of this lawsuit, Interstate had neither affirmed nor denied coverage of the KS claim. (Stip. Facts ¶ 98.)

### 3.  Doe

On May 28, 2008, Matthew Doe filed suit against the Archdiocese in Connecticut Superior Court, alleging that he had suffered mental and physical harm from the summer of 1981 through the fall of 1982 as a result of the Archdiocese's negligent and reckless failure to protect him from Father Ivan Ferguson's sexual misconduct. (Stip. Facts ¶ 133; *see* Doe Claim Notification.) Mr. Sitarz notified Gallagher Bassett of the new claim, with copies to Interstate, Lloyds, and other insurers, on June 27, 2008. (*See* Doe Claim Notification.)

Subsequently, on July 31, 2008, Mr. Darling and Ms. Adams went to Mr. Sitarz's office and reviewed the Archdiocese's defense file for the Doe case. (*See* Email re Files to Review Dec. 2, 2008 at 2.) A week later, the Archdiocese emailed Ms. Adams enclosing copies of that file (with the exception of files subject to attorney-client or work product privileges). (*See* Ltr. re Doe Aug. 6, 2008, Pl.'s Trial Ex. 25.) Interstate sent the Archdiocese its standard ROR on August 22, 2008. (Doe ROR, Pl.'s Trial Ex. 85.)

On June 16, 2010, Mr. Sitarz sent Gallagher Bassett, Interstate, and other insurers copies of Mr. Doe's responses to the Archdiocese's interrogatories and requests for production. (Ltr. re Doe Jun. 16, 2010, Def.'s Trial Ex. 557.) In his cover letter, he noted that Mr. Doe had alleged that Father Bollea, the pastor at St. Mary's at the time of the claimed abuse, "had to have known" about the abuse. (*Id.*)

In October and December 2010, Mr. Sitarz sent Interstate copies of Mr. Doe's therapist's treatment notes, two supplemental responses to interrogatories by Mr. Doe, and an expert's final report. (*See* Interstate Notes re Doe at 6, 8; Doe Suppl. Compliance Oct. 15, 2010, Def.'s Trial Ex. 560; Email re Doe Dec. 17, 2010, Def.'s Trial Ex. 567.) A year later, in October and December 2011, Mr. Sitarz forwarded Interstate deposition summaries with respect to Father Gene Gianelli, Father Doyle, Chaundra Bailey, and Dr. Grove. (*See* Interstate Notes re Doe at 5; Ltr. re Doe Oct. 19, 2011, Def.'s Trial Ex. 580.)

Ms. Adams emailed Mr. Sitarz on December 6, 2011 to request time to review the Matthew Doe file again to ensure that Interstate had a complete copy of the file. (Email re Doe Dec. 6, 2011, Pl.'s Trial Ex. 92.) Thereafter, as Mr. Sitarz and Ms. Adams testified, Ms. Adams went to Mr. Sitarz's office, reviewed all of the non-privileged documents in Mr. Sitarz's defense file for the Matthew Doe case, including the pleadings from Matthew Doe case, expert witness disclosures, the Archdiocese's discovery compliance, the Archdiocese's requests for admissions, the Archdiocese's responses to interrogatories, correspondence, deposition transcripts, and the "secret archive files" for Father Ferguson, and flagged a number of documents of which she wanted copies. (*See* Sitarz Test., Trial Tr. Vol. 12 AM at 2127–28; Adams Test., Trial Tr. Vol. 12 PM at 2545–46, 2548–49.) Ms. Adams stated at trial that Mr. Sitarz did send her copies of some of the pleadings, but because of the protective orders in place in the Matthew Doe case and in a companion case involving a

23

claimant known as Jacob Doe, he was reluctant to make copies of all of the files Ms. Adams had requested without a confidentiality agreement with Interstate. (Adams Test., Trial Tr. Vol. 12 PM at 2545–48, 2550.) Although the Archdiocese did subsequently send a proposed confidentiality agreement to Interstate (*see* Emails re Doe Dec. 19, 2011, Pl.'s Trial Ex. 93; Emails re Doe Dec. 20, 2011, Pl.'s Trial Ex. 94), Interstate never signed the agreement (Sitarz Test., Trial Tr. Vol. 12 AM at 2132).

On January 6, 2012, in a letter to Mr. Sitarz entitled "Re: Jacob Doe/Matthew Doe v. The Hartford Roman Catholic Diocesan Corporation, et al.," Mr. Darling lamented the Archdiocese's "failure to provide [Interstate] with copies of certain documents that were produced to Plaintiff's counsel during the course of discovery" in the Jacob and Matthew Doe cases, and complained that "Interstate ha[d] made repeated requests for materials in relation to the pending cases against the Archdiocese, including"

1. The entire personnel file of Fr. Foley, Fr. Ferguson, John Brooks, Fr. Paturzo, Msgr. Lacey, Fr. Perrault, Joseph Rozint, Fr. Primavera and Fr. Shiner [including but not limited to] any and all records of any complaints made against each person, and disciplinary warnings or actions taken against each person, any transfers, any psychiatric and/or psychological evaluations of each person, and any other document relating to each such individual contained in any record of the Archdiocese;
2. The entire "secret archive" files relating to any of the above-named individuals including all notes, correspondence or documents of whatever nature made or received by any Bishop or priest of the Archdiocese relating to any individual accused of sexual abuse from 1940 to the present; and
3. Any and all deposition transcripts, answers to interrogatories or statements from any of the individuals listed in paragraph [1] from any claim or suit.

24

(Ltr. re Doe Jan. 6, 2012, Pl.'s Trial Ex. 95 at 2–3.) In addition, Mr. Darling requested a copy of the Archdiocese's privilege log and a list of documents that Interstate had requested which were not identified in the privilege log but had not been produced to Interstate.[11] (*Id.* at 5.)

Mr. Tucker responded to Mr. Darling's letter, on behalf of Mr. Sitarz, on January 9, 2012, defending the Archdiocese's refusal to provide copies of the personnel and secret archive files, on the grounds that the Archdiocese was not required by the insurance contract to provide copies of such files; under canon law and Connecticut law, the Archdiocese was prohibited from providing the copies; and the protective orders that issued in the Doe cases prevented the Archdiocese from providing the copies. (*See* Ltr. re Doe Jan. 9, 2012, Pl.'s Trial Ex. 231.) The record does not reveal any response to Mr. Tucker's letter by Mr. Darling.

The Jacob Doe case was tried in late January and February 2012. (*See* Sons Test., Trial Tr. Vol. 4 PM at 615.) Ms. Adams attended the trial on Interstate's behalf and obtained copies from the clerk of trial exhibits (including Father Ferguson's Canon 489 file up to 1985, with the exception of two documents[12]), a stipulation, motions in limine and related filings, and all other documents on the court's public docket of which she desired copies. (Adams Test., Trial. Tr. Vol. 13 PM at 2552–53; *see also* Sons Test., Trial Tr. Vol. 12 PM at 613.) On February 12, 2012, a jury returned a one million dollar verdict in favor of Jacob Doe. (*See* GB Notes re Doe, Def.'s Trial Ex.

---

[11] Like the EGC letter, Interstate contends that this letter should be construed as requesting documents with respect to all of the claimants, rather than just Matthew and Jacob Doe. However, for the same reasons the Court rejected this argument in relation to the EGC letter, it rejects it here.

[12] Ms. Sons testified (Sons Test., Trial Tr. Vol. 4 PM at 616–20) that these two documents were an April 18, 1979 note (*see* Ferguson Canon File Part 1 at 42)—which she asserted would not have made any difference to her coverage analysis—and a January 30, 1981 letter from Dr. Michael Peterson to Archbishop Whealon (*see id.* at 71), which is discussed further in the Court's conclusions of law below.

673 at 21.) Nearly three months later, on May 4, 2012, Matthew Doe accepted a $750,000 settlement offer, about which Mr. Sitarz notified Gallagher Bassett (with copies to Interstate, Lloyds, and other insurers) the same day. (Email re Doe May 4, 2012, Def.'s Trial Ex. 662.) Mr. Sitarz further requested that Gallagher Bassett "take whatever steps may be needed at this time to begin to process the Archdiocese's claim for reimbursement insurance." (*Id.*)

The general release signed by Matthew Doe on May 14, 2012, pursuant to the settlement agreement, provided in relevant part: "Matthew Doe . . . does hereby release and forever discharge" the Archdiocese "and all of its past, present and future Archbishops, Bishops, Auxiliary Bishops, Priests," and other affiliated individuals and entities "from any and all manner of liability, action and actions, cause and causes of action, suits, damages, judgments, executions, obligations, [and] claims . . . in whole or in part based on alleged acts or omissions . . . including but not limited to all matters arising out of or relating to alleged sexual misconduct as alleged in a certain civil action entitled: Matthew Doe v. The Hartford Roman Catholic Diocesan Corporation." (Doe General Release, Def.'s Trial Ex. 603.) Mr. Doe withdrew his complaint three days later (*see* Doe Withdrawal, Pl.'s Trial Ex. 27), at which time Mr. Sitarz sent the executed release to Gallagher Bassett, Lloyds, and Interstate (*see* Sitarz Email re Doe May 17, 2012, Def.'s Trial Ex. 604).

On June 21, 2012, Mr. Sitarz notified Gallagher Bassett and the insurers that the Archdiocese had sent a settlement check in the amount of $750,000 to Mr. Doe's counsel the day before and that the Archdiocese's expenses and fees totaled $139,445.47, and additionally requested that Gallagher Bassett (a) send him its expenses so that he could finalize the amount of defense costs for which he sought reimbursement and (b) "follow up on all insurance reimbursements." (Sitarz Email re Doe June 21, 2012, Pl.'s Trial Ex. 29.) The record does not reveal any reply to this email.

26

On October 3, 2012, Mr. Sitarz emailed Mr. Hanson at Gallagher Bassett, again attaching the executed release in the Matthew Doe case and requesting confirmation that he had "requested payment from all insurers." (Emails re Doe Oct. 2012, Pl.'s Trial Ex. 110 at 3.) Apparently having received no response, Mr. Sitarz emailed Mr. Hanson again on October 11, 2012, again requesting confirmation that he had "requested payment from all insurers." (*Id.*) Ed Ryan of Gallagher Bassett responded to Mr. Sitarz's email the same day, explaining that Gallagher Bassett was still trying to determine the amount Lloyds owed the Archdiocese. (*Id.* at 2.) In November 2014, the Archdiocese reached a settlement agreement with Lloyds on the Matthew Doe claim. (*See* Settlement Agreement.)

### 4. Mallory

On August 30, 2006, Mr. Sitarz notified Gallagher Bassett (with copies to Lloyds, Interstate, and other insurers), by letter entitled "Richard Mallory v. the Hartford Roman Catholic Diocesan Corp., et al.," that Richard Mallory had sent a demand letter to Mr. Sitarz claiming he had been abused from November 1977 to October 1978 by Father Ivan Ferguson. (Stip. Facts ¶¶ 100–01; Mallory Demand Ltr.) Interstate sent the Archdiocese an ROR on September 12, 2006, informing the Archdiocese of potential coverage issues but not expressly denying coverage. (Stip. Facts ¶ 102; *see* Mallory ROR, Pl.'s Trial Ex. 79.) While otherwise nearly identical to the RORs Interstate sent the Archdiocese with respect to the other claimants, the Mallory ROR additionally requested "any and all information [the Archdiocese] ha[d] in regards to the allegations made by Mr. Mallory, including copies of any personnel files of Fr. Ferguson." (Mallory ROR at 1.) On February 7, 2007, Mr. Sitarz sent a report of his interview with Mr. Mallory to Gallagher Bassett, copied to Lloyds, Interstate, and other insurers. (Stip. Facts ¶ 103; *see* Mallory Interview Report, Def.'s Trial Ex. 528.)

27

A month and a half later, on March 26, 2007, Ms. Sons wrote in her claim handling notes on the Mallory claim: "Based on the facts that have been developed we may have some exposure in this case. . . . I need to obtain add[itiona]l information on Fr. Ferguson, how many allegations against him, when they were made, [and] when did the Diocese know." (Interstate Notes re Mallory, Pl.'s Trial Ex. 240 at 33.) Following an unsuccessful mediation, on October 7, 2007, Mr. Mallory filed suit against the Archdiocese in Connecticut Superior Court, alleging negligence and recklessness. (*See* Stip. Facts ¶ 107; Mallory Compl., Pl.'s Ex. 19.) The Archdiocese forwarded a copy of the complaint to Interstate on January 9, 2008, and thereafter provided the Archdiocese with regular updates on the case, copies of pleadings, and summaries of depositions. (*See* Interstate Notes re Mallory at 41–43, 45–56.)

At Ms. Adams's request, in mid-December 2008, the Archdiocese permitted her to review its defense file for the Mallory claim and provided her with copies of some of the files. (*See* Email re Files to Review Dec. 2, 2008; Sitarz Email re Files Dec. 22, 2008.) On May 18, 2009, Mr. Sitarz sent Interstate Mr. Mallory's responses to the Archdiocese's interrogatories and requests for production (*see* Interstate Notes re Mallory at 46), in which Mr. Mallory alleged that his mother had told Reverend Thomas Shea about the abuse in approximately October 1978 (*see* Mallory Interrog. Resp., Def.'s Trial Ex. 540 at 14). The same day, Ms. Sons assessed the value of the case at $750,000 to $1.2 million, and noted that the injuries claimed were "similar to another case the Diocese settled for $750k." (Interstate Notes re Mallory at 47.)

On August 13, 2009, Mr. Sitarz sent Interstate Mr. Mallory's responses to the Archdiocese's supplemental interrogatories. (*See id.* at 48.) In her summary of the responses, Ms. Sons noted that Mr. Mallory had alleged that Father Shea knew about the abuse while it was ongoing and that KC had told Father Donahue about Father Ferguson's abuse of him before Father Ferguson had begun

28

to abuse Mr. Mallory. (*Id.*) Lloyds, which apparently also received a copy of the supplemental interrogatories, responded with several follow-up questions for Mr. Sitarz regarding KC. (*Id.* at 49.) Mr. Sitarz replied, by letter dated July 15, 2009, copied to Interstate, reminding Cathy Sugayan of Lloyds that KC had filed a claim in 1998 "in a case entitled John A. Doe v. The Hartford Roman Catholic Diocesan Corporation, et al., in which Fr. Ferguson was the alleged perpetrator." (Ltr. re Mallory Jul. 9, 2009, Def.'s Trial Ex. 543 at 1.) He attached to his letter copies of the transcripts of the 1998 deposition testimony of KC, as well as Mrs. Jolly and her daughter. (*Id.*) On November 5, 2009 and May 18, 2010, respectively, Mr. Sitarz sent Interstate summaries of his depositions of Mr. Mallory and KC. (*See* Interstate Notes re Mallory at 52; KC Dep. Summary.) Mr. Sitarz forwarded Ms. Sons an additional report with Mr. Mallory's supplemental discovery compliance on February 2, 2010, and copies of expert witness disclosures filed by Mr. Mallory on March 10, 2010. (*See* Interstate Notes re Mallory at 53.)

The Archdiocese settled the Mallory lawsuit on August 4, 2010 for $775,000. (Stip. Facts ¶ 115; *see* Settlement Email re Mallory Jul. 29, 2010, Def.'s Trial Ex. 653; *see also* Mallory Withdrawal, Pl.'s Trial Ex. 21.) Mr. Mallory signed a general release the same day, in which he agreed to release the Archdiocese "and all of its past, present and future Archbishops, Bishops, Auxiliary Bishops, Priests," and other affiliated individuals and entities "from any and all manner of liability, action and actions, cause and causes of action, suits, damages, judgments, executions, obligations, [and] claims . . . in whole or in part based on alleged acts or omissions . . . including but not limited to all matters arising out of or relating to alleged sexual misconduct as alleged in a certain civil action entitled Richard Mallory v. The Hartford Roman Catholic Diocesan Corporation." (Mallory General Release, Pl.'s Trial Ex. 20 at 1.) Mr. Sitarz forwarded the release and withdrawal to Gallagher Bassett, with copies to Lloyds, Interstate, and other insurers on

August 25, 2010, noting that the settlement check was being sent out that day and requesting that Gallagher Bassett "proceed to obtain the full (100%) insurance reimbursement for the Archdiocese." (Email re Mallory Settlement Aug. 25, 2010, Pl.'s Trial Ex. 22.)

The record does not reveal any additional activity on the Interstate claim until March 22, 2011, when Mr. Sitarz emailed John Smith at Gallagher Bassett, with copies to Lloyds, Interstate, and other insurers, noting that the Mallory claim had been "outstanding for quite a while," and requesting Gallagher Bassett's "help in obtaining the insurance reimbursements . . . as soon as possible." (Email re Mallory Mar. 22, 2011, Pl.'s Ex. 242.) Ms. Sons documented this email in the claims notes for Mr. Mallory, writing: "rec[eive]d an email from Jack Sitarz to John Smith asking for status on payments of various claims. The only claim on the list that triggers [Interstate's] policies are Richard Mallory." (Interstate Notes re Mallory at 59.) Over a month later, on April 29, 2011, Mr. Smith responded that he "d[id] not find anything in [his] file to indicate that a 'formal' request for reimbursement ha[d] been sent to Interstate" but that if Mr. Sitarz wanted him to submit such a request he would do so as soon as he received from Mr. Sitarz confirmation that the request would be based on the TSF agreement; a copy of the check showing the amount paid to Mr. Mallory to settle the claim; and a copy of the settlement agreement and release. (Email re Mallory Apr. 29, 2011, Pl.'s Trial Ex. 99.)

The record does not reveal that Mr. Sitarz responded to this email. However, on May 22, 2012, Mr. Sitarz contacted Gallagher Bassett to ascertain whether Gallagher Bassett had yet sought collection on the Mallory claim. (Emails re KS & Mallory May 22, 2012.) Mr. Hanson responded that the reimbursement request had not yet been sent to Interstate but could be at any time, and he warned that Interstate would "ask for a full document production/prove up for each claim." (*Id.*) Mr. Sitarz replied the same day, insisting that he had already "tried to send Mr. Sons copies

of whatever [he] sen[t] to [Gallagher Bassett]" and that she should therefore "already have what [Gallagher Bassett] ha[d]." (*Id.*) Mr. Hanson forwarded this entire exchange to Ms. Sons a month later on June 21, 2012, asking her for "a shopping list" of documents she wanted. (Email re KS & Mallory, Pl.'s Trial Ex. 243.) There is no response from Ms. Sons in the trial record.

By letter dated June 25, 2012 entitled "Re: Richard Mallory v. Archdiocese of Hartford," Mr. Darling notified Mr. Sitarz and Mr. Tucker that

> there is presently documentation, as well as information, that is material to Interstate Fire & Casualty's ("IFC") evaluation of the claim that is outstanding and access to your defense file materials is necessary in order to evaluate coverage for this claim. IFC will be materially prejudiced if it does not have access to the defense file materials and Diocese documents identified in more detail below.

(Ltr. re Mallory Jun. 25, 2012, Pl.'s Trial Ex. 84 at 1.)  Mr. Darling continued:

> Despite prior requests, the Diocese of Hartford has been unwilling to provide IFC with access to the underlying defense files and, instead, has only forwarded portions of the underlying materials. . . . For example, although there have been numerous depositions taken in the Richard Mallory case, IFC has yet to receive a copy of the subject deposition transcripts and, instead, has only received your summary correspondence. Accordingly we request that you make your entire file in the Richard Mallory matter available to us for review and copy within the next two weeks . . . .

> Moreover, once again, this brings to the forefront what we believe is another significant issue beyond just this particular case, i.e., not providing use with information about the priests involved in these allegations, their records, and the Archdiocese['s] records concerning abuse claims going back before the time of these particular claims through the present. Although we have previously requested copies of the priest files, including Fr. Ferguson's file, who is the alleged abuser in this and numerous other pending matters, as well as for other alleged abusers, we have yet to receive such documents.

(*Id.*) Mr. Darling went on to "renew and reiterate" the requests for documentation he had made in his January 6, 2012 letter regarding Jacob and Matthew Doe.[13] (*Id.* at 2.)

In addition, Mr. Darling requested:

1. A list of all pending Hartford Diocese clergy abuse claims or suits for which the Diocese is seeking indemnification from Interstate, including the dates when any such matters have been scheduled for trial and the name(s) of the priests who are alleged to have committed abuse in the matter, and all underlying discovery materials and pleadings for each matter, or if only in a claim stage, all documents, correspondence, statements and any other documents in each claim file; and

2. The history of settlements and/or trial results in Diocese clergy abuse claims for the past ten (10) years, including the amount of the result, a full description of the nature and frequency of the abuse, and the name of the accused abusers (whether involving IFC coverage periods or not).

(*Id.*)

By letter dated July 6, 2012, Mr. Tucker responded, in relevant part:

As you admit, defense counsel have routinely been sending you summaries of the depositions. To our knowledge, this is the first time you have asked for the deposition transcripts from the Richard Mallory case. If you "have yet to receive a copy" of those transcripts, it is because you never asked for them or expressed the desire to receive more than the summaries . . . .

Looking once more specifically at your request for personnel files and secret archive files, I refer you once again to my letter to you of January 9. . . .

As for your request for deposition transcripts, answers to interrogatories, or statements from any of the nine individuals listed in your first paragraph number 1, it is a puzzle to us. There is no claim against Interstate relating to any of these individuals other than one claim concerning Fr. Ferguson, and that claim is the

---

[13] Interstate asserts that this letter should be construed as requesting documents with respect to all of the claimants, rather than only Mr. Mallory. However, for the same reasons the Court rejected this argument in relation to the EGC and Jacob/Matthew Doe letters, it rejects it here.

Richard Mallory claim . . . . Moreover, none of the individuals identified in the first
number paragraph 1 of your letter is the subject of any pending claim against the
Archdiocese that implicates the Interstate time period. . . .

Your letter also requests "the history of settlement and/or trial results in Diocese
clergy abuse claim for the past ten (10) years. . . ." With all due respect, we do not
read the policy to require the Archdiocese to create reports for Interstate.

(Ltr. re Mallory July 6, 2010, Pl.'s Trial Ex. 77 (internal citations and footnotes omitted).)

Having received no response to his July 6 letter, on September 14, 2012, Mr. Tucker sent

Mr. Darling another letter, detailing his efforts to obtain a reply from Interstate:

When three weeks had passed with no response from you [regarding the July 6
letter], on July 27 I emailed you to follow up and to ask, "When may the
Archdiocese expect payment of Interstate's obligation on this long-outstanding
claim?" You replied the same day, saying, "I somehow missed your prior email. I
am reviewing this now and will respond. My apologies."

Notwithstanding the commitment in your July 27 email, no response was
forthcoming, and so I emailed you on August 3 to follow up. You did not respond.
I emailed you on August 8 to follow up. You did not respond. I emailed you on
August 10 to follow up. You did not respond.

. . . I phoned you on August 15, and we spoke. You committed that Interstate would
respond to my July 6 letter by no later than August 31. . . . August 31 came and went
and we did not receive the promised response. I therefore emailed you on
September 2 to follow up. You did not respond.

I emailed you again on September 5 . . . . You did not respond. . . . I phoned you on
the morning of . . . September 11 . . . [and] left you a detailed message. . . . More
than three full days have passed, and you have not responded.

(Ltr. re Mallory Sept. 14, 2012, Pl.'s Trial Ex. 233.)

It was not until October 1, 2012 that Mr. Darling replied (in a letter signed by both him and

Ms. Adams). (*See* Ltr. re Mallory Oct. 1, 2012, Pl.'s Trial Ex. 78.) In their response, Mr. Darling and

Ms. Adams: disputed that any privilege applied to any documents but asked the Archdiocese to

provide a privilege log if it was going to withhold documents; noted that "[i]n the Richard Mallory case, obviously [their] chief concern [wa]s records pertaining to Fr. Ferguson" because such records were needed in order for Interstate to determine if the abuse was "expected or intended" within the meaning of the policy; and asserted that "[Interstate] ha[d] no obligation to reimburse a covered claim until a satisfactory proof of claim ha[d] been presented," including the personnel and secret archive files, proof of actual payment of the settlement to Mr. Mallory, proof of litigation costs, and proof that the Archdiocese had exhausted its SIR and underlying excess liability coverage. (*Id.* at 4–6.)

On October 16, 2012, a little more than a month before the 27-month time limitation to file suit (*see* Lloyds' Policy § IV.13) had run,[14] Mr. Tucker called and emailed Ms. Adams "to discuss a tolling agreement so that [the parties could] continue to discuss and, ideally, negotiate an agreement concerning, coverage for those of the underlying claims against the Archdiocese that reach Interstate's coverage." (Emails re Mallory Oct. 2012, Pl.'s Trial Ex. 235 at 3.) Nine days later, on October 25, 2012, Mr. Tucker emailed Ms. Adams again, requesting a response. (*Id.* at 2–3.) Ms. Adams replied the next day that the "claims examiner" was "out of the office" until October 30, 2012. (*Id.* at 2.) On November 9, 2012, Mr. Darling and Ms. Adams wrote to Mr. Tucker, reiterating many of their concerns regarding "the Archdiocese's ongoing failure to produce the documents requested in [their] prior correspondences," and asking Mr. Tucker to send them a proposed tolling agreement to review. (Interstate Ltr. re Mallory, Nov. 9, 2012, Pl.'s Trial Ex. 236.) Mr. Tucker emailed such an agreement the same day, noting "[t]ime is of the essence, especially in

---

[14] The Archdiocese paid the Mallory settlement on August 25, 2010. Twenty-seven months from that time would have been November 25, 2012.

view of the delay since the Archdiocese made its request." (Tucker Email re Mallory Nov. 9, 2012, Pl.'s Trial Ex. 237 at 1.)

Mr. Tucker responded to the rest of Mr. Darling and Ms. Adams's letter, as well as their October 1 letter three days later. In his lengthy correspondence, he reiterated his position that Interstate had already obtained copies of all relevant parts of the Ferguson files (via the Jacob Doe litigation) and that the Archdiocese was entitled to withhold documents pursuant to Connecticut law and under claims of privilege. (*See* Ltr. re Mallory Nov. 12, 2012, Pl.'s Trial Ex. 234 at 2–9.) In addition, he noted that in the past, Interstate had "paid on coverage claims brought by the Archdiocese based on the Archdiocese providing Interstate with copies of the pertinent settlement release executed by the plaintiff and written notification of when the Archdiocese sent the settlement check to the plaintiff's attorney," information which, he asserted, had been provided to the Archdiocese "more than two years ago." (*Id.* at 10.) Nonetheless, he enclosed with his letter a copy of the check to Mr. Mallory, as well as a (rather scant and unspecific) privilege log, and the total defense costs that Interstate had expended (which he asserted Interstate should have already received from Gallagher Bassett). (*See id.* at 10, 19, 24.) He closed with an ultimatum: "If Interstate does not commit *by noon on November 19, 2012* to pay the Richard Mallory claim (or, within that time period, execute an appropriate tolling agreement such as [that] sent [to] you by email on November 9, 2012), the Archdiocese will have no choice but to commence litigation." (*Id.* at 14.)

Having received no reply, the Archdiocese filed suit on November 19, 2012. In November 2014, the Archdiocese reached a settlement agreement with Lloyds on the Mallory claim. (*See* Settlement Agreement.)

## II. Conclusions of Law[15]

### A. Breach of Contract

To prove a claim for breach of contract in Connecticut, a plaintiff must show: "(1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the opposing party; (4) direct and proximate cause; and (5) damages." *McMann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 503–04 (2006). Of these elements, the parties here dispute only whether the Archdiocese performed its duties under the contract and whether Interstate breached the contract when it failed to indemnify the Archdiocese for the settlement amounts and defense costs that the Archdiocese paid in relation to the four underlying claims.

### 1. The Archdiocese's Performance

Under Connecticut law, "the general rule with respect to compliance with contract terms . . . is not one of strict compliance, but substantial compliance." *Pack 2000, Inc. v. Cushman*, 311 Conn. 662, 675 (2014) (internal quotation marks and alterations omitted). "The doctrine of substantial compliance is closely intertwined with the doctrine of substantial performance, [which] shields contracting parties from the harsh effects of being held to the letter of their agreements." *Id.* (internal quotation marks omitted). Under this doctrine, therefore, "a technical breach of the terms of a contract is excused, not because compliance with the terms is objectively impossible, but because actual performance is so similar to the required performance that any breach that may have been committed is immaterial." *Mastroianni v. Fairfield Cty. Paving, LLC*, 106 Conn. App. 330, 341 (2008) (internal quotation marks omitted). Further, Connecticut law requires that an

---

[15] There is no dispute that Connecticut law applies here.

insurer seeking to rescind a policy demonstrate that it was materially prejudiced by any failure to perform on the insured's part. *See Arrowood Indem. Co. v. King*, 605 F.3d 62, 77 (2d Cir. 2010) (interpreting Connecticut law).[16]

Here, Interstate asserts that the Archdiocese failed to satisfy its performance obligations under the contract by (1) failing to comply with the "books or records" provision of the contract; and (2) failing to comply with the "proof of loss" provision.[17] The Archdiocese contends, however, that it substantially complied with its performance obligations under both provisions and that any noncompliance on its part was not materially prejudicial to Interstate.

### a.   The Archdiocese's Compliance with the Books & Records Provision

As noted earlier, under the books or records provision, "the Underwriters or their duly authorized representatives shall be permitted at all reasonable times . . . [to] examine the Assured's

---

[16] (*See also* Order on Pre-Trial Motions [Doc. # 210] ¶ 3.)

[17] Interstate's fourth and sixth affirmative defenses claim, respectively, that the Archdiocese failed to comply with conditions precedent generally and that it failed to comply specifically with the books or records and proof of loss requirements. (*See* Answer [Doc. # 16] at 8–10.) However, as Interstate acknowledged at the pre-trial conference on March 17, 2016, because these "affirmative defenses" merely assert that the Archdiocese cannot prove an essential element of a breach of contract claim (namely, that it fully performed on the contract), they are not properly understood as affirmative defenses. *See Stonington Water St. Assocs., LLC v. Nat'l Fire Ins. Co. of Hartford*, 472 F. App'x 71, 72 (2d Cir. 2012) ("'[Under Connecticut law,] [a]s to all conditions precedent the plaintiff sustains the burden of proof' as to whether he or she performed the condition." (quoting *Benanti v. Delaware Ins. Co.*, 86 Conn. 15 (1912)); *see Nat'l Pub. Co. v. Hartford Fire Ins. Co.*, 287 Conn. 664, 673 (2008) ("Although the general rule is that a defendant who pleads a special defense bears the burden on that issue, we have recognized an exception in the context of a special defense based on a claim that an insured has failed to comply with the terms of the insurance policy. When an insured brings an action against an insurer for breach of the insurance contract, the insured bears the burden of proving that it complied with the terms of the contract, including the conditions." (internal citations omitted)). The burden of proof therefore remains with the Archdiocese to demonstrate performance.

books or records so far as they relate to coverage afforded by this Insurance." (Lloyds' Policy § IV.3.) Interstate contends that the Archdiocese violated this provision with respect to each of the four claimants. These arguments are discussed below.

As a preliminary matter, the Court must determine whether Lloyds' requests for documents from the Archdiocese should, as Interstate argues, be construed as requests on behalf of Interstate. Ms. Sons offered conflicting testimony on this point, first averring that Interstate did not rely on Lloyds' investigation but rather did its own investigation and that Interstate did not expect Lloyds to give Interstate documents it obtained through its investigation (Sons Test., Trial Tr. Vol. 4 AM at 495–96), and then one and two days later, testifying that Interstate did rely on document requests by Lloyds and did expect that the Archdiocese would send it copies of documents requested by Lloyds (*id.*, Trial Tr. Vol. 5 AM at 767–78; *id.*, Trial Tr. Vol. 6 AM at 889). In light of this conflicting testimony, the lack of documentation demonstrating that it was understood that Lloyds' document requests were intended to cover Interstate as well, and the record evidence showing that when Interstate wanted documents, it asked for them, the Court concludes that Interstate may not rely on requests for documents made by Lloyds to demonstrate the Archdiocese's non-compliance with its performance obligations under its contract with Interstate. With that premise established, the Court now turns to the evidence of the Archdiocese's compliance with the books or records clause as to each claimant.

### i.    JA

The record reveals only one request for documents by Interstate with respect to the JA claim: a single line in the August 2008 ROR in which Interstate requested that it be copied on all pertinent correspondence and pleadings filed and served. (*See* JA ROR at 4.) With respect to correspondence, the record evidence demonstrates that Mr. Sitarz copied Interstate on most of his

communications regarding the JA claim, and Interstate has pointed to no instance in which this was not true. As to pleadings, the JA case was settled before any litigation commenced, and there were therefore no pleadings on which to copy Interstate. Because the Archdiocese has shown by a preponderance of the evidence that it substantially complied with Interstate's document requests regarding the JA claim, the Court finds that the Archdiocese has met its burden of demonstrating performance as to the books or records clause on the JA claim.

### ii.   KS

Interstate sought somewhat more information about the KS claim. As with all the claimants, Interstate's ROR with respect to KS requested that Interstate be "copied on all pertinent correspondence and pleadings filed and served." (KS ROR at 4.) The record reveals that the Archdiocese substantially complied with this request as to its correspondence, and as KS never filed suit, there were no pleadings to provide. In addition, on December 2, 2008, Ms. Adams asked to review Mr. Sitarz's defense file on the KS case. (*See* Email re Files to Review Dec. 2, 2008.) Mr. Sitarz complied with this request and also provided Ms. Adams with copies of certain documents from the file. (*See* Sitarz Email re Files Dec. 22, 2008.) Apparently without being asked for them, Mr. Sitarz also sent Interstate copies of Mr. Sitarz's interview report of KS, KS's first communion record, KS's medical records, and KS's medical bills. (*See* KS School Records; KS Interview Report; Interstate Notes re KS at 32; Ltrs. re KS May 2010 & Sept. 2009.) Nonetheless, perplexingly, in May 2010, Ms. Adams asked Mr. Sitarz to send her unspecified "additional information" about the "nature of the allegations, the nature of the alleged injuries, [Mr. Sitarz's] evaluation, and the status of settlement negotiations" (Emails re KS May & Sept. 2010 at 2), all or most of which, Mr. Sitarz had already provided Interstate. There is no evidence that Interstate ever requested Father

Crowley's personnel or Canon 489 files. On the basis of this record, the Court must conclude that the Archdiocese substantially complied with the books or records provision as to KS.

### iii.   Doe and Mallory

The Matthew Doe and Richard Mallory claims are less straightforward. For ease, a summary of Interstate's document requests and the Archdiocese's compliance or lack thereof as to each of the Doe and Mallory claims follows:[18]

---

[18] Interstate claims that the January 6, 2012 (*see* Ltr. re Doe Jan. 6, 2012) and June 25, 2012 (*see* Ltr. re Mallory Jun. 25, 2012) letters from Interstate to the Archdiocese requesting certain documents included a request for a privilege log. However, Mr. Darling, who wrote both letters and the nearly identical 2008 letter regarding EGC (*see* Ltr. re EGC Jul. 24, 2008), testified that he was not asking for the Archdiocese's litigation privilege log but rather a privilege log that would indicate which documents the Archdiocese was withholding from Interstate (Darling Test., Trial Tr. Vol. 13 AM at 2489).

Interstate additionally appears to argue that the Archdiocese failed to comply with the books or records clause by sending Interstate summaries of its depositions rather than transcripts. However, the record does not reveal that Interstate ever requested full transcripts (except, as noted in the tables below, with respect to priests), and both Mr. Sitarz (Sitarz Test., Trial Tr. Vol. 11 PM at 2056–57) and the Archdiocese's expert, William Berglund (Berglund Test., Trial Tr. Vol. 9 PM at 1645), testified that it is standard practice in the insurance industry for an insured to provide its insurer with summaries rather than full transcripts, unless the insurer specifically requests otherwise. For this reason, to the extent Interstate contends that the Archdiocese violated the books or records provision by failing to provide full deposition transcripts for individuals other than priests, the Court rejects this argument.

**Matthew Doe:**

| Document Requested | Date Document Requested | Date Document Received |
|---|---|---|
| Defense file | July 2008[19] & Dec. 6, 2011[20] | July 31, 2008[21] & Mid Dec. 2011[22] |
| Pleadings | August 22, 2008[23] | June, Oct., Dec. 2010[24];  Oct. & Dec. 2011[25]; Feb. 2012[26] |
| Personnel and Canon 489 files of Fathers Foley, Brooks, Paturzo, Lacey, Perrault, Rozint, Primavera, & Shiner | January 6, 2012[27] | Not turned over to Interstate |
| Father Ferguson's Canon 489 file | January 6, 2012[28] | Mid Dec. 2011 & February 2012[29] (up to 1985, except 2 documents) |

---

[19] (*See* Email re Files to Review Dec. 2, 2008 at 2.)

[20] (*See* Email re Doe Dec. 6, 2011.)

[21] With the exception of documents for which the Archdiocese claimed privileges, Father Ferguson's Canon 489, and Father Ferguson's personnel files. (*See* Email re Files to Review Dec. 2, 2008 at 2; Ltr. re Doe Aug. 6, 2008.)

[22] With the exception of documents for which the Archdiocese claimed privileges. Father Ferguson's Canon 489 file was included in this file.

[23] (*See* Email re Files to Review Dec. 2, 2008; Ltr. re Doe Aug. 6, 2008.)

[24] Mr. Doe's responses and supplemental to the Archdiocese's interrogatories and requests for production, medical treatment notes, and an expert report. (*See* Ltr. re Doe Jun. 16, 2010; Interstate Notes re Doe at 6, 8; Doe Suppl. Compliance Oct. 15, 2010; Email re Doe Dec. 17, 2010.)

[25] Deposition summaries for Gianelli, Doyle, Bailey, and Grove, pleadings in the Jacob and Matthew Doe cases, expert witness disclosures, the Archdiocese's discovery compliance, the Archdiocese's requests for admissions, the Archdiocese's responses to interrogatories, and the "secret archive files" for Father Ferguson. (*See* Interstate Notes re Doe at 5; Ltr. re Doe Oct. 19, 2011.)

[26] Interstate obtained from the Clerk's office during the Jacob Doe trial copies of all publicly-filed, including motions in limine and related fillings, stipulations, and trial exhibits.

[27] (*See* Ltr. re Doe Jan. 6, 2012.)

[28] (*See id.*)

[29] Interstate obtained copies of these documents during the Jacob Doe litigation.

| | | |
|---|---|---|
| Father Ferguson's personnel file | January 6, 2012[30] | Not turned over to Interstate[31] |
| Deposition transcripts, answers to interrogatories, or statements by Fathers Foley, Brooks, Paturzo, Lacey, Perrault, Rozint, Primavera, & Shiner in any claim or suit | January 6, 2012[32] | Not turned over to Interstate |
| Deposition transcripts, answers to interrogatories, or statements by Father Ferguson in any claim or suit | January 6, 2012[33] | Not turned over to Interstate |
| List of documents Interstate requested that the Archdioceses did not turn over | January 6, 2012[34] | Not turned over to Interstate |

---

[30] (*See* Ltr. re Doe Jan. 6, 2012.)

[31] Mr. Sitarz testified that he sent Father Ferguson's personnel file to Gallagher Bassett in connection with the Paul Mallory case, but he was unsure about whether he also sent it to Interstate. (Sitarz Test., Trial Tr. Vol. 13 AM at 2361–64.) From the letter itself (Pl.'s Trial Ex. 351), it does not appear that he did. Although the letter is copied to Interstate, along with enclosures, it appears that the personnel file was sent only to Gallagher Bassett, and the record does not demonstrate that Gallagher Bassett ever forwarded it to Interstate. The Court thus concludes that the Archdiocese did not turn over to Interstate Father Ferguson's personnel file.

[32] (*See* Ltr. re Doe Jan. 6, 2012.)

[33] (*See id.*)

[34] (*See id.*)

**Richard Mallory:**

| Document Requested | Date Document Requested | Date Document Received |
|---|---|---|
| Pleadings | Sept. 12, 2006[35] | Jan. 2008, March, May, Aug., Nov. 2009[36]; Feb., Mar., May 2010[37] |
| Defense file | December 2, 2008[38] | Mid Dec. 2008[39] |
| Father Ferguson's Canon 489 file | June 25, 2012[40] | Mid Dec. 2011[41] & February 2012[42] (up to 1985, except 2 documents) |
| Father Ferguson's personnel file | Sept. 12, 2006[43] & June 25, 2012[44] | Not turned over to Interstate[45] |
| Personnel and Canon 489 files of Fathers Foley, Brooks, Paturzo, Lacey, Perrault, Rozint, Primavera, & Shiner | June 25, 2012[46] | Not turned over to Interstate |

---

[35] (*See* Mallory ROR.)

[36] Complaint, offer of judgment,  Mr. Mallory's responses and supplemental responses to the Archdiocese's interrogatories and requests for production, and summary of Mr. Mallory's deposition. (*See* Interstate Notes re Mallory at 41–43, 45–46, 48, 52.)

[37] Summary of KC deposition, Mr. Mallory's supplemental discovery compliance and copies of expert witness disclosures. (*See id.* at 53; KC Dep. Summary.)

[38] (*See* Email re Files to Review Dec. 2, 2008.)

[39] With the exception of documents for which the Archdiocese claimed privileges. Father Ferguson's Canon 489 and personnel files were not included in this file. (*See* Email re Files to Review Dec. 2, 2008; Sitarz Email re Files Dec. 22, 2008.)

[40] (*See* Ltr. re Mallory Jun. 25, 2012.)

[41] Interstate was permitted to examine but not copy this file.

[42] Interstate obtained copies of these documents during the Jacob Doe litigation.

[43] (*See* Mallory ROR.)

[44] (*See* Ltr. re Mallory Jun. 25, 2012.)

[45] As noted *supra*, the Court finds, notwithstanding Mr. Sitarz's testimony that he may have sent Father Ferguson's personnel file to Interstate, that the Archdiocese did not turn over the file.

[46] (*See* Ltr. re Mallory Jun. 25, 2012.)

| | | |
|---|---|---|
| Deposition transcripts, answers to interrogatories, or statements by Fathers Foley, Brooks, Paturzo, Lacey, Perrault, Rozint, Primavera, & Shiner in any claim or suit | June 25, 2012[47] | Not turned over to Interstate |
| Deposition transcripts, answers to interrogatories, or statements by Ferguson in any claim or suit | June 25, 2012[48] | Not turned over to Interstate |
| List of documents Interstate requested that the Archdiocese did not turn over | June 25, 2012[49] | Not turned over to Interstate |
| List of all pending clergy abuse claims for which the Archdiocese is seeking indemnification, as well as all documents in the claim file for each claim | June 25, 2012[50] | Not turned over to Interstate |
| History of settlements and/or trial results in clergy abuse claims for the past 10 years | June 25, 2012[51] | Not turned over to Interstate |

As can be seen from the above charts, the Archdiocese failed to comply with Interstate's document requests as to the following categories of documents: (1) documents about priests other than Father Ferguson (personnel files, Canon 489 files, depositions, answers to interrogatories, and statements of Foley, Brooks, Paturzo, Lacey, Perrault, Rozint, Primavera, and Shiner); (2) documents that did not already exist (list of documents Interstate requested which the Archdiocese did not turn over, history of settlements in past ten years, and list of all pending clergy abuse

---

[47] (*See id.*)

[48] (*See id.*)

[49] (*See id.*)

[50] (*See id.*)

[51] (*See id.*)

claims); (3) Father Ferguson's personnel file; (4) Father Ferguson's Canon 489 file from 1985 on and the two missing documents from prior to 1985; (5) deposition transcripts, answers to interrogatories, or statements by Father Ferguson in any claim or suit; and (6) the Archdiocese's discovery responses in the Mallory suit.[52]

### (1) Documents about Priests Other than Father Ferguson

Many of the documents Interstate requested from the Archdiocese with respect to the Doe and Mallory claims pertained to priests other than Father Ferguson—the priest accused by Doe and Mallory. Interstate has, however, offered no persuasive evidence or testimony to explain why such information was "related to coverage." Because the Court finds that in fact these documents were not related to coverage, and the Archdiocese's obligation to permit Interstate to examine its books or records extended only "so far as they relate to coverage," the Court concludes that the Archdiocese did not breach the books or records clause by failing to turn over documents about priests other than Father Ferguson in connection with the Doe and Mallory claims.

### (2) Documents that did not Already Exist

Interstate also requested that the Archdiocese produce a number of documents that did not exist prior to the request; in other words, Interstate wanted the Archdiocese to create new

---

[52] Interstate also asserts that it was prejudiced by not receiving the Archdiocese's discovery responses in the Matthew Doe case—specifically the Archdiocese's privilege log (Pl.'s Trial Ex. 340 & Def.'s Trial Ex. 558), responses to requests for admissions (Def.'s Trial Ex. 565), supplemental responses to interrogatories (Def.'s Trial Ex. 566), supplemental responses to requests for admissions (Def.'s Trial Ex. 568), answers to third set of interrogatories (Def.'s Trial Ex. 569), and documents referenced in objections to fourth set of requests for admissions (Def.'s Trial Ex. 572). (See Sons Test., Trial Tr. Vol. 8 AM at 1273–74, 1276–81, 1288–89, 1292–95; id., Trial Tr. Vol. 8 PM at 1415–31.) However, according to Ms. Adams's uncontradicted testimony, she was permitted to examine the Archdiocese's discovery compliance in December 2011, by which time all of these documents would have been in the file. (See Adams Test., Trial Tr. Vol. 13 M at 2548.)

documents for it to examine, including: a list of documents Interstate requested which the Archdiocese did not turn over, the history of the Archdiocese's settlements of priest abuse claims in the prior ten years, and list of all pending clergy abuse claims. Interstate has, however, offered no authority for the proposition that the books or records provision can or should be construed as requiring the Archdiocese to prepare reports for Interstate. The plain language of the clause requires only that the Archdiocese permit Interstate to examine its books or records. Absent any evidence that the parties intended a more expansive meaning of the clause, the Court concludes that the Archdiocese was under no obligation to create new documents, and its failure to do so therefore did not violate the books or records clause.

### (3) Father Ferguson's Personnel File

Next, Interstate asserts that the Archdiocese violated the books or records clause by failing to turn over Father Ferguson's personnel file. This file, however, contained no relevant information that was not also in the Canon 489 files Interstate obtained. Indeed, Ms. Sons testified that the only document she would have wanted from the personnel file was Father Ferguson's assignment card (*see* Sons Test., Trial Tr. Vol. 8 AM at 1252–53), which she admitted is also in the Canon 489 file Interstate reviewed in December 2011 (*id.*, Vol. 8 PM at 1410–11; *see* Ferguson Canon File Part 1 at 6) and of which it obtained a copy in February 2012 (*see* Sons Test., Trial Tr. Vol. 8 PM at 1410–11). As such, the Court concludes that Interstate was not materially prejudiced by the Archdiocese's failure to turn over Father Ferguson's personnel file.[53]

---

[53] Because the Court finds no material prejudice, it does not reach the Archdiocese's claims that production of the personnel file would have violated Connecticut law, canon law, and the protective order issued by the state court.

**(4) Father Ferguson's Canon 489 File**

Interstate additionally argues that the Archdiocese failed to comply with the books or records provision when it refused to turn over Father Ferguson's Canon 489 file. This claim is, however, belied by Ms. Adams's testimony that Mr. Sitarz permitted her to examine the Canon 489 file in December 2011. (*See* Adams Test., Trial Tr. Vol. 13 PM at 2548.) Moreover, by mid-February 2012, Interstate had obtained a copy of the only portion of the file the Jacob Doe court ruled relevant to the issue of whether or not the Archdiocese had notice of Father Ferguson's abuse (the very same issue Ms. Sons testified was the reason she sought Father Ferguson's file (Sons Test., Trial Tr. Vol. 4 PM at 614))—which encompassed all but two documents up to 1985.

Interstate nonetheless contends that one of the two missing pre-1985 documents, as well as several of the post-1985 documents, were relevant to its analysis, and the Archdiocese's refusal to turn them over materially prejudiced Interstate. The Court does not agree.

The pre-1985 document was a January 30, 1981 letter from Dr. Michael Peterson of the Saint Luke Institute to Archbishop Whealon, in which Dr. Peterson informed the Archbishop that Father Ferguson had completed the St. Luke Institute Fourth Aftercare Workshop January 21–25, 1981, and that the "results of the extensive medical, neurological, and psychological tests [would] be tabulated over the next two weeks," and Whealon would receive "at that time a more complete report documenting" Father Ferguson's progress. (Ferguson Canon File Part 1 at 71.) Ms. Sons testified that this letter might have changed her analysis because it would have alerted her to the existence of the medical results referenced in the letter. (Sons Test., Trial Tr. Vol. 12 PM at 618.) However, the evidence demonstrates that as of at least the Jacob Doe trial in February 2012, Interstate did in fact have these results, which are memorialized in an August 26, 1981 letter from Dr. Peterson to Archbishop Whealon. (*See* Ferguson Canon File Used in Doe Trial, Pl.'s Trial Ex.

47

241 at 134–35.) As such, the Court finds that Interstate was not materially prejudiced by the fact that it did not have an opportunity to examine the missing pre-1985 document.

With respect to documents in the Canon 489 file dated 1985 and forward, Interstate claims prejudice from its failure to receive two documents: meeting notes from a December 1, 1992 meeting of the Archdiocese's sexual misconduct committee (*see* Sexual Misconduct Comm. Notes, Def.'s Trial Ex. 721), and a December 5, 1992 memorandum written by Bishop Rosazza (*see* Rosazza Memo). The misconduct committee notes include the following statements, which Ms. Sons testified would have been material to her analysis: "Archbishop gave a synopsis of the history of Father [Ferguson]. Secret Files read regarding past dealings with Archbishop Whealon and programs attended (e.g. Alcoholism at St. Luke Hospital and sexual abuse at Institute of Living)." (Sexual Misconduct Comm. Notes.) Ms. Sons explained that these notes would have been important to her analysis because they reference treatment at the Institute of Living, about which she did not know, and they indicate that Father Ferguson's treatment at St. Luke was solely for alcoholism. (*See* Sons Test., Trial Tr. Vol 8 AM at 1324; *id.* at Vol. 8 PM at 1415.) However, Ms. Sons conceded that she knew from reviewing Father Ferguson's file that his treatment at the Institute of Living took place after 1983 (and was not, therefore, relevant). (*Id.* at Vol. 8 PM at 1415.) Further, the description of St. Luke as an alcoholism treatment center should not have been news to Ms. Sons, as several documents in the Canon 489 file that was before Ms. Sons described the center's focus as treating alcoholism (though they also made clear that Dr. Peterson's view was that Father Ferguson's pedophilia could be treated by treating his alcoholism). (*See, e.g.,* Ltr. re Ferguson Mar. 21, 1979; Ferguson Canon File Part 1 at 78.) In light of these facts, the Court can conceive of no material prejudice Interstate suffered by not having had the sexual misconduct committee notes.

The Rosazza memorandum was likewise immaterial to Interstate's analysis. The memorandum memorialized Bishop Rosazza's December 1, 1992 conversation with TJ's mother, Mrs. Jolly, during which Mrs. Jolly told him that she had brought KC to meet with Father Donahue in 1978 after KC confided in TJ (who relayed the information to her mother) that he had been abused by Father Ferguson. (*See* Rosazza Memo.) Ms. Sons testified that this was important because it showed that KC had contacted the Archdiocese about the abuse back in 1978. (Sons Test., Trial Tr. Vol. 8 PM at 1418.) However, it is apparent from Ms. Sons's notes on the Mallory and Doe claims that Interstate knew about KC's allegation that Fathers Shea and Donahue had notice of his abuse as of at least 2009 (*see* Interstate Notes re Doe at 48 (alleging that KC reported abuse to Shea and Donahue); Interstate Notes re Mallory at 7 (same); Ltr. re Mallory Jul. 9, 2009 (enclosing copies of KC, Mrs. Jolly, and TJ deposition transcripts); Email re Doe Dec. 17, 2010 (sending Doe's responses to supplemental interrogatories); Doe Suppl. Compliance Oct. 15, 2010 (asserting that Shea and Donahue knew about the abuse)), and likely earlier, since KC sued the Archdiocese and Father Ferguson in 1993 (*see* John A. Doe Compl., Pl.'s Trial Ex. 44), and Interstate was notified of that claim (*see* Interstate ROR re John Does A, B and C, Pl.'s Trial Ex. 336).

Accordingly, the Court concludes that Interstate has not proved that it was materially prejudiced by the Archdiocese's failure to turn over every document in Father Ferguson's Canon 489 file.[54]

---

[54] Because the Court finds no material prejudice, it does not reach the Archdiocese's claims that production of the Canon 489 file would have violated Connecticut law, canon law, and the protective order issued by the state court.

### (5) Father Ferguson's Deposition

Interstate next asserts that it was materially prejudiced by the Archdiocese's failure to provide it with the deposition of Father Ferguson taken by KC's attorney in 1997 in connection with his lawsuit against the Archdiocese and Father Ferguson. Once again, the Court does not agree.

Ms. Sons identified several parts of the deposition that she claimed would have been important to her claims analysis, including Father Ferguson's testimony that: he was sent to St. Luke to treat his alcoholism; there was nothing besides alcoholism that he was being treated for; St. Luke is a treatment facility for priests who are in trouble with alcohol or drugs; and St. Luke does not provide treatment for "sexual disorders." (Sons Test., Trial Tr. Vol. 8 PM at 1389–91; *see* Ferguson Dep. Def.'s Excerpts, Def.'s Trial Ex. 521.) This information would have been important, Interstate argues, because had Interstate known that Father Ferguson was treated only for alcoholism and not for sexual abuse prior to being placed at St. Mary's (where he abused Mr. Mallory), it would have denied the Archdiocese's claim on the grounds that it was on notice that Father Ferguson was likely to abuse children again.

There are a few problems with this argument. First, as elaborated upon in Section II.A.2 below, because this Court has held that the notice analysis is a subjective one, even if Father Ferguson believed he was being treated only for alcoholism, as long as the Archdiocese reasonably believed he was being treated for pedophilia (at least indirectly[55]), the Archdiocese cannot be said

---

[55] As discussed more fully below, Dr. Peterson subscribed to the theory that Father Ferguson's pedophilic tendencies were triggered by his alcoholism, and the Archbishop, who had been referred to St. Luke by another treatment center and other dioceses, reasonably relied on Dr. Peterson's expertise.

to have subjectively known it was substantially probable that he would abuse again. Second, unlike the underlying claims here, the KC lawsuit was brought against Father Ferguson himself (in addition to the Archdiocese), and as a result, his deposition testimony is not the testimony of a disinterested observer. He had every motivation to deny that he had ever sexually abused children (and therefore that he had any need for treatment for pedophilia), and indeed, he repeatedly invoked the Fifth Amendment when asked about his sexual activities with children, including pre-1978, and gave no testimony from which it could be inferred that the Archdiocese had hints of his conduct. For these reasons, and because there was ample evidence before Interstate regarding St. Luke and the range of disorders it treated in Father Ferguson's Canon 489 file, the Court finds that Interstate has failed to prove that it was materially prejudiced by the Archdiocese's refusal to turn over Father Ferguson's deposition transcript.

### (6) State Court Documents

Interstate's final argument with respect to the books or records provision is that it was materially prejudiced by the Archdiocese's failure to provide it with the Archdiocese's responses to discovery in the Mallory case. Interstate has fallen far short of meeting its burden on this claim. The record evidence is mixed on the subject of whether the Archdiocese even responded to any discovery implicating the contents of the Canon 489 file before the case settled,[56] and if the Archdiocese did respond to any discovery requests, the record is devoid of the content of those

---

[56] Mr. Sitarz initially testified that he responded to certain discovery requests that required him to use documents from Father Ferguson's Canon 489 file. (Sitarz Test., Trial Tr. Vol. 12 AM at 2122–23.) However, he later testified that while he knew he had responded to discovery requests in the Mallory case, he did not know whether any production was made in the case before it settled, and he did not believe that the Archdiocese had answered any interrogatories or requests for admissions based on documents in the Canon 489 file. (*Id.*, Trial Tr. Vol. 13 AM at 2472.)

responses. Absent this evidence, the Court cannot evaluate whether or how Interstate would have been materially prejudiced by not receiving copies of the Archdiocese's discovery responses in the Mallory case, and Interstate has therefore failed to meet its burden.

In sum, for the aforementioned reasons, the Court finds that the Archdiocese substantially complied with its performance obligations under the contract's books or records provision.

### b.  The Archdiocese's Compliance with the Proof of Loss Provision

The Court now turns to Interstate's claim that the Archdiocese failed to comply with the proof of loss requirement in the policies. Although there is no dispute that the policies require the submission and acceptance of a "satisfactory proof of interest and loss" (Lloyds' Policy § IV.11), as noted earlier, they do not define the term "proof of interest and loss," and the parties dispute the term's meaning.

The Archdiocese urges the Court to adopt a narrow definition, i.e., settlement documentation, the amount of settlements and defense costs in relation to the four underlying claims (Pl.'s Objs. Def.'s Proposed Conclusions of Law [Doc. # 171-4] ¶ 4), while Interstate proposes a far broader definition that would encompass any information that would "allow the insurer to investigate, evaluate, verify, value and validate the insured's claim, and to evaluate its own rights, liabilities and responsibilities under the policy" and which also includes a formal reimbursement request requirement. (Def.'s Proposed Conclusions of Law [Doc. # 175] ¶ 5.)

With respect to the formal reimbursement request requirement, Interstate's expert witness, Thomas Segalla, testified that he believed that the parties' course of dealing on these four claims demonstrated that they had developed a protocol under which Mr. Sitarz would write to Gallagher Bassett and ask it to facilitate reimbursement from the insurers. (Segalla Test., Trial Tr. Vol. 12 AM at 2233.) While it is true that in each of these claims, some time after notifying Interstate that

the underlying case had settled, sending it a copy of the release, and requesting reimbursement, Mr. Sitarz emailed Gallagher Bassett asking about the status of the requests for reimbursement, these emails alone are not sufficient to establish that the parties had developed an unwritten understanding that a "formal reimbursement request" would be required. Indeed, no witness, Mr. Segalla included, was able to define what a "formal reimbursement request" even entailed, and how it differed from the email Mr. Sitarz sent at the conclusion of each of the underlying cases notifying Interstate of the settlement amount and requesting reimbursement. The Court therefore concludes that the proof of loss provision did not require the submission of a "formal reimbursement request."

The Court need not delve into the remaining aspects of the dispute over what a proof of loss entailed, as even under the more expansive definition propounded by Interstate, the Archdiocese submitted adequate proofs of loss for each of the underlying claims.

With respect to the JA claim, by April 2, 2012, Interstate knew that the JA claim spanned only one policy period, it knew the amount of the settlement and that it pierced Interstate's layer, and it knew that the Archdiocese was requesting reimbursement on the claim. (*See* Emails re JA Jan.–Feb. 2012; Sitarz Email re JA Feb. 17, 2012; Email re JA Mar. 19, 2012; Email re JA Apr. 2, 2012.) It had JA's medical records and Mr. Sitarz's report of his interview of JA, and it did not request any further information. (*See* Interstate Notes re JA at 5; JA Interview Report; Emails re JA Oct. 2010 at 2–3.) As Mr. Segalla himself acknowledged, the burden was on Interstate to inform the Archdiocese what information it wanted as part of a proof of loss. Having failed to do so, Interstate cannot now claim that it did not receive an adequate proof of loss from JA.

Similarly, with respect to KS, Interstate knew by February 18, 2011 that the KS claim had settled, the amount of defense costs claimed, that the KS claim pierced Interstate's layer, and that

the Archdiocese was seeking reimbursement. (*See* Sitarz Email re KS Sept. 30, 2010; Emails re KS Dec. 20, 2010 at 1; Email re KS Feb. 18, 2011 at 1.) It had KS's school, communion, and medical records, Mr. Sitarz's report of his interview of KS, and Mr. Sitarz's defense file on the KS claim. (*See* KS Interview Report; Sitarz Email re Files Dec. 22, 2008; Interstate Notes re KS at 32, 35, 37.) It asked for no further documentation, and failed to respond when Mr. Hanson asked Ms. Sons in February 2012 what, if any, additional documentation she needed to finish her coverage evaluation. (*See* Email re Doe Feb. 17, 2012.) Under these circumstances, the Court concludes that even under Mr. Segalla's expansive definition of proof of loss, the Archdiocese satisfied its obligations with respect to the KS claim.

Turning to the Matthew Doe claim, by June 21, 2012, Interstate knew the amount of the settlement, that defense costs totaled more than $139,445.47, and that the Archdiocese was seeking reimbursement. (*See* Email re Doe May 4, 2012; Sitarz Email re Doe May 17, 2012; Sitarz Email re Doe June 21, 2012.) It had twice reviewed Mr. Sitarz's defense files, obtained summaries of the depositions of Gianelli, Doyle, Bailey, and Grove, and received copies of: the pleadings in the Jacob and Matthew Doe cases, expert witness disclosures, the Archdiocese's discovery compliance, Matthew Doe's discovery compliance, and motions, stipulations, and exhibits filed in the Jacob Doe case, including all relevant parts of Father Ferguson's Canon 489 file. (*See* Email re Files to Review Dec. 2, 2008 at 2; Ltr. re Doe Aug. 6, 2008; Ltr. re Doe Jun. 16, 2010; Interstate Notes re Doe at 5, 6, 8; Doe Suppl. Compliance Oct. 15, 2010; Email re Doe Dec. 17, 2010; Ltr. re Doe Oct. 19, 2011.) It had, in short, more than enough information to make its coverage determination. The Court therefore finds that the Archdiocese satisfied its proof of loss obligations with respect to the Matthew Doe claim.

Finally, as to the Richard Mallory claim, by the end of the Jacob Doe trial on February 12, 2012, Interstate knew the amount of the settlement and total defense costs, that this amount pierced its layer, and that Interstate was seeking reimbursement. (*See* Settlement Email re Mallory Jul. 29, 2010; Email re Mallory Settlement Aug. 25, 2010; Email re Mallory Mar. 22, 2011.) It had reviewed Mr. Sitarz's defense file, obtained a summary of the KC and Mallory depositions, copies of Mr. Mallory's discovery compliance, copies of the pleadings in the Mallory suit, as well as copies of the motions, stipulations, and exhibits filed in the Jacob Doe case, including all relevant parts of Father Ferguson's Canon 489 file. (*See* Mallory Interview Report; Interstate Notes re Mallory at 41–43, 45–56; Email re Files to Review Dec. 2, 2008; Sitarz Email re Files Dec. 22, 2008; Ltr. re Mallory Jul. 9, 2009; KC Dep. Summary.) Notwithstanding Interstate's belated, bloated, and redundant June 25, 2012 document request (*see* Ltr. re Mallory Jun. 25, 2012), the Court finds that the Archdiocese had satisfied its obligations under the proof of loss provision by February 12, 2012.

Having concluded that the Archdiocese substantially performed its end of the contract, the Court now turns to the next element of a breach of contract claim: breach.

### 2.   Whether Interstate Breached the Contract

The Archdiocese claims that Interstate breached the insurance contract by refusing to indemnify it for its losses. In order to prove this claim, the Archdiocese must have demonstrated that: (1) the incidents of abuse were "occurrences" under the contract; and (2) the settlements it reached with the victims were reasonable. For the reasons discussed below, the Court finds that the Archdiocese has met its burden of proof on both of these points.

### a.   Whether the Incidents of Abuse Were "Occurrences" under the Contract

Interstate's indemnification duty hinges on proof that the underlying incidents of sex abuse were "occurrences" under the contract. As this Court made clear in its Ruling on the parties' Cross-

Motions for Summary Judgment, an incident of abuse is an occurrence under the policy if (a) the Archdiocese did not subjectively know that it was (b) substantially probable that the priests would abuse children.

Defendant nonetheless maintains that the Court should reconsider this ruling and hold, following the Connecticut Superior Court's decision in *Linemaster Switch Corp. v. Aetna Life & Cas. Corp.*, No. CV91-0396432S, 1995 WL 462270 (July 25, 1995), that where "exceptional circumstances" exist, an objective, rather than subjective test, is appropriate. The *Linemaster* court adopted the exceptional circumstances test from *Morton Int'l, Inc. v. Gen. Accident Ins. Co.*, 629 A.2d 831 (N.J., 1993), a case involving environmental-coverage litigation in which the New Jersey Supreme Court listed the following "exceptional circumstances" as establishing a prima facie case of subjective intent if proven: "duration of the discharges; whether the discharges occurred intentionally, negligently or innocently; the quality of the insured's knowledge concerning the harmful propensities of the pollutants; whether regulatory authorities attempted to discourage or prevent the insured's conduct; and the existence of subjective knowledge concerning the possibility or likelihood of harm." Rather than "supplanting" the subjective test with an objective one, the court in *Linemaster* stated that it was more "understandable to say a subjective test applies in these cases but when 'exceptional circumstances' such as those listed are proven a prima facie case of subjective intent is made out that the damages were 'expected or intended' or perhaps it should be conclusively so presumed." 1995 WL 462270, at *24.

While *Linemaster* found this test to be "reasonable"—as did this Court—as the basis for applying a subjective rather than objective standard, the Court is unpersuaded by Interstate's argument that the exceptional circumstances test should be applied here. First, only *Linemaster* has used this test in Connecticut to date. Second, *Linemaster* and *Morton* were both

56

environmental-coverage cases, and the language of the test is inextricably connected to environmental pollution and regulation. Third, in the only two sex abuse cases in which courts applied something akin to an exceptional circumstances test (both New Jersey cases), the courts did so on the basis that sexual abuse is so reprehensible and "inherently injurious" that one need not look to the subjective intent of the abuser because "the intent to injure" can be "presumed from the performance of the act." *Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 185 (1992); *see also Atl. Employers Ins. Co. v. Tots & Toddlers Pre-Sch. Day Care Ctr., Inc.*, 239 N.J. Super. 276, 283 (App. Div. 1990) ("A subjective test suggests that it is possible to molest a child and not cause some kind of injury, an unacceptable conclusion. Certainly, one would and should expect some physical or psychological injury or both, to result from such acts."). However, the issue in this case is the very different question of the Archdiocese's knowledge of its priests' sexual abuse (rather than the priests' knowledge of whether their abuse would harm the children they abused). As such, the Court declines to apply the exceptional circumstances test here.

Instead, as outlined in the court's summary judgment ruling, the Court will apply a subjective test, asking whether the Archdiocese *subjectively knew* to a *substantial probability* that the priests in this case, specifically Fathers Crowley and Ferguson, would abuse again such that the underlying victims' injuries were expected and thus not occurrences under the insurance policy. Subjective knowledge constitutes *actual* knowledge or willful blindness to facts, *see Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011), not merely a showing that the Archdiocese should have known about possible future abuse.

Although the doctrine of willful blindness originated in the criminal law context, it has been applied in the civil context with two requirements: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate

actions to avoid learning of that fact." *Id.* at 769. To this extent, willful blindness surpasses recklessness and negligence insofar as it requires deliberate actions to avoid confirming a substantial probability of wrongdoing.

In *City of Carter Lake v. Aetna Cas. & Sur. Co*, the Eighth Circuit distinguished between "reasonable foreseeability" and "substantial probability":

> A result is reasonably foreseeable if there are indications which would lead a reasonably prudent man to know that the particular results could follow from his acts. Substantial probability is more than this. The indications must be strong enough to alert a reasonably prudent man not only to the possibility of the results occurring but the indications also must be sufficient to forewarn him that the results are *highly likely to occur.*

604 F.2d 1052, 1059 n. 4 (8th Cir.1979) (emphasis added); *see also Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 826 (4th Cir. 2013); *Walnut Grove Partners, L.P. v. Am. Family Mut. Ins. Co.*, 479 F.3d 949, 955 (8th Cir. 2007) ("Substantial probability requires more than reasonable foreseeability."); *Carney v. Vill. of Darien*, 60 F.3d 1273, 1280 (7th Cir. 1995) ("Substantial probability, as defined by the court, exists if there are indications sufficient to forewarn a reasonably prudent person that the results are highly likely to occur. The allegations that the Village Defendants were aware of numerous complaints against Officer White regarding his prior abusive nature, sexual misconduct and regular unexplained voidance of traffic tickets constitute sufficient indications to warn the village officials that Officer White would probably commit similar acts in the future. Accordingly, any injury resulting from a later act would not be an accident or occurrence, and therefore not within the coverage provision on bodily injury of the SMP policy." (internal citations omitted)).[57]

---

[57] Although these cases use an objective standard in their discussions of what constitutes a "substantial probability," and here, the Court is applying a subjective standard, their analysis of

Here, Interstate concedes that JA's abuse was an occurrence. With respect to KS, however, it contends that the abuse was not an occurrence because the Archdiocese had notice of Father Crowley's history of abuse, based on prior complaints by ML, DR, and CB. However, for the reasons discussed in the Court's conclusions of fact regarding evidence of notice, the Court holds that the Archdiocese did not subjectively know it was substantially probable that Father Crowley would abuse children prior to his abuse of KS. That leaves only the Father Ferguson claims (Mr. Mallory and Mr. Doe).

As to Mr. Mallory, Interstate asserts that the Archdiocese had notice of Father Ferguson's history of abuse because Fathers Shea, Donahue, and Bollea knew, prior to Mr. Mallory's abuse, that Father Ferguson had abused children. With respect to Mr. Doe, whose abuse took place after Father Ferguson had returned from St. Luke and had been placed at St. Mary's, Interstate argues that the Archdiocese was on notice that Father Ferguson would offend again because Father Ferguson had received treatment only for alcoholism and not for pedophilia. The Court discusses these arguments in turn.

### i.    Mallory

As a preliminary matter, the parties dispute whether Fathers Shea, Donahue, and Bollea's alleged knowledge of prior instances of abuse can be imputed to the Archdiocese. Interstate argues in the affirmative on the grounds that: (1) priests are agents of the Archdiocese, and the knowledge of agents is imputed to their principals; and (2) the priests were at a sufficiently high level within

---

what constitutes a substantially probable likelihood that an injury or other event will occur is nonetheless useful.

the hierarchy of the Archdiocese to qualify as proxies for the Archdicoese.[58] The Archdiocese responds that: (1) individual priests are not employees of the Archdiocese; (2) Fathers Donahue, Shea, and Bollea were not under the Archdiocese's control at the time they are alleged to have received notice; (3) even if Fathers Donahue, Shea, and Bollea were employees of the Archdiocese, their knowledge cannot be imputed to the Archdiocese because they were not "sufficiently high level" employees; and (4) subjective knowledge, by its terms, cannot be imputed to the Archdiocese.

In the Title VII context, the Second Circuit has held that

> An official's actual or constructive knowledge of harassment will be imputed to the employer when principles of agency law so dictate. That will be the case when a) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company, or b) the official is charged with a duty to act on the knowledge and stop the harassment, or c) the official is charged with a duty to inform the company of the harassment.

*Duch v. Jakubek*, 588 F.3d 757, 763 (2d Cir. 2009) (quoting *Torres v. Pisano*, 116 F.3d 625, 636–37 (2d Cir. 1997)); *see Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63–64 (2d Cir. 1998) (same). "For non-supervisory co-workers who lack authority to counsel, investigate, suspend, or fire the accused harasser . . . the co-worker's inaction does not spark employer liability unless that co-worker has an official or strong de facto duty to act as a conduit to management for complaints about work conditions." *Duch*, 588 F.3d at 763 (internal quotation marks, brackets, and emphasis omitted).

---

[58] Interstate additionally contends that the priests had a duty to report the abuse because they were mandated reporters under Connecticut law. However, at the pre-trial conference on March 17, 2016, Interstate clarified that this was not intended as an argument that the priests' knowledge should be imputed to the Archdiocese.

Thus, although Interstate is correct that "[i]t is the general rule . . . that notice to or knowledge of an agent, while acting within the scope of his authority and in reference to a matter over which his authority extends, is notice or knowledge of the principal," *City of West Haven v. U.S. Fid. & Guar. Co.*, 174 Conn. 392, 395 (1978) (internal quotation marks omitted), this rule "is based upon the existence of a duty on the part of the agent to act in light of the knowledge which he has," *Cromer Fin. Ltd. v. Berger*, 245 F. Supp. 2d 552, 560 (2d Cir. 2003) (quoting Restatement (Second) of Agency § 272, cmt. a (1958)); *see also* Restatement (Third) of Agency § 5.03 (2006) ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal . . . ."). Moreover, even when an agent has knowledge of a fact material to his duties to the principal, his knowledge will not be imputed to the principal if he acts adversely to the principal and it is shown that he was also acting "entirely for his own or another's purpose." Restatement (Second) of Agency § 282 (1958).

In this case, Father Gianelli testified that Father Donahue was a co-pastor at St. Mary's parish in Simsbury, Connecticut and a professor at St. Thomas seminary. (Gianelli Test., Trial Tr. Vol. 2 PM at 192–93.) According to Fathers Ferguson (*see* Ferguson Dep. Pl.'s Excerpts, Pl.'s Trial Ex. 339 at 52) and McCarthy (McCarthy Test., Trial Tr. Vol. 3 AM at 355), Father Shea was a pastor at St. Bernard's. Father McCarthy confirmed that Father Bollea was a pastor in Derby, Connecticut. (*Id.*) No evidence was adduced at trial to demonstrate that any of Fathers Donahue, Shea, or Bollea was an official at a sufficiently high level in the Archdiocese's management hierarchy to qualify as a proxy for the Archdiocese, that any of the priests was charged with a duty to act on or notify the Archdiocese of knowledge of abuse, or that any of the priests possessed supervisory authority over Father Ferguson. Rather, the evidence showed that all priest assignments were made by the

Archbishop; that while pastors had some supervisory responsibilities over assistant pastors, only the Archbishop had the power to discipline a priest (*id.* at 314–16); and that Father Ferguson did not take orders from Father Shea (Ferguson Dep. Pl.'s Excerpts at 52). As such, the Court finds that Fathers Shea, Donahue, and Bollea's knowledge, if any, of Father Ferguson's history of abuse prior to his abuse of Mr. Mallory, cannot be imputed to the Archdiocese. As such, the Court finds that Mr. Mallory's abuse was an "occurrence" under the policies.

### ii.  Doe

Mr. Doe's claim is a closer call. If the Archdiocese, after being informed of Father Ferguson's abuse of several minors in March 1979, had done nothing and had allowed Father Ferguson to remain at the school and rectory working with minors, the Court could readily conclude that the Archdiocese knew to a substantial probability that Father Ferguson would abuse again. On the other hand, had the Archdiocese returned Father Ferguson to a fulltime position in an environment with minors (and boys specifically), but informed his new supervisors of his admitted past abuse and ensured that he was monitored and continued to attend the required A.A. meetings, the Court would have to conclude that the Archdiocese did not subjectively know to a substantial probability that Father Ferguson would abuse again. The facts of this case lie between these two scenarios.

However, the Court concludes, based on the facts in the record, that it is more likely than not that the Archbishop did not subjectively know to a substantial probability that Father Ferguson would offend again. Although the Archdiocese sent Father Ferguson to a rehabilitation center that focused on sobriety and not pedophilia, Dr. Peterson subscribed to the theory that Father Ferguson's pedophilic tendencies were triggered by his alcoholism, and the Archbishop, who had been referred to St. Luke by another treatment center and other dioceses, reasonably relied on Dr.

Peterson's expertise.[59] Further, following Father Ferguson's completion of inpatient treatment at St. Luke, he spent two years attending outpatient treatment at St. Luke, traveling there for aftercare meetings, and participating in weekly sobriety meetings closer to where he lived, and both he and Dr. Peterson kept Archbishop Whealon apprised of Father Ferguson's attendance at these meetings and his perceived progress. (*See* Ferguson Canon File Part 1 at 45, 53, 68, 78; Ltr. from Peterson to Whealon Apr. 3, 1979.) It was not until two years had elapsed since Father Ferguson was released from St. Luke that the Archbishop appointed him pastor at St. Mary's, where he would later abuse Mr. Doe. (*See* Ferguson Canon File Part 1 at 77.)

Given that the Archbishop reasonably believed Father Ferguson had been alcohol-free for two years and had been attending regular A.A. meetings when he placed him at St. Mary's, it cannot be said that the Archdiocese subjectively knew to a substantial probability that Father Ferguson would go on to abuse Mr. Doe. Therefore, the Court concludes that Mr. Doe's claim constitutes an "occurrence" under the insurance policy.

### b. Whether the Settlements were Reasonable[60]

An insured seeking reimbursement for a settlement it paid bears the burden of proving that the settlement was reasonable. *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 815 (2013) ("The insured seeking compensation for the settlement, however, bears the burden of proving reasonableness."). Courts determine the reasonableness of a settlement by applying the

---

[59] The Court hastens to add that the events at issue here took place in the late 1970s and early 1980s, when far less was known about pedophilia. What was reasonable to believe at that time may well be quite different from what would be reasonable to believe today.

[60] The parties have stipulated that all defense costs were reasonable and that Matthew Doe's settlement was reasonable. (*See* Stip. Facts ¶¶ 66, 96, 128, 160, 162.)

following non-exhaustive factors: "'whether there is a significant prospect of an adverse judgment, whether settlement is generally advisable, whether the action is taken in good faith, and whether it is not excessive in amount.'" *Fortin v. Hartford Underwriters Ins. Co.*, 139 Conn. App. 826, 837 (2013) (quoting *Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 249 Conn. 36, 56 (1999)) (internal alterations omitted).

The Archdiocese called two witnesses to testify as to the reasonableness of the settlement amounts. Mr. Sitarz explained the factors underscoring his assessment of what constituted a reasonable settlement offer in the context of a sex abuse claim, including the nature of the abuse and how sympathetic the plaintiff would appear to a jury. (*See* Sitarz Test., Trial Tr. Vol. 11 AM at 2017; *id.* Vol. 11 PM at 2038–40, 2059–61, 2074.) Phillip Newbury, the Archdiocese's expert, emphasized that the two most important factors for determining the reasonableness of a settlement offer in a sex abuse claim were (1) the ability to satisfy the "should have known" standard of negligence (the standard under which the Archdiocese would be held liable for the transgressions of its priests, as distinct from the standard used to determine Interstate's liability coverage under the insurance policies as issue), and (2) the nature and extent of the abuse. (Newbury Test., Trial Tr. Vol. 9 AM at 1548, 1555.) Mr. Newbury testified that based on these factors, all of the settlement amounts in this case were reasonable. (*Id.* at 1551–52.) Although Interstate disputes the reasonableness of the settlement amounts, it introduced no evidence to refute the Archdiocese's evidence.

The Court concludes, based on its review of the record, that the Archdiocese has satisfied its burden of proving that the underlying settlements in this case were reasonable. The Court thus turns to Interstate's ninth affirmative defense which claims that the Archdiocese cannot prevail on

a claim for either a breach of contract or violation of the covenant of good faith and fair dealing because the Archdiocese's conduct was itself inequitable and taken in bad faith.

### 3.   Ninth Affirmative Defense (the Archdiocese's own Conduct)

The parties dispute whether Connecticut recognizes the affirmative defense claimed by Interstate, namely that the Archdiocese's claim is barred by its own inequitable conduct and bad faith.[61] Interstate cites to a single Connecticut case recognizing such an affirmative defense—a 2009 decision of the Connecticut Superior Court, in which the court refused, without discussing its reasoning, to strike an insurer's affirmative defense of bad faith. *SJ Partners, LLC v. Assurance Co. of Am.*, No. CV085003126S, 2009 WL 1960247, at *8 (Conn. Supp. Ct. Jun. 12, 2009). The parties do not cite, nor is this Court aware of, any other Connecticut caselaw on the subject.

In the absence of binding precedent from Connecticut's Supreme Court, this Court must "'predict how the state's highest court would resolve' any identified uncertainty or ambiguity." *Avedisian v. Quinnipiac Univ.*, 387 F. App'x 59, 60 (2d Cir. 2010) (quoting *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 297 (2d Cir. 2000)). In so doing, the Court must give "'proper regard to relevant rulings of other courts of the State.'" *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994) (quoting *Comm'r of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465 (1967)). However, "while the decrees of lower state courts should be attributed some weight[,] the decision is not controlling where the highest court of the State has not spoken on the point" but

---

[61] Although Interstate takes pains to differentiate this claim from a "comparative bad faith" defense (*see* Def.'s Proposed Conclusions of Law ¶¶ 49–50), it appears to be just that. To the extent what Interstate in fact means by this defense is that evidence of the Archdiocese's conduct demonstrates that Interstate's own conduct was reasonable under the circumstances, that argument, which is not an *affirmative* defense, is addressed in the Court's discussion of Count Two below.

rather "is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Estate of Bosch*, 387 U.S. at 465 (internal quotation marks and alterations omitted).

This Court is not convinced that the Connecticut Supreme Court would recognize the affirmative defense pressed by Interstate. Such a defense has been rejected in several states, including California where the state supreme court—overturning *California Casualty*,[62] an appellate court decision in which the defense was recognized—reasoned:

> [T]he *California Casualty* court's holding is grounded on the faulty premise that the obligations of insurer and insured—and thus their bad faith—are comparable. They are not. The parties are bound by a reciprocal obligation of good faith and fair dealing, but the particular duties differ given the differing performance due under the contract of insurance. A fundamental disparity exists between the insured, which performs its basic duty of paying the policy premium at the outset, and the insurer, which, depending on a number of factors, may or may not have to perform its basic duties of defense and indemnification under the policy. An insured is thus not on equal footing with its insurer—the relationship between insured and insurer is inherently unequal, the inequality resting on contractual asymmetry. An insurer's tort liability for breach of the covenant is thus predicated upon special policy factors inapplicable to the insured.
>
> The scope of the *insured's* duty of good faith and fair dealing in turn is confined by the express contractual provisions of the policy. . . . Because an insured's breach of the covenant does not sound in tort, the insured's contractual breach of an *express* policy provision cannot be raised by the insurer as a defense in a bad faith action brought against it by the insured. It would be illogical to allow the insurer in such a suit to instead interpose as a defense the insured's contractual breach of an *implied* policy provision (i.e., the covenant of good faith and fair dealing) based on those same express policy terms.

---

[62] *Cal. Cas. Gen. Ins. Co. v. Superior Court*, 173 Cal. App. 3d 274, 283 (Ct. App. 1985).

*Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 404–05 (2000), *as modified* (July 26, 2000).

Although no Connecticut court has discussed and analyzed *Kransco* in particular or the existence of an affirmative defense of bad faith in general, Connecticut courts have adopted much of the reasoning underpinning *Kransco*, such that the conclusion that no such defense exists in Connecticut flows logically from Connecticut caselaw.

Connecticut, like California, has "long recognized that 'an insurer and its insured have a special relationship,'" which, "along with unequal bargaining power, leave[s] insureds no choice but to 'depend on the good faith and performance of the insurer.'" *Hutchinson v. Farm Family Cas. Ins.*, 273 Conn. 33, 53 (2005) (quoting *Vu v. Prudential Prop. & Cas. Ins. Co.*, 26 Cal. 4th 1142, 1150–51 (2001)). It is this recognition, as well as an acknowledgment of the "disastrous economic effects that a bad-faith refusal to pay may cause the insured," *Grand Sheet Metal Prods. Co. v. Protection Mut. Ins. Co.*, 34 Conn. Supp. 46, 51 (1977), that led Connecticut courts to adopt the rule that "when [an] insurer unreasonably and in bad faith withholds payment of [a] claim of its insured, it is subject to liability in tort," *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 575 (1973); *see Grand Sheet Metal*, 34 Conn. Supp. at 51 ("This court . . . adopts the *Gruenberg* rule."); *see also Mamudi v. State Farm Fire & Cas. Co.*, No. CV126016785S, 2012 WL 6901141, at *2 (Conn. Super. Ct. Dec. 20, 2012) ("'[W]hen the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.'" (quoting *L.F. Pace & Sons, Inc. v. Travelers Indemnity Co.*, 9 Conn. App. 30, 46 (1986)); *Nationwide Mut. Ins. Co. v. Pasiak*, No. X08FSTCV084015401, 2011 WL 6413817, at *3 (Conn. Super. Ct. Nov. 30, 2011) ("[I]t is well settled that our courts allow 'an independent cause of action in tort arising from an insurer's

common law duty of good faith.'" (quoting *Buckman v. People Express, Inc.*, 205 Conn. 166, 170 (1987)).

Thus, while Connecticut (as Interstate notes), like California, recognizes that every insurance policy carries "an implied duty requiring that *neither* party do anything that will injure the right of the other to receive the benefits of the agreement," *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432–33 (2004) (emphasis added), no Connecticut court has recognized a tort of 'reverse bad faith' against insureds, nor are Connecticut courts likely to do so in light of the established precedent outlined above. It follows that because "an insured's breach of the covenant is not actionable in tort," an insurer cannot "lessen responsibility for its own tortious conduct" by putting forth an affirmative defense of bad faith. *Kransco*, 23 Cal. 4th at 406–07. This Court therefore concludes that Connecticut does not, and is not likely to, permit an affirmative defense of bad faith by insurers. For that reason, judgment is granted in the Archdiocese's favor on Interstate's ninth affirmative defense, and the Court finds for the Archdiocese on Count One as to all of the claimants.

### B.   Covenant of Good Faith and Fair Dealing

Plaintiff's second count alleges that Interstate breached the covenant of good faith and fair dealing. Connecticut "recognizes a common-law duty of good faith and fair dealing between an insurer and its insured." *Carford v. Empire Fire & Marine Ins. Co.*, 94 Conn. App. 41, 46 (2006). "To constitute a breach of the implied covenant of good faith and fair dealing, the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Ramirez v. Health Net of Ne., Inc.*, 285 Conn. 1, 16 (2008) (internal quotation marks and alterations omitted); *see TD Bank, N.A. v. J & M Holdings, LLC*, 143 Conn. App. 340, 349 (2013) (same). "Bad faith in general

implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights and duties, but by some interested or sinister motive . . . . Bad faith means more than mere negligence; it involves a dishonest purpose." *De La Concha*, 269 Conn. at 433 (internal quotation marks and citations omitted).

The Archdiocese claims that Interstate breached the implied covenant of good faith and fair dealing by: (1) failing to request documents or otherwise investigate whether the Archdiocese's claims were covered under the insurance policies (specifically, with regard to the JA and KS claims); and (2) imposing conditions that went beyond the terms of the policies and failing to handle the Archdiocese's claims consistently with industry practice or prior course of dealing between the parties (specifically, in the Doe and Mallory claims, by requesting documents not relevant to the claims or which Interstate already possessed, refusing to enter into a confidentiality agreement, demanding a formal request for reimbursement, and refusing to enter into a tolling agreement with respect to the Mallory claim, all in bad faith).

Interstate responds by denying that it engaged the alleged conduct, and by claiming, in its ninth affirmative defense, that "the Archdiocese's claims should be barred as a result of its own inequitable conduct or bad faith." (Def.'s Proposed Findings of Law [Doc. # 175] ¶ 49.) The Court first takes up the question of whether the Archdiocese has proved that Interstate engaged in bad faith with respect the JA and KS claims and then considers the Doe and Mallory claims

### 1. JA and KS

The Court cannot conclude based on the evidence presented at trial that the Archdiocese has met its burden of demonstrating that Interstate acted in bad faith in failing to affirm or deny the JA and KS claims on the basis of missing documentation while simultaneously failing to ask

for documentation. Interstate's conduct was certainly negligent, perhaps even reckless, but there is simply no evidence from which the Court can infer "a dishonest purpose" or "some interested or sinister motive," *De La Concha*, 269 Conn. at 433, rather than an honest mistake or mere carelessness or inattention.

### 2. Doe and Mallory

As with the JA and KS claims, there is no remaining factual dispute regarding whether Interstate engaged in the conduct of which it is accused. The Court has already found merit in Plaintiff's assertions that Interstate requested documents not relevant to the claims or which it already possessed, and unreasonably demanded a formal request for reimbursement, and Interstate does not deny refusing to enter into confidentiality or tolling agreements with the Archdiocese. The only issue left for the Court to resolve is whether Interstate undertook these actions in bad faith. It concludes that it did not.

There is no question that the document requests were overbroad, and in the case of Mr. Mallory, also tardy and redundant (as Interstate already possessed all of the relevant documentation by the time it sent the June 25, 2012 letter). But, there is no evidence that this was the result of bad faith, rather than a misconception of the Archdiocese's duties under the contract, sloppiness, or negligence on Interstate's part. Likewise, the Court has found no evidence to support the assertion that Interstate imposed a "formal reimbursement request" requirement in bad faith. While, as discussed above, the Court is not persuaded that such a requirement existed under the contract, it is evident that there was some confusion on even Mr. Sitarz's part to what exactly was required of the Archdiocese.[63]

---

[63] Mr. Sitarz for example, asked Gallagher Bassett whether it had submitted a reimbursement request with respect to each claim, although he himself had already requested

With respect to the confidentiality and tolling agreements, the Court also finds that the Archdiocese has fallen short of proving bad faith. The Archdiocese's proposed confidentiality agreement restricted Interstate's ability to use the information contained within the Canon 489 files in future coverage litigation, and for this reason, Ms. Sons (Sons Test., Trial Tr. Vol. 8 AM at 1307) and Mr. Darling (Darling Test., Trial Tr. Vol. 13 PM at 2506–08) testified, Interstate did not wish to sign the agreement. The Archdiocese presented no evidence to show this rationale was not genuine. As to the tolling agreement, although the Court finds Interstate's dilatory conduct unreasonable and unfair, it does not find any evidence of bad faith, as opposed to mere negligence. Accordingly, judgment is entered in Interstate's favor on Count Two.

### C. CUIPA/CUTPA

Plaintiff's final claim is that Interstate violated CUIPA. Because CUIPA does not provide a right of action, Connecticut courts have permitted plaintiffs to utilize CUTPA as a vehicle for bringing CUIPA claims. *See Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 645 & n.14 (2002) (permitting plaintiffs to assert a CUTPA violation based on CUIPA, even where CUIPA count was pleaded as a stand-alone claim); *Mead v. Burns*, 199 Conn. 651, 663 (1986) (determining that it is possible to state a cause of action under CUTPA for a violation of CUIPA). CUTPA prohibits any person from "engag[ing] in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," Conn. Gen. Stat. § 42-110b(a), and provides a right of action for "[a]ny person who suffers any ascertainable loss of money or

---

reimbursement directly from Interstate in each instance. (*See* Oct. 2012 Emails re JA; Emails re KS & Mallory May 22, 2012; Emails re Doe Oct. 2012.)

property, real or personal, as a result of[64] the use or employment" of an unfair or deceptive act, Conn. Gen. Stat. § 42-110g(a). CUIPA in turn defines unfair or deceptive acts or practices in the business of insurance and prohibits any person from engaging in such practices in Connecticut. *See* Conn. Gen. Stat. § 38a-815.

Among the practices prohibited by CUIPA are "unfair claim settlement practices," including, as relevant here, "failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies," Conn. Gen. Stat. § 38a-816(6)(B); "failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed," *id.* § 38a-816(6)(E); "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear," *id.* § 38a-816(6)(F); and "compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds," *id.* § 38a-816(6)(G).

In order to prove an "unfair claim settlement practice," a plaintiff must demonstrate that the defendant has engaged in unfair or deceptive acts "with such frequency as to indicate a general business practice." Conn. Gen. Stat. § 38a-816(6); *see Lees v. Middlesex Ins. Co.*, 229 Conn. 842 (1994) ("In requiring proof that the insurer has engaged in unfair claim settlement practices with such frequency as to indicate a general business practice, the legislature has manifested a clear

---

[64] "[T]o prevail in a CUTPA action, a plaintiff must establish both that the defendant has engaged in a prohibited act and that, as a result of this act, the plaintiff suffered an injury." *Tucker v. Am. Int'l Grp., Inc.*, No. 3:09-CV-1499 (CSH), 2016 WL 1367725, at *4 (D. Conn. Apr. 5, 2016) (internal quotation marks omitted). "'The language "as a result of" requires a showing that the prohibited act was the proximate cause of a harm to the plaintiff.'" *Id.* (quoting *Abrahams v. Young & Rubicam*, 240 Conn. 300, 306 (1997)).

intent to exempt from coverage under CUIPA isolated instances of insurer misconduct . . . improper conduct in the handling of a single insurance claim, without any evidence of misconduct by the defendant in the processing of any other claim, does not rise to the level of a 'general business practice.'"). Factors relevant to a court's determination of whether a practice is a "general business practice" include: "the degree of similarity between the alleged unfair practices in other instances and the practice allegedly harming the plaintiff; the degree of similarity between the insurance policy held by the plaintiff and the policies held by other alleged victims of the defendant's practices; the degree of similarity between claims made under the plaintiff's policy and those made by other alleged victims under their respective policies; and the degree to which the defendant is related to other entities engaging in similar practices." *Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 166 (D. Conn. 2014).

The Court begins by discussing whether Plaintiff has proved that Interstate engaged in the claimed unfair practices in the four underlying claims at issue here, and then turns to the related question of whether Plaintiff has proved that the practices engaged in here were Interstate's general business practices within the meaning of CUIPA.

### 1. Unfair Practices in Handling the Four Claims at Issue Here

Two of Plaintiff's four CUIPA allegations[65] are based on essentially the same conduct by Interstate: its failure to affirm or deny the underlying claims within a reasonable time after Plaintiff's provision of a proof of loss.

---

[65] "Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed," Conn. Gen. Stat. § 38a-816(6)(E); and "compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds," *id.* § 38a-816(6)(G).

As discussed above, by February 18, 2011 and April 2, 2012, respectively, Interstate had all of the documentation it had requested on the KS and JA claims and more, it knew the amount of the settlements and that they pierced Interstate's layer, and it knew that the Archdiocese was requesting reimbursement on the claims. Nonetheless, it failed to act on the claims by the filing of this lawsuit on November 19, 2012—a year and nine months after the KS documentation was submitted and seven and a half months after the JA documentation was submitted. Under no definition of "reasonable time" is a year and nine months or seven and a half months reasonable.

Likewise, by June 21, 2012 and February 12, 2012, respectively, Interstate had more than sufficient information to make its coverage determinations on the Matthew Doe and Richard Mallory claims, it knew the amount of the settlements and that they pierced Interstate's layer, and it knew that the Archdiocese was requesting reimbursement on the claims. Yet it failed to act on the claims in the five and nine months, respectively, that elapsed before this lawsuit was filed. In the circumstances present here, that five and nine-month delay was not reasonable. As such, the Court finds that Plaintiff has proved that Interstate violated §§ 38a-816(6)(E) and (G) of CUIPA, at least as to the four claims at issue here.

Further, Plaintiff has proved that it suffered an ascertainable loss, in the form of lost investment earnings, as a result of Interstate's delays in paying the underlying claims.[66] Matthew

---

[66] Interstate's contention that "this harm was not proximately caused by any prohibited act under CUIPA or CUTPA, but rather [by] the wrongful denial of benefits" (Def.'s Proposed Conclusions of Law ¶ 92) misses the mark. "[P]roximate cause is an actual cause that is a substantial factor in the resulting harm." *Abrahams*, 240 Conn. at 306 (internal quotation marks and alterations omitted). Here, while Interstate's failure to reimburse Plaintiff at all was obviously one cause of Plaintiff's damages, Plaintiff has proved that it was also harmed by Interstate's delay in reimbursing it. Because this delay was a substantial factor in bringing about damages separate

Byrne, the Archdiocese's Chief Financial Officer's uncontradicted testimony was that had the Archdiocese received the amounts it sought from Interstate on each of the claims, it would have invested those sums in its Investment Trust. Thus, as demonstrated by Plaintiff's Trial Exhibit 181, had the JA claim been paid by May 2, 2012 (one month after the date on which the Court has found Interstate had adequate information to make a coverage determination), the Archdiocese would have accrued an additional $27,576.16 through its Investment Trust. Had the Matthew Doe claim been paid by July 21, 2012, the Archdiocese would have earned the Archdiocese an additional $84,868.62.

The Court departs from Mr. Byrne's analysis, as reflected in Exhibit 181, however, with respect to Mr. Mallory and KS. While Mr. Byrne calculated the Archdiocese's lost earnings for Mr. Mallory beginning in September 2010, the Court has found that Interstate did not have all of the documentation it would have needed to make a coverage determination on the Mallory claim until February 12, 2012, and as such, the claim should have been paid by March 12, 2012, toward the end of the March 2012 quarter. As such, the Court calculates the Archdiocese's lost earnings on the Mallory claim from the quarter ending June 2012, yielding a total loss of $60,285.36. Similarly, although Mr. Byrne calculates the Archdiocese's earnings on the KS claim from March 2012, because the Court has found that the Archdiocese should have been paid by mid-March, most of the way through the quarter, the Court begins with the next quarter (ending June 2012), yielding a total loss of $33,796.75. Accordingly, though the Court disagrees with Plaintiff's claim as to the

---

and apart from the damages Plaintiff incurred as a result of Interstate's failure to pay, the Court finds that Plaintiff has proved proximate cause.

amount of its losses, it finds that Plaintiff has proved that it suffered an ascertainable loss as a result of Interstate's practices.

Plaintiff's next CUIPA claim is that Interstate failed to "acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies." Conn. Gen. Stat. § 38a-816(6)(B). To the extent this claim merely reiterates the Archdiocese's assertion that Interstate failed to act upon its communications providing proofs of loss, the Court finds, for the reasons discussed above, that Plaintiff has proved a violation of § 38a-816(6)(B) as to the four underlying claims here. To the extent the Archdiocese claims that Interstate routinely failed to act with reasonable promptness upon other types of communications, the Court finds no support for this claim as to JA, KS, or Matthew Doe. Further, while Plaintiff has proved this allegation with respect to the Mallory claim, Plaintiff has not proved that it suffered any ascertainable loss due to Interstate's delays in responding to communications other than requests for reimbursement.[67]

Plaintiff's final CUIPA claim is that Interstate did not "attempt[] in good faith to effectuate prompt, fair and equitable settlements of claims in which liability ha[d] become reasonably clear." Conn. Gen. Stat. § 38a-816(6)(F). Plaintiff's allegations in support of this claim appear to mirror its allegations in support of Count Two. Because the Court has already found that the Archdiocese failed to prove those allegations, Plaintiff's CUIPA claim is denied as to § 38a-816(6)(F).

The Court thus need only reach the second part of the CUIPA analysis—whether Plaintiff has proved that the unfair practices Interstate engaged in were general business practices—for

---

[67] Plaintiff specifically disclaims that it is arguing that its costs associated with bringing this suit are an ascertainable loss within the meaning of CUTPA. (*See* Pl.'s Objs. Def.'s Proposed Conclusions of Law ¶ 91.)

Plaintiff's claim that Interstate has a general business practice of failing to affirm or deny claims within a reasonable time after provision of a proof of loss. It is to that analysis that the Court now turns.

### 2.   General Business Practices[68]

The Archdiocese contends that Interstate's general business practice of violating §§ 38a-816(6)(E) and (G) can be seen by examining Interstate's conduct in handling claims brought by: the Diocese of Portland, Maine; the Diocese of Manchester, New Hampshire; the Archdiocese of Seattle, Washington; the Diocese of Phoenix, Arizona; the Diocese of Sacramento, California; the Diocese of Springfield, Massachusetts; and the Archdiocese of Milwaukee, Wisconsin. (*See* Pl.'s Proposed Conclusions of Law [Doc. # 171-3] ¶¶ 48, 50.) With respect to the Diocese of Springfield, Massachusetts and the Archdiocese of Milwaukee, Wisconsin, however, the only evidence the Archdiocese introduced to support its claim is a complaint filed by each of those dioceses. Because complaints are merely allegations, the Archdiocese cannot meet its burden by putting forth solely complaints. As such, the Court finds no evidence of unfair practices in Springfield or Milwaukee. Discussion of the remaining dioceses with respect to which the Archdiocese alleges Interstate engaged in unfair practices follows.

### a.   Portland, Maine

On June 9, 2009, Gallagher Bassett notified Interstate that a claim of sexual abuse against the Diocese of Portland, Maine had settled and that the Diocese was requesting reimbursement from Interstate. (*See* Interstate Claim Notes Portland, Pl.' Trial Ex. 265 at 35.) Interstate replied

---

[68] For the ease of the reader, the Court includes both its findings of facts and conclusions of law with respect to Interstate's general business practices here.

the same day asking for documentation from the Diocese, including the priest file, which it received on July 31, 2009. (*Id.* at 37–38.) Eight and a half months elapsed with apparently no communication between Interstate and the Diocese. (*See id.* at 38–46.) On April 16, 2010, Interstate contacted the Diocese to discuss a settlement, and on April 23, 2010, Interstate agreed to pay the entire amount the Diocese had requested. (*Id.* at 46–47.)

It is apparent from the evidence before the Court that Interstate had all of the information it needed to make a coverage decision by August 2009, and yet it failed to act on the claim for eight and a half months—an unreasonable delay which represents substantially the same conduct Interstate engaged in with respect to the four claimants here.

### b. Manchester, New Hampshire

The record contains evidence of Interstate's handling of four claims in Manchester related to priest abuse of the John Doe brothers (John Doe I, II, and III) and K (or KM).

The Diocese of Manchester notified Interstate of the John Doe claims by letters dated January 31, 2003. (*See* Notice of Doe Claims, Pl.'s Trial Exs. 296–98.) On February 21, 2003 (*see* Ltr. re Manchester Feb. 21, 2003, Pl.'s Trial Ex. 300) and March 28, 2003 (*see* Ltr. re Manchester Mar. 28, 2003, Pl.'s Trial Ex. 301), the Diocese alerted Interstate to upcoming settlement discussions with the plaintiffs. According to Martha Kipp, the Diocese's Director of Risk Management, on March 30, 2003, the Diocese settled the John Doe claims. (Kipp Test., Trial Tr. Vol. 11 AM at 1901–02.) However, there is no evidence in the record indicating that the Diocese notified Interstate of this settlement until October 9, 2003. (*See* Interstate Claim Notes Manchester, Pl.'s Trial Ex. 286 at 1–16; *see also* Ltr. re Manchester Oct. 9, 2003, Def.'s Trial Ex. 734.)

On April 22, 2003, Interstate sent out reservation of rights letters regarding the John Doe claims, in which it requested medical records and other documentation, as well as the personnel

file of the accused priest. (*See* RORs re John Does, Pl.'s Trial Exs. 205–07.) Although Ms. Kipp testified (Kipp Test., Trial Tr. Vol. 11 AM at 1910) that she produced the requested documentation and that she either sent Interstate the priest file or referred it to documents produced by the Attorney General (*see* Att'y Gen. Report re Manchester, Def.'s Trial Ex. 752), the claims notes are devoid of any reference to such a response, and the Diocese was unable to produce any written letter by Ms. Kipp with her response. In late July 2003, the Archdiocese filed a declaratory judgment action against Interstate and other insurers with respect to a number of claims, including the John Does. (*See* Compl. Manchester, Pl.'s Trial Ex. 283.)

It appears that Interstate first learned of the Diocese's settlement of the John Doe claims on October 9, 2003.[69] (*See* Ltr. re Manchester Oct. 9, 2003.) Thereafter, on October 28, 2003, Interstate requested a copy of the defense file, an evaluation of the claims, and itemized billing for defense costs. (Interstate Claim Notes Manchester at 16.) The record does not reveal that these items were ever provided. On May 28, 2004, the Diocese proposed a settlement of the three John Doe claims (Ltr. re Manchester May 28, 2004, Pl.'s Trial Ex. 308), which Interstate accepted on June 8, 2004 (Interstate Claim Notes Manchester at 27).

The K claim followed a similar course. The Diocese first notified Interstate of the claim on January 31, 2003. (*See* Notice of K Claim, Pl.'s Trial Ex. 299.) Thereafter, it wrote to Interstate regarding settlement discussions with K on February 21, 2003 (*see* Ltr. re Manchester Feb. 21, 2003) and April 3, 2003 (*see* Ltr. re Manchester Apr. 3, 2003, Pl.'s Trial Ex. 302). On April 10, 2003, the Diocese sent Interstate deposition transcripts (*see* Ltr. re Manchester Apr. 10, 2003, Pl.'s Trial

---

[69] The complaint in the July 2003 declaratory judgment action did not specify which underlying claims were included in the action. (*See* Compl. Manchester, Count II.)

Ex. 303), which Ms. Kipp identified as memorializing the depositions of K and a priest who knew both the accused priest and K (Kipp Test., Trial Tr. Vol. 11 AM at 1907). Interstate issued its reservation of rights letter regarding the K claim on April 22, 2003, at which time it requested the personnel file of the accused priest, George Robichaud, as well as other relevant documentation. (*See* ROR re K, Pl.'s Trial Ex. 302.) Ms. Kipp testified that she either gave Interstate a copy of the Father Robichaud file or referred it to the Attorney General's report (Kipp Test., Trial Tr. Vol. 11 AM at 1946), but as she later admitted (*id.* at 1939), the report does not appear to include any information regarding Father Robichaud (*see* Att'y Gen. Report re Manchester), and the record contains no evidence that Ms. Kipp sent Father Robichaud's file to Interstate.

On April 30, 2003, according to Ms. Kipp, the Diocese, Tim McNamara of Interstate, and K met to discuss the K claim. Ms. Kipp testified that shortly after this meeting, in May 2003, the Diocese and K reached a settlement, which the Diocese paid sixty to ninety days later. (Kipp Test., Trial Tr. Vol. 11 AM at 1947, 1958.) There is no evidence that the Diocese notified Interstate of this settlement until October 9, 2003, at which time Ms. Kipp sent Interstate a letter listing the K claim among other claims that had settled. (*See* Ltr. re Manchester Oct. 9, 2003.) On May 28, 2004, the Diocese proposed a settlement of the K claim (Ltr. re Manchester May 28, 2004), which Interstate accepted on June 8, 2004 (Interstate Claim Notes Manchester at 27).

As is evident from the Court's findings of fact above, although there was a substantial delay between October 9, 2003, when Interstate was first notified of the settlement of the John Doe and K claims, and May 2004 when the parties began to discuss settlement of the Diocese's lawsuit, it does not appear that this delay was the fault of Interstate. While Interstate could have, and probably should have, been more diligent about obtaining the documentation it believed it needed, it is not evident from the record that the Diocese actually provided the priest files or other documentation

requested by Interstate as part of its coverage investigation. These circumstances are distinct from the kind of unreasonable delays Interstate caused in the four claims at issue in this case. The Court thus concludes that Interstate's handling of the Manchester claims provides no support for Plaintiff's claim of a general business practice of delay.

### c.  Seattle, Washington

Plaintiff has put forth evidence regarding Interstate's handling of five claims by the Archdiocese of Seattle: RH and John Doe, BB, CM, and GK.

#### i.    RH and John Doe

On February 5, 2008, the Archdiocese of Seattle, Washington notified Gallagher Bassett, with copies to Interstate, of a lawsuit by RH and John Doe against the Archdiocese, arising out of sexual abuse of the plaintiffs by a Christian Brother. (*See* Ltr. re Seattle Feb. 5, 2008, Pl.'s Trial Ex. 315.) Interstate sent reservation of rights letters to the Archdiocese on April 8, 2009 (*see* ROR re John Doe Seattle, Pl.'s Trial Ex. 316) and April 14, 2008 (*see* ROR re RH Seattle, Pl.'s Trial Ex. 317). The Archdiocese settled the underlying claims with RH and John Doe in September 2009, and on August 27, 2010, it requested reimbursement on both claims. (*See* RH and John Doe File, Pl.'s Trial Ex. 311 at 79–80.) By letter dated October 11, 2010, Interstate requested the following documents from the Archdiocese:

1.  Any and all documents reflecting the financial relationship between the Archdiocese of Seattle and the Christian Brothers organization, including the allocation of tuition monies paid to either or both entity, and any and all financial records.
2.  Any and all financial records, including all documents, of the Archdiocese of Seattle and/or the Christian Brothers organization created during, or reflecting financial information from, the period of the Brother Courtney's tenure at O'Dea High School.
3.  A copy of the transcript of every deposition taken in connection with the numerous cases involving the Archdiocese and the Christian Brothers as a

> result of claims filed against the two entities, or either entity separately, in which Brother Courtney was alleged to have caused injury to anyone at O'Dea High School.
>
> 4.   Any and all personnel files, documents, and things maintained by the Archdiocese concerning Brother Courtney during his tenure at either O'Dea High School or St. Alphonsus Parish School.

(*Id.* at 77–79.)

The Archdiocese replied on October 14, 2010, noting that this was "not the first request to Interstate Insurance for reimbursement on a claim involving Edward Courtney[;] [h]is claims history [wa]s well known to Interstate;" and Interstate already had his "entire personnel file and all related documents," as they had been "previously produced." (Ltr. re Seattle Oct. 14, 2010, Pl.'s Trial Ex. 318 at 1.) With respect to deposition transcripts, the Archdiocese asserted that it had already produced all transcripts "along with detailed case summaries and assessments" for cases involving Courtney for which it had sought coverage from Interstate, and that deposition transcripts pertaining to other claims were not relevant to Interstate's analysis. (*Id.*) Finally, the Archdiocese sought an "explanation why information pertaining to O'Dea [High School] [wa]s relevant to these cases at St. Alphonsus [Parish School]." (*Id.*)

Interstate responded on November 17, 2010 with a list of deposition transcripts and personnel documents it already had regarding Courtney and a request that the Archdiocese produce any other transcripts relating to a claim against Courtney or personnel documents that it possessed. (*See* RH and John Doe File at 73–76.) Further, it explained that "the financial information and documentation during Brother Courtney's tenure at O'Dea and St. Alphonsus . . . is relevant because Brother Courtney . . . was on staff at O'Dea prior to being hired at St. Alphonsus" and "[t]he financial relationship of the two entities is clearly relevant to the issue of the insured's knowledge of the allegations against Brother Courtney." (*Id.* at 73–74.)

By letter dated January 14, 2011, the Archdiocese sent Interstate six boxes of documents, including "[a]ll deposition transcripts involving, referencing or discussing allegations against Brother Courtney in both O'Dea and St. Alphonsus cases"; "[d]ocuments in Brother Courtney's personnel file not listed in the index provided with your November 17, 2010 letter"; and "[f]inancial information and documentation during Brother Courtney's tenure at O'Dea High School and St. Alphonsus Grade School," as well as a timeline of Courtney's tenure at O'Dea and St. Alphonsus put together by the Archdiocese's counsel. (*Id.* at 68; *see id.* at 69–72.) Interstate sent the Archdiocese brief letters on January 31 and February 28, 2011, notifying it that it had received the documents and was in the process of reviewing them. (*See id.* at 66–67.)

On March 28, 2011, Interstate wrote to the Archdiocese again, now requesting more documents: "the exhibits to the depositions of all current and former members/employees of the Christian Brothers, current and former members/employees of the Seattle Archdiocese, and current and former employees of O'Dea High School and St. Alphonsus School . . ., the 30(b)(6) deposition of the Christian Brothers . . . [, and] the videotape of the deposition of Mary Ellingson." (*Id.* at 64.) The Archdiocese responded on April 13, 2011, complaining that the "March 28 requests make demands that go beyond the Archdiocese's obligation under the duty to cooperate" but nonetheless agreeing to produce more documentation if Interstate "narrow[ed] its request to specific exhibits" and "cover[ed] the cost" of producing those exhibits. (*Id.* at 63.) "In an effort to comply with [the Archdiocese's] request to limit the scope of [Interstate's] request for exhibits," on April 26, 2011, Interstate narrowed its request to four specific exhibits and asked that the Archdiocese "ensure that [it] ha[d] produced Mr. Courtney's entire personnel file as kept by the Archdiocese." (*Id.* at 61.) The Archdiocese complied with that request shortly thereafter. (*See id.* at 59 ("Thank you for providing the exhibits requested in my last letter.").) However, on May 24,

2011, Interstate requested an additional 47 exhibits to depositions plus all exhibits to the April 13, 2009 deposition of Courtney, as well as transcripts of two additional depositions. (*Id.* at 59–60.) Seemingly exasperated, on April 13, 2011, the Archdiocese "extended an offer to discuss settlement," to which it received no reply. (*Id.* at 58.) On June 14, 2011, the Archdiocese filed suit against Interstate. (*See id.* at 3, 58.)

Without viewing the underlying depositions and documents, the Court cannot say with certainty whether or when Interstate had enough information to make its coverage determination on the RH and John Doe claims. However, in light of the narrow question before Interstate, the Archdiocese's extensive cooperation, and the descriptions of the vast amount of documentation provided to Interstate, the Court finds it is more likely than not that by January 2011, or April 2011 at the latest, Interstate had sufficient information to reach a coverage decision but failed to do so. This delay is analogous to Interstate's conduct in the underlying claims here, and is some evidence that could support a finding of a general business practice.

### ii.   BB

On February 5, 2008, the Archdiocese of Seattle notified Gallagher Bassett, with copies to Interstate, of a lawsuit by BB against the Archdiocese, which, like the RH and John Doe claims, arose out of abuse by Brother Courtney. (*See* Ltr. re Seattle Feb. 5, 2008.) Two months later, on April 4, 2008, the Archdiocese sought reimbursement from Interstate on the BB claim (*see* BB File, Pl.'s Trial Ex. 310 at 15), although it appears that claim did not actually settle until July 2011 (Interstate Claim Notes re BB, Pl.'s Trial Ex. 319). Between April and November 2008, counsel for the Archdiocese and Mr. McNamara reached "a compromise proposal to accept reimbursement of defense fees and costs, only." (BB File at 15.) However, Interstate insisted, by letter dated November 19, 2008, that it still needed "copies of all discovery exchanged in the [BB] case,

including written discovery responses, documents produced, deposition transcripts, and expert reports." (*Id.*) The parties scheduled a meeting for December 17, 2008 to discuss "issues raised in Interstate's letter," prior to which the Archdiocese provided a copy of a document regarding the ownership and management of the Briscoe Boys Memorial School (previously requested by Interstate). (*See id.* at 12, 14.)

However, on December 12, 2008, before the scheduled meeting took place, Interstate filed a declaratory judgment action, seeking a declaration that it had no obligation to reimburse the Archdiocese for the BB claim. (*See id.* at 3; Interstate Compl. re BB, Pl.'s Trial Ex. 314.) The December 17, 2008 meeting went forward anyway, and following the meeting, on January 9, 2009, the Archdiocese forwarded to Interstate a number of documents it had apparently requested at the meeting. (*See* BB File at 9.) The record does not reveal what happened next, but the parties stipulated to the dismissal of the declaratory judgment action in April 2009 (*see id.* at 5), at which time, Mary Santi, the Chancellor and Executive Director of Human Resources of the Seattle Archdiocese (Santi Dep. at 33), and Deborah Sons (Sons Test., Trial Tr. Vol. 8 AM at 1361–62) testified, the Archdiocese withdrew its request for reimbursement.

The above facts reveal no significant delays in Interstate's handling of the BB claim. As such, this case does not provide support for the Archdiocese's CUIPA claim.

### iii.   CM

On January 11, 2012, the Archdiocese of Seattle wrote to Interstate to request reimbursement for the Archdiocese's settlement of a sexual abuse claim by CM. (*See* CM File, Pl.'s Trial Ex. 312 at 22.) Interstate responded by letter dated February 14, 2012, requesting: "[d]ocumentation and information reflecting the payments made by the Archdiocese of Seattle under i[t]s self-insured retention"; "[d]ocumentation and information reflecting the payments

made by or on behalf of Lloyds under the primary indemnity policy"; "[i]nformation regarding the specific amount of reimbursement that the Archdiocese is requesting" and "[p]roof of actual payment by the Archdiocese"; "[c]opies of all settlement agreements executed by the parties"; "[c]opies of any requests for and orders of dismissal executed by the courts"; "[a] copy of the entire personnel file of Fr. James McGreal, including his current status"; "[a] complete copy of the secret archives file maintained by the Archdiocese of Seattle regarding Fr. James McGreal"; "[a] copy of all statements given by Fr. James McGreal in connection with [the CM] claim"; "[c]opies of any documents reflecting the Archdiocese's admission of fault in connection with the hire, retention and supervision of Fr. James McGreal"; "[c]opies of all records and documents which support the admission concerning Fr. James McGreal and his hiring, retention and supervision"; "[c]opies of all documents regarding the incardination of Fr. James McGreal with the Archdiocese of Seattle or any other Diocese of Archdiocese"; "[c]opies of all discovery exchanged and depositions taken in the lawsuit filed by [CM]"; and "[c]opies of all depositions given by Fr. James McGreal and by other persons regarding his conduct." (*Id.* at 19–20.)

The Archdiocese replied on April 4, 2012, attaching copies of all requested documentation, with the exception of McGreal's personnel and secret archives files, discovery, and depositions, some of which the Archdiocese claimed it had already provided to Interstate, and all of which the Archdiocese agreed to make available for Interstate to review at its counsel's office "at a mutually agreeable day and time." (*Id.* at 14–17.) Interstate obtained copies of all of these records on April 27, 2012, and on each of May 9, June 7, July 6, August 6, and September 12, 2012, it notified the Archdiocese that it was "in the process of reviewing and evaluating" the documents. (*See id.* at 9–13.) Finally, on October 10, 2012, Interstate extended an offer of settlement (*see id.* at 7), and on December 19, 2012, the parties reached an agreement (*id.* at 2–3.)

Although in this case, unlike many of the others, Interstate kept the Archdiocese apprised of its investigation, and although the documentation Interstate was reviewing was likely voluminous, simply put, five and a half months of document review is unreasonable in light of the narrow issue before Interstate. Interstate's handling of the CM claim is thus further support for Plaintiff's CUIPA claim.

### iv.   GK

On June 10, 2010, Interstate sent the Archdiocese of Seattle a reservation of rights letter with respect to the GK claim, a priest sex abuse allegation. (GK File, Pl.'s Trial Ex. 313 at 16–20.) In September 2011, the Archdiocese settled the claim with GK, and on April 9, 2012, it requested reimbursement from Interstate. (*See id.* at 15.) Interstate responded four months later on August 6, 2012, requesting 18 different categories of documents (*see id.* at 12), which the Archdiocese produced on December 14, 2012 (*see id.* at 11). On February 12, 2013, Interstate noted that an email written by GK "suggests there is additional correspondence which has not been provided to us" and requesting "copies of the referenced letters," as well as "all documents sent to and from GK related to [the accused priest]." (*Id.* at 9.) The Archdiocese provided the requested documentation on February 21, 2013. (*See id.* at 7.) Nonetheless, Interstate wrote again on February 28, 2013 requesting additional information (*id.* at 4), which the Archdiocese provided on March 6, 2013 (*see id.* at 3). The Archdiocese later reached a settlement agreement with Interstate. The record does not reveal when settlement negotiations began, but it does show that they concluded on August 19, 2013. (*See id.* at 2.)

Although Interstate's multiple, broad requests for extensive documentation give the Court some pause, as does the delay between the provision of documents on March 6, 2013 and the settlement, the record does not contain adequate information to enable to the Court to find by a

preponderance of the evidence that Interstate unreasonably delayed affirming or denying the claim after the Archdiocese's provision of the proof of loss. At least some of the information provided on March 6, which included an explanation of how the claim demand of $133,867.90 was calculated (*see id.* at 3), appears important to Interstate's coverage determination, and the record does not reveal when the parties began to discuss a settlement, so the length of the delay after March 6 is unclear. While the GK claim may therefore provide some weak support to the Archdiocese's CUIPA claims, it is not particularly strong evidence.

### d.  Phoenix, Arizona

On November 30, 2005, the Diocese of Phoenix gave Interstate notice of a claim by a plaintiff that he was sexually abused by several priests when he was a teenager. (Interstate Claim Notes Phoenix Part 1, Pl.'s Trial Ex. 287 at 1.) Included in the Diocese's letter was the personnel file of one of the priests, and initial discovery responses from the plaintiff, the Diocese, and several other defendants. (*See id.*) Mary Casey, an Interstate claims handler, noted after reviewing the personnel file that there was "nothing in the file to indicate that the Diocese knew or should have known [of] a propensity to molest." (*Id.* at 2.) On February 24, 2009, Ms. Sons noted: "We have now been presented with a proof of loss." (Interstate Claim Notes Phoenix Part 2, Pl.'s Trial Ex. 288.) Apparently at some point between February 24, 2009 and April 30, 2009, Interstate sent the Diocese several requests for additional information about its claim, but the record does not reveal the content of those requests or the Diocese's answers. (*See* Interstate Claim Notes Phoenix Part 2, Pl.'s Trial Ex. 290 at 2.) In September 2009, Interstate filed a declaratory judgment action against the Diocese. (*Id.* at 1.) Although the Diocese prevailed initially, the Ninth Circuit later overruled that decision, finding that the assault and battery exclusion applied to bar the Diocese's claims. (Sons Test., Trial Tr. Vol. 8 AM at 1364–65.)

While there are some holes in the record before the Court, it is evident that as of February 24, 2009, Interstate had what Ms. Sons herself termed a "proof of loss." That should have enabled Interstate to make a coverage determination, even if it needed additional information to determine the exact amount that it would reimburse the Diocese. Nonetheless, as of September 2009, more than six months after the Diocese tendered the proof of loss, Interstate had made no coverage decision. As noted several times before, the Court finds this period of time to be unreasonable given the narrow issue before Interstate.

### e.  Sacramento, California

On November 13, 2003, Gallagher Bassett notified Interstate of a lawsuit against the Diocese of Sacramento, California by James Doe, who claimed that Father Jose Urbina had sexually abused him. (Interstate Notes Sacramento Part 1, Pl.'s Trial Ex. 274 at 25.) On May 4, 2005, Interstate sent the Diocese its coverage position, in which it noted that although the James Doe claim fell within Interstate's policy period, it did not believe that Mr. Doe was likely to win at trial, and Interstate had no obligation to pay until after the claim settled anyway. (Interstate Coverage Ltr. Sacramento, Pl.'s Trial Ex. 268 at 6–8.) In January and June 2005, the Diocese provided Interstate with "a number of reports," including a summary of Mr. Doe's deposition, and other information about the Doe claim. (Interstate Notes Sacramento Part 1 at 30; *see* Email re Sacramento July 12, 2005, Pl.'s Trial Ex. 270 at 1.)

A mediation was held on June 20, 2005 regarding the James Doe claim, as well as 30 others, which ultimately led to a global settlement of all of the claims for $35 million. (*See* Email re Sacramento July 12, 2005 at 1–2.) The Diocese sent Interstate the per-claimant breakdown of that settlement sum on July 1, 2005 (*see id.* at 2), which revealed that Mr. Doe was to receive $3.4 million (Interstate Notes Sacramento Part 1 at 33). Ms. Casey noted in her claims handling notes that the

James Doe settlement left "Interstate potential exposure of $1,125,000" and that Interstate "expect[ed] that the Diocese [would] seek reimbursement from Interstate on [the Doe] claim." (*Id.*)

In an email dated July 12, 2005, Interstate requested: "If the Diocese wishes to submit a proof of claim under the Interstate policies, please include [a copy of the insurance policy and how much the Diocese is seeking from Interstate on each claim] along with proof of payment to each of the claimants of the amount allocated to them in the settlement." (Email re Sacramento July 12, 2005 at 1–2.) The record does not reveal any further communication between the parties until November 10, 2005, when the Diocese sent Interstate a letter requesting reimbursement on five claims; the Doe claim was not included. (*See* Ltr. re Sacramento Dec. 16, 2005 at 1.) In its December 16, 2005 response, Interstate wrote: "This letter . . . sets forth Interstate['s] . . . position on coverage of the five claims . . . which you list in your letter as triggering one or more Interstate policies. We understand these are the only claims against the Diocese for which it seeks insurance from Interstate. If that is not correct, please advise me as soon as possible." (*Id.*) Ms. Casey's January 25, 2006 claim handling notes similarly state: "In his letter [requesting reimbursement], [Diocese counsel Barry] Weinstein specifically list[s] 5 claimants on which he seeks reimbursement. This claimant, [James Doe], is not listed as one of the 5 and it is not clear what position the Diocese has taken on this claim." (Interstate Notes Sacramento Part 1 at 34.) Likewise, on March 7, 2006, Ms. Casey noted: "Although we know that the Diocese has settled this case for $3.4 mil, they have not yet made a formal demand to Interstate for reimbursement" (Interstate Reinsurance Report Sacramento, Pl.'s Trial Ex. 273 at 4); on April 20, 2006 she added: "There is still no formal demand from the Diocese on this case. . . . We will continue to wait to see if the Diocese presents this claim to us" (Interstate Notes Sacramento Part 1 at 38); and on July 28, 2006, she wrote: "Still no word

from the Diocese in regards to our coverage position" (*id.* at 39). The file was closed on November 27, 2006 with a note stating: "Please let me know if these claims are ever pursued." (*Id.* at 41.)

On September 19, 2007, the Diocese filed a declaratory judgment action seeking reimbursement from Interstate and other insurers for the sums it expended in settling the 31 underlying claims. (*Id.*; *see also* Archdiocese Compl. Sacramento, Pl.'s Trial Ex. 278.) On January 22, 2009, Interstate settled the six claims that reached its layer (the James Doe claim plus the five aforementioned claims). (*Id.* at 48.)

Plaintiff's claim that this case demonstrates a general practice of delay by Interstate hinges on Plaintiff's allegation that Interstate's insistence on a reimbursement request by the Diocese was a needless formality. However, in the Sacramento case, unlike the claims at issue here, there is no evidence that Interstate did in fact seek reimbursement from Interstate in any form (as opposed to in some formalistic fashion). Given that the settlement covered more than 30 claims and only a handful of them reached Interstate's layer, it was not unreasonable for Interstate to expect the Diocese to tell it which claims it sought reimbursement for. This is particularly true because in responding to the Diocese's November 10, 2005 letter, Interstate specifically stated that it understood the Diocese to be seeking reimbursement only for the five claims it had listed in its letter, and explicitly requested that the Diocese notify it if its understanding was incorrect. (*See* Ltr. re Sacramento Dec. 16, 2005 at 1.) Interstate could, and apparently did, conclude from the Diocese's failure to correct Interstate, that it was not seeking reimbursement on the James Doe claim. As such, any delay in Interstate's handling of the Doe claim can only be attributed to the Diocese's own lack of diligence in seeking reimbursement for the claim, and is not evidence of unfair practices on Interstate's part.

### 3.   The Final Analysis

In sum, the Court finds evidence of unreasonable delay in Interstate's claim handling in the four claims at issue in this case as well as in five to six other claims. As the Archdiocese obtained from Interstate claims files for 57 claims (*see* Pl.'s Proposed Findings of Fact [Doc. # 207] ¶ 144), this amounts to a showing of unfair practices in approximately 9 to 11% of cases (apart from the underlying claims here). The question then is whether this is adequate to demonstrate a general business practice.

The law is not clear on this point. While it is axiomatic that a "'plaintiff must show more than a single act of insurance misconduct . . . [or] isolated instances of unfair settlement practices' in order to successfully claim that the defendant has a general business practice," Connecticut jurisprudence offers surprisingly little guidance regarding how many acts of misconduct must be proved to demonstrate a general practice. *Belz*, 46 F. Supp. 3d at 165–66 (quoting *Lees*, 229 Conn. at 850). The Connecticut Supreme Court has, however, noted that because "[t]he term 'general business practice' is not defined in the statute . . . we may look to the common understanding of the words as expressed in a dictionary." *Lees*, 229 Conn. at 849 n.8. Citing Webster's Third New International Dictionary, the court defined "general" as "prevalent, usual [or] widespread" and "practice" as "[p]erformance or application habitually engaged in . . . [or] repeated or customary action." *Id.*

Applying those definitions here, the Court finds that Plaintiff has failed to prove that Interstate maintained a general business practice of failing to affirm or deny claims within a reasonable time after the insured's provision of a proof of loss. In the circumstances of this case, where the insurer provided the same insurance policy under the same Bishop's Plan to dioceses around the country; the dioceses submitted claims for the reimbursement of approximately 1700

settlements with victims of sexual abuse by priests under that policy; and Plaintiff obtained a sample of 57 claims handling files, a showing of unfair practices in only ten to twelve percent of those cases does not suffice to demonstrate that unfair practices were "prevalent, usual [or] widespread." *Id.* As such, judgment is granted in Interstate's favor on Count Three.

### D. Damages

The Court now turns to the issue of damages. As a preliminary matter, the Court must address Interstate's related claims that: (1) Plaintiff is not entitled to any damages because the misconduct alleged by the underlying claimants against the Archdiocese is "derivative of and inextricably intertwined with" the intentional conduct of the offending priests, such that it is barred by the assault and battery exclusion in the policies; and (2) Plaintiff is entitled to only a reduced amount of damages to the extent the expenses incurred by the Archdiocese in settling the underlying claims were incurred to secure releases of the perpetrator priests (as opposed to the Archdiocese itself).[70] Interstate's first argument is foreclosed by this Court's ruling on summary judgment that Plaintiff's claims were not barred by the assault and battery exclusion in the policies. (*See* Ruling on Cross-Mots. Summ. J. at 9–15.) Its second argument fares little better.

Although the offending priest was named in each of the releases in the underlying cases, the Court is not persuaded that the Archdiocese's expenses would have been any less had the settlements not included the priests. The Doe and Mallory cases, filed in court, explicitly sought

---

[70] These arguments are Interstate's seventh and thirteenth affirmative defenses. However, because in order to prove breach of contract, *Plaintiff* must demonstrate that settlements paid by the Archdiocese were for "occurrences" under the contract, which, by definition cannot be intentional acts, the burden is on Plaintiff to prove that the settlements covered negligence rather than intentional torts (notwithstanding Defendant's inartful pleading of its arguments as affirmative defenses).

damages against the Archdiocese for its claimed negligence, and did not name Father Ferguson (or his estate) as a defendant. While the KS and JA claims never went to court, both the JA and KS demand letters were entitled "[Claimant] v. Archdiocese of Hartford, et al." (*see* JA Demand Ltr.; KS Demand Ltr.) and the releases signed in both cases were extremely broad, going far beyond the individual priest and releasing any person or entity affiliated with the Archdiocese from any liability "as a result of or in any way connected with certain alleged incidents of clergy sexual misconduct and assaults allegedly occurring in the State of Connecticut" around the time of the claimed abuse (*see* JA General Release; KS General Release). Further, there is no record evidence to suggest that the amounts of the settlements or the Archdiocese's expenses incurred in obtaining those settlements hinged on the inclusion of the offending priests in the releases, and there is no evidence of any attempts by the plaintiffs to obtain compensation from the individual priests (or their estates) or of any involvement in the cases by the individual priests (or their representatives). *Cf. Interstate Fire & Cas. Co. v. Catholic Diocese of El Paso*, 622 F. App'x 418, 421 (5th Cir. 2015) (rejecting claim by Interstate for allocation of a portion of diocese's settlement with plaintiff to claims against offending priest where there was no evidence suggesting an intent to allocate by the diocese or plaintiff). As such, this Court will not reduce Plaintiff's requested damages to account for non-covered expenses.

The Court therefore awards Plaintiff the following amounts, representing the total amount expended by the Archdiocese for settlements and defense costs: $105,805 for the JA claim; $106,744.75 for the KS claim; $235,965.50 for the Richard Mallory claim; and $290,222.97 for the Matthew Doe claim, all totaling $738,738.22. The Archdiocese additionally seeks prejudgment interest on each of these sums. "Under Connecticut law, 'the allowance of prejudgment interest as an element of damages [under Connecticut General Statutes § 37–3a(a)] is an equitable

determination and a matter lying within the discretion of the trial court.'" *Daimlerchrysler Ins. Co., LLC v. Pambianchi*, No. 3:08CV943 (MRK), 2011 WL 721630, at *1 (D. Conn. Feb. 23, 2011), *aff'd sub nom. DaimlerChrysler Ins. Co. v. Pambianchi*, 469 F. App'x 65 (2d Cir. 2012) (quoting *W. Haven Sound Dev. Corp. v. City of W. Haven*, 207 Conn. 308, 321 (1988)). However, "'[b]efore awarding interest, the trial court must ascertain whether the defendant has wrongfully detained money damages due to the plaintiff.'" *Id.* (quoting *W. Haven Sound*, 207 Conn. at 321).

The Court here has already made this finding with respect to each of the underlying claims, and the Court now further finds that in light of Interstate's unreasonable delays in each of the underlying claims, an award of prejudgment interest is appropriate here. As discussed above, the JA claim should have been paid, at the latest, by May 2, 2012; the KS claim by March 18, 2011; the Doe claim by July 21, 2012; and the Mallory claim by March 12, 2012. The Court therefore orders prejudgment interest commencing on these dates.

Connecticut General Statutes § 37-3(a) provides for "interest at the rate of ten percent a year, and no more, . . . in civil actions . . . as damages for the detention of money after it becomes payable." Connecticut courts have interpreted this provision as setting a maximum rate of interest of 10% per year, but have held that courts have discretion to apply a lesser rate. *Marulli v. Wood Frame Const. Co., LLC*, 154 Conn. App. 196, 210 (2014); *see also Sosin v. Sosin*, 300 Conn. 205, 245 n.26 (2011) ("[T]his court repeatedly has recognized that the trial court has broad discretion under § 37–3a to determine . . . the rate of interest . . . ."); *Sears, Roebuck & Co. v. Board of Tax Review*, 241 Conn. 749, 765–66 (1997) (holding that 10 percent interest rate set forth in § 37–3a is not required rate of interest but, rather, represents maximum rate that trial court, in its discretion, may apply). Plaintiff here has introduced evidence of the amount it would have earned had Interstate paid the claims in a timely manner, in each quarter from the date on which Interstate should have

tendered payment until December 2015. (*See* Pl.'s Trial Exs. 180, 181.) The Court concludes that these rates should be applied as prejudgment interest.[71] Plaintiff is to provide Interstate with updated rates from January 2016 through the date of this judgment within 10 days of the date of this judgment.

---

[71] Plaintiff additionally appears to seek consequential damages in the amount it would have earned on the sums claimed had they been paid in a timely manner. Because such damages would be duplicative of the prejudgment interest awarded by the Court, the Court will not additionally award consequential damages.

### III. Conclusion

For the foregoing reasons, the Court concludes that the Archdiocese has proved, by a preponderance of the evidence, that Interstate breached its contracts with the Archdiocese as to each of the underlying claims by failing to timely reimburse the Archdiocese on those claims. However, the Archdiocese has failed to meet its burden of demonstrating that Interstate violated its duty of good faith and fair dealing or that Interstate violated CUIPA/CUTPA.

The Court awards Plaintiff compensatory damages on Count One in the amount of $738,738.22, plus prejudgment interest in the amount of $206,526.89 ($33,796.75 for KS, $27,576.16 for JA, $84,868.62 for Mr. Doe, and $60,285.36 for Mr. Mallory[72]) for the period up to January 2016, and interest at a rate equal to the Archdiocese's quarterly earnings thereafter until the date of this Ruling, to be documented by the Archdiocese within **10 days** of this Ruling. Judgment shall enter in favor of the Archdiocese and against Interstate in the total amount of $945,265.11 plus 2016 interest. The Clerk is requested to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 28th day of July, 2016.

---

[72] The JA and Doe figures come from Pl.'s Trial Ex. 181. The Mallory and KS figures are discussed in the Court's discussion of the Archdiocese's ascertainable loss in Section II.C.1 of this Ruling.