UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| THE HARTFORD ROMAN CATHOLIC DIOCESAN, CORP.<br>*Plaintiff,*<br>v.<br>INTERSTATE FIRE AND CASUALTY CO.<br>*Defendant.* | Civil No. 3:12cv1641(JBA)<br><br>July 26, 2017 |

**RULING ON PLAINTIFF'S MOTION FOR AMENDED OR ADDITIONAL FINDINGS AND CONCLUSIONS OF LAW AND TO AMEND THE JUDGMENT**

Plaintiff, Hartford Roman Catholic Diocesan Corporation (the "Archdiocese") brought suit in November 2012 against Defendant Interstate Fire and Casualty Company ("Interstate") for breach of contract (Count One), breach of the covenant of good faith and fair dealing (Count Two), and unfair trade practices in violation of the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. § 38a-815 *et seq.*, and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b (Count Three), arising from Interstate's failure to indemnify the Archdiocese for monies it paid in settlement to four victims of three of its priests' sexual abuse. On July 28, 2016, after a three-week bench trial, judgment entered in the Archdiocese's favor on Count One and in Interstate's favor on Counts Two and Three. (*See* Memorandum of Decision ("Decision") [Doc. # 250] at 2.)

The Archdiocese now asks [Doc. # 256] that this Court, pursuant to Fed. R. Civ. P. 52(b), 59(a)(2), and 59(e), amend and/or make additional conclusions of law and findings of fact, and enter a new judgment in favor of the Archdiocese on Count Three, finding that Interstate violated CUIPA and is liable to the Archdiocese pursuant to CUTPA. (Pl.'s Mem. Supp. Mot. to Amend

Judgment ("Pl.'s Mot. to Amend") [Doc. # 256-1] at 1.) For the following reasons, Plaintiff's Motion is denied.

## I. Discussion[1]

Rule 59(e) allows a court to "alter or amend a judgment" on a party's motion. Fed. R. Civ. P. 59(e). Rule 52(b) permits a court, on a party's motion, to "amend its findings–or make additional findings–and . . . amend the judgment accordingly." Fed. R. Civ. P. 52(b).[2] The relief under the two Rules often overlaps "and the courts are not always consistent regarding which rule to apply," however, 52(b) motions "permit a party to request clarification or supplementation of the facts found to aid the appellate court in understanding the factual issues at trial" even where the judgment will not be altered. Steven S. Gensler, *Federal Rules of Civil Procedure, Rules & Commentary Rule 52* (2017); *see also Hollis v. City of Buffalo*, 189 F.R.D. 260, 262 (W.D.N.Y. 1999) ("Under Rule 52(b) a court may amend its findings of fact in order to . . . clarify the record for appeal.).[3] Despite the nuances between the Rules, courts within this circuit have reviewed motions

---

[1] The Court's findings of fact are laid out in its Memorandum of Decision.

[2] Plaintiff also purports to move pursuant to 59(a)(2), which states that "[a]fter a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Neither party offers any analysis of Section 59(a)(2), nor does Plaintiff request additional testimony be taken. The Court therefore construes this as simply another request to amend the judgment, under the same analysis as Rules 52(b) and 59(e).

[3] Other circuits have addressed the interplay between Rules 52(b) and 59(e) with varying interpretations. *See National Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.*, 899 F.2d 119, 122–123 (1st Cir. 1990) (noting the similarity between motions under Rules 52(b) and 59(e), although motions attacking the correctness of the judgment are more appropriately analyzed under Rule 59(e)); *U.S. v. Martin*, 226 F.3d 1042, 1047 n.6 (9th Cir. 2000) (noting in dicta that both Rules 52(b) and 59(e) give authority to the district court to amend its prior judgment in a non-jury case); *cf. Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 158 (3d Cir. 1999) (Rule 59(e) motion more appropriate than Rule 52(b) to address miscomputation of back

under Rules 52(b) and 59(e) under the same standard. *See e.g., Graham v. United States*, No. CIV 3:01CV177 AHN, 2006 WL 3361752, at *1 (D. Conn. Nov. 16, 2006) (finding the same standard applies for both Rules and therefore instead of separately addressing the 52(b) motion, "consider[ed] it as part of [the] Rule 59(e) motion"); *Bissell-Wisniowski v. Milford Council of Aging*, No. 03-1252, 2004 WL 2634455, at *1 (D.Conn. Nov. 16, 2004) (considering Rules 52(b) and 59(e) under the same standard).

Under both Rules 52(b) and 59(e) a court may "revisit a prior decision when there has been an intervening change in the law, new evidence becomes available, or there is a need to correct a clear error or prevent manifest injustice." *Hollis*, 189 F.R.D. at 262; *see also United States v. Rice*, 594 F. App'x 481, 485 (10th Cir. 2014). The Second Circuit has specifically approved a district court's authority under Rule 59(e) to "alter or amend [a] judgment to correct a clear error of law or prevent manifest injustice." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (internal quotation marks and citations omitted). Plaintiff asserts that "[t]he purpose of [its] Motion [is] to correct errors in law and in fact," which it argues require a new judgment in favor of Plaintiff on Count Three.[4] (Pl.'s Reply at 1.) "The standard for granting such ... motion is strict, and it will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter

---

pay in final judgment as Rule 52(b) addresses findings and their effect on the judgment rather than errors in the judgment alone); *Pro Edge L.P. v. Gue*, 377 F. Supp. 2d 694, 698 (N.D. Iowa 2005) (any motion that calls into question the correctness of the judgment rather than challenging the court's fact finding should be analyzed under Rule 59(e), not Rule 52(b)).

[4] The Court does not address Defendant's arguments addressing the first two grounds for reconsideration–intervening change in law or newly available evidence–which Plaintiff does not claim.

the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (articulating the standard in context of reviewing a Motion under Fed. R. Civ. P. 59(e)); *see also Taylor v. Hous. Auth. of New Haven*, No. 3:08CV557 (JBA), 2010 WL 2801895, at *1 (D. Conn. July 14, 2010) (applying same standard for Fed. R. Civ. P. 52(b)).

Neither Rule is intended to provide a party with the opportunity to merely relitigate matters or present the case under new theories. *See e.g., Wallace v. Brown*, 485 F. Supp. 77, 78 (S.D.N.Y. 1979); *Sims v. Mme. Paulette Dry Cleaners*, No. 82 CIV. 5438 (MEL), 1986 WL 12511, at *1 (S.D.N.Y. Oct. 31, 1986). Thus, to serve the compelling interest of preserving finality of litigation, "a party who realizes, with the acuity of hindsight, that he failed to present his strongest case at trial, is not entitled to a second opportunity by moving to amend a finding of fact or a conclusion of law." *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1220 (5th Cir.1986); *see also* 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2582 (1971).[5]

---

[5] Plaintiff's Reply states, "[i]n *Shrader*, the Second Circuit held that the District Court properly reconsidered its rulings based upon additional relevant case law and legislative history, all of which could have previously been brought to the District Court's attention but was only introduced for the first time on the motion for reconsideration." (Pl's Reply at 3-4.) To be clear, "in *Shrader*, the Second Circuit did not approve of the district court's decision to reconsider. Rather, the *Shrader* court merely noted that 'in light of [the defendant's] introduction of additional relevant case law and substantial legislative history,' it could not 'say that the district court's decision to reconsider its earlier ruling was an abuse of discretion.'" *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, No. 13 CIV. 06577 LGS, 2015 WL 1782206, at *2 (S.D.N.Y. Apr. 15, 2015) (quoting *Shrader*, 70 F.3d at 257). On the other hand, in *Wallace* the district court refused to reconsider its decision, noting that the plaintiff, [u]nder the guise of seeking an amendment of this court's finding because of an alleged 'manifest error' . . . in fact[] [was] attempt[ing] to relitigate already-decided factual issues and present new legal theories based on evidence available, though not used, during trial." 485 F. Supp. at 78.

The Archdiocese argues that the findings and conclusions of law in the Decision must be amended because the Court: (1) adopted the incorrect standard for proving a CUIPA general business practice, (2) overlooked admissions by Interstate that it always violated Conn. Gen. Stat. § 38a-816(6)(E) in addition to "facts that would increase the percentage of unfair claims settlement practices by Interstate," and (3) failed to separately consider the claims made under Section 38a-816(6)(G), which it claims the evidence establishes Defendant violated. (Pl.'s Mot. to Amend at 1-2.) In opposition Interstate maintains that the Court properly rejected the CUTPA and CUIPA claims based on the Archdiocese's failure to prove Interstate engaged in a "general business practice," arguing that the Archdiocese has pointed to no clear error as required for relief under Rules 52 and 59, but rather is attempting to offer new evidence or legal theories which were available at the time of trial, but which the Archdiocese chose not to make part of its case. (Def.'s Opp'n at 1.)

### A. The Standard the Court Used for Determining What Constitutes a "General Business Practice" was not Clearly Erroneous

The Archdiocese first attacks the legal standard the Court used in making its determination that Interstate's claim handling practices did not rise to the level of a general business practice within the meaning of CUIPA, arguing that "[t]he Court's standard was too high, based on case law from Connecticut and sister states and based on the NAIC's [("National Association of Insurance Commissioners")] benchmarks for the percentage of unfair practices that warrant a finding of a general business practice." (Pl.'s Mot. to Amend at 4.) Thus, the Archdiocese argues that the Court abused its discretion because it premised its decision on an error of law. (Pl.'s Reply at 4 (citing *India.com, Inc. v. Dalal*, 412 F.3d 315, 320 (2d Cir. 2005).)

However, the Court used the definition adopted by the Connecticut Supreme Court in *Lees v. Middlesex Ins. Co.*, 229 Conn. 842 (1994). (Memorandum of Decision at 92.) Looking to the dictionary for the words' common understanding, the *Lees* Court noted that "[g]eneral" is defined as "prevalent, usual [or] widespread" . . . and "practice" means "[p]erformance or application habitually engaged in . . . [or] repeated or customary action." *Lees*, 229 Conn. at 849 n.8. Plaintiff does not explain how the Court's reliance on a controlling state supreme court decision constitutes clear error.

### 1. Connecticut Courts and Federal District Courts

It is undisputed that violation of Section 38a-816(6) "requires proof that the unfair settlement practices were 'with such frequency as to indicate a general business practice.'" *Lees*, 229 Conn. at 847-48 (quoting *Mead v. Burns*, 199 Conn. 651 (1986)). Still, the Archdiocese, relying on *Lees* and quoting *Quimby v. Kimberly Clark Corporation*, 28 Conn. App. 660, 671-72 (1992), argues that "more than a singular failure" involving only the policyholder-plaintiff suffices to establish a general business practice. (Pl.'s Mot. to Amend at 4.) Defendant counters that although "many cases have held that more than one act of misconduct is necessary . . . the Archdiocese is twisting those holdings to mean that anything more than one instance is sufficient to prove a CUIPA violation." (Def.'s Opp'n at 8.)

This Court agrees with Defendant. While both *Quimby* (reviewing superior court's grant of defendant's motion to dismiss) and *Lees* (reviewing superior court's grant of summary judgment) found that "isolated" or "singular" instances of insurer misconduct were not sufficient to satisfy the "general business practice" requirement where the respective plaintiffs failed to either allege facts or present evidence of misconduct by the defendant in processing *any* other claims, both cases noted the necessity for a plaintiff to show the practice was engaged in with some

6

"frequency." *Quimby*, 28 Conn. App. at 672; *Lees*, 229 Conn. at 849. As discussed above, the *Lees* court further expanded on the dictionary definitions of the words "general" and "practice," which is the standard this Court used in determining whether Plaintiff proved that Interstate engaged in a general business practice. Plaintiff has pointed to no clear error in the Court's interpretation of Connecticut law on what qualifies as a general business practice.

Plaintiff recognizes that decisions from other states are not binding but urges that they nonetheless "provide guidance" because CUIPA is based on a model act. (Pl.'s Mot. to Amend at 8.)[6] It thus argues that the Court should have followed Connecticut superior court cases and other federal district courts, which it believes employ a lower standard. However, because the decisions of the Connecticut superior courts and other district courts either within or outside of the Second Circuit are not binding, even if such "guidance" might potentially have been persuasive at the trial stage, the cases Plaintiff cites do not provide a basis for altering or amending this Court's findings or resulting judgment.[7] *See Shrader*, 70 F.3d at 257.

---

[6] *See e.g. Bentley v. Tri-State of Branford, LLC*, No. 3:14-CV-1157 (VAB), 2016 WL 2626805, at *1 (D. Conn. May 6, 2016) (VAB) (noting that other district court decisions are not binding on the District Court); *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, 739 F. Supp. 2d 100, 101 (D. Conn. 2010) (noting that district court not bound by Connecticut Superior Court decisions on matters of state law).

[7] In fact, two of the three Connecticut federal court rulings Plaintiff claims as support for its argument, *Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 167 (D. Conn. 2014) and *Tucker v. Am. IntlGrp., Inc.*, No. 3:09-CV-1499 (CSH), 2016 WL 1367725, at *17-18 (D. Conn. Apr. 5, 2016), were cited in the Memorandum of Decision and therefore were not overlooked. (*See* Memorandum of Decision at 72 n.64, 73.)

### 2. *The NAIC Market Regulation Handbook and Conn. Gen. Stat. § 38a-15*

Plaintiff urges this Court to follow the Market Regulation Handbook that the NAIC provides to state insurance departments for their audits of insurers' claims handling practices, which presumes that misconduct is a general business practice if more than seven percent of the claims sampled are found to involve the same type of misconduct. (Pl.'s Mot. to Amend at 10.) Additionally, Plaintiff argues that the Court should consider Conn. Gen. Stat. § 38a-15, which was amended effective October 1, 2016 to specifically authorize use of the procedures and definitions in NAIC's Market Regulation Handbook.[8] (*Id.* at 14.) Defendant responds that notwithstanding the fact that the statute was not effective until October 1, 2016, "per the express terms of the amendment, the 'procedures and definitions' set forth in the Market Regulation Handbook are not even controlling on the insurance commissioner when performing an administrative audit, let alone a federal district court assessing a party's civil liability under CUIPA." (Def.'s Opp'n at 13.)

The NAIC Handbook was published in 2006 and therefore was clearly available to Plaintiff at the time of trial, but was not incorporated in Plaintiff's evidence, proposed conclusions of law or argument at trial. While the Handbook might have had a persuasive impact when the Court initially made its decision, it lacks that impact upon reconsideration given that it is not controlling

---

[8] The statute, with the new language in bold, states the following:

> The commissioner shall, as often as the commissioner deems it expedient, undertake a market conduct examination of the affairs of any insurance company, health care center, third-party administrator, as defined in section 38a-720, or fraternal benefit society doing business in this state. **Any such examination may be conducted in accordance with the procedures and definitions set forth in the National Association of Insurance Commissioners' Market Regulation Handbook.**

Conn. Gen. Stat. § 38a-15.

8

or binding and failure to consider it does not constitute clear error. Further, the amendment to Section 38a-15, although not in effect when the judgment was entered, does not change this analysis, because it too is advisory only. Accordingly, reconsideration of the standard utilized in the Decision to determine whether Plaintiff proved a "general business practice" is not warranted.

### B. The Court's Finding that Interstate Violated Conn. Gen. Stat. § 38a-816(6)(E) in More Than Nine to Eleven Percent of Similar Claims was not Clearly Erroneous

The Court made its determination that Interstate violated subsection E in 9-11% of similar claims based upon the Archdiocese's arguments and presentation of the evidence at trial. In its proposed conclusions of law, the Archdiocese referenced the evidence regarding four other dioceses (located in Portland, Manchester, Seattle, and Phoenix) to support its assertion that, in violation of subsection E, "Interstate failed to affirm or deny coverage within a reasonable time after proofs of loss ha[d] been completed" with such frequency as to indicate a general business practice.[9] (Pl.'s Concl. of Law [Doc. # 171-3] at ¶ 48.) Two of the four identified dioceses had multiple claims, with five claims in Seattle (BB, GK, CM, RH and John Doe) and four claims in Manchester (John Doe I, II, III, and KJKM).

Trial evidence about each of these eleven claims was examined, as was one additional claim in the Diocese of Sacramento, in determining whether there was proof of an unreasonable delay between Interstate's receipt of completed proofs of loss and its coverage determinations. Ultimately out of the twelve claims, the Court identified three which it determined could be

---

[9] Subsection E makes "failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed" an unfair claim settlement practice. Conn. Gen. Stat. § 38a-816.

9

considered "unreasonable delay"–one claim in Portland (eight and a half months), the CM claim in Seattle (five and a half months), and one in Phoenix (six months),[10] (Memorandum of Decision at 77-78, 85-87, 88-89) as well as three claims (the GK, RH and John Doe claims in Seattle) where there was potential support for the Archdiocese's claims of unfair insurance settlement practices (*id.* at 84, 88).[11] With respect to the remaining six claims, this Court found no evidence of unreasonable delay. (*Id.* at 78-81, 84-85, 89-91.)

Based on the 57 claims files the Archdiocese obtained from Interstate, the Court concluded Interstate committed unfair practices in approximately 9 to 11% of cases (apart from the underlying claims here). The Archdiocese takes issue with both the number of cases in which the Court found unreasonable delay as well as the total sample size used as the denominator to arrive at the 9-11% calculation. Interstate maintains that in addition to never having previously raised these arguments, the Archdiocese misrepresents the evidence and is bound by the Court's initial findings. (Def.'s Opp'n at 17.)

---

[10] Defendant notes that in actuality the Court clearly erred in concluding there was unreasonable delay in Defendant's handling of the Phoenix claim because the Archdiocese never introduced evidence of the exact date of the filing of Interstate's declaratory judgment action, instead asking Ms. Sons whether the action had been commenced by September 14, 2009. (Trial Trans. 743:17-13). The docket sheet for *Interstate Fire & Casualty Company, Inc. v. Roman Catholic Church of the Diocese of Phoenix*, Docket No. 2:09-cv-01405-NVW (D. Ariz.) (Ex. 1 to Def.'s Opp'n), of which this Court may take judicial notice, however, proves that the Complaint was originally filed on July 2, 2009, just over one month after the last letter was sent from Defendant to Plaintiff's counsel. (*Id.* at 16 n.6 (citing *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (docket sheets are public records of which the court may take judicial notice).) One month does not constitute undue delay and therefore the Court corrects its conclusion to reflect that Interstate did not violate subsection E with regard to its handling of the Phoenix claim.

[11] This is in addition to Interstate's handling of the four claims at issue in this case, where the Court also found evidence of unreasonable delay. (Memorandum of Decision at 92.)

10

### *1. The Evidence Does not Show Interstate Always Violated Section E*

Plaintiff first contends that "because Interstate never provided its policyholders with an affirmance or denial of coverage it *always* violated subsection E." (Pl.'s Mot. to Amend at 16.) Interstate again highlights that the Archdiocese's proposed conclusions of law identified only four dioceses where a violation of § 38a-816(6)(E) allegedly occurred, never arguing until now that Interstate always committed this unfair practice, and further urges that even putting this shortcoming aside, the evidence does not support Plaintiff's conclusion.

This Court specifically found that in six instances of the twelve argued by the Archdiocese (out of the 57 claim sample), there was not enough evidence to conclude Interstate failed to affirm or deny coverage in violation of subsection E. (*See* Memorandum of Decision at 92.) Plaintiff's Motion makes no effort to demonstrate clear error in this finding by identifying evidence that would undermine the Court's analysis of Interstate's handling of these six claims. Instead, contrary to the admonition that a party may not use reconsideration as an opportunity "to introduce evidence that was available at trial but was not proffered, to relitigate old issues, to advance new theories, or to secure a rehearing on the merits," *United States v. Local 1804-1, Int'l Longshoremen's Ass'n*, 831 F. Supp. 167, 169 (S.D.N.Y. 1993), *aff'd sub nom. United States v. Carson*, 52 F.3d 1173 (2d Cir. 1995) (quoting *Fontenot*, 791 F.2d at 1219), the Archdiocese makes new, broader, arguments encompassing the totality of the 57 sample claims.

Plaintiff claims for the first time that based on the evidence at trial, Interstate never affirms or denies coverage because a diocese expected or intended the abuse even after receiving priest files, and that even if Interstate makes a payment on a claim, it still does not affirm coverage. (Pl.'s Mot. to Amend at 16.) Although the Court need not consider the Archdioceses' arguments to the extent that they are simply efforts at relitigating issues under new theories, should Plaintiff identify

11

clearly erroneous facts or manifest injustice in the Court's analysis of the claims, the Court would be required to make corrections. For this reason alone the Court undertakes the following analysis.

Interstate's claims handler, Deborah Sons, admitted that she had never denied coverage on a priest sex abuse claim on the ground that a diocese expected or intended the abuse. (*See* Sons Test., Trial Tr. at 683:24-684:7.) However, she also clarified that she had issued denials for other reasons such as where the incident occurred outside of the policy period.[12] (*Id.* at 758:10-759:14.) Ms. Sons further explained that for claims where it was unclear that there had been an "occurrence" under the policy, Interstate would negotiate with the insured or sometimes file a declaratory judgment action in lieu of sending a denial letter so the coverage question could be resolved. (*Id.* at 758:23-759:10.)

Plaintiff contends that negotiating settlements or filing declaratory judgment actions does not "take Interstate's conduct out of this type of CUIPA violation." (Pl.'s Mot. to Amend at 17 n.12.) Relatedly, the Archdiocese asserts that this Court cannot assume that claims are affirmed simply because they are paid by Interstate, pointing to "Interstate's admission that it never affirmed or denied a claim" and its "further admission that [it] paid only one claim in full (Portland, Maine)."[13] (Pl.'s Mot. to Amend at 17-18.) In support, the Archdiocese argues Interstate's

---

[12] While Ms. Sons testified that for priest abuse claims Interstate always reserves its rights to contest the coverage (Sons Test. at 728:19- 729:6), Plaintiff cites no authority that this is the same as failing to affirm or deny coverage. Ms. Sons's testimony was that for all pending claims, a reservation of rights letter was sent to the diocese. (*Id.*) There was no evidence or argument offered by Plaintiff at trial, nor is there now, that Interstate's reservation of its rights, which it appears to have actually sent to each diocese upon notification of a claim, means it never affirmed or denied coverage for those claims later in the process.

[13] Plaintiff provides no explanation as to the significance of the fact that only one claim was "paid in full," even assuming the evidence aligned with this conclusion. Ms. Sons testified that she could not answer whether the Portland, Maine claim was the only one on Trial Exhibit 263 that

requirement that all dioceses enter into settlement agreements in order to receive payments undermines the assumption that claims are effectively "affirmed" when they were paid by Interstate because the settlement agreements typically contained a provision specifically denying that either the Diocese or Interstate is "adopti[ng] . . . any coverage position." (*See e.g.*, Trial Exs. 267; 555; 631; Sons Test., Trial Tr. at 675:10-676:6).

Plaintiff's argument hinges on the premise that a violation of subsection E occurs if an insurer refuses to explicitly adopt a coverage position on a particular claim, even where that insurer has acted on the claim within a reasonable time period, whether by initiating a declaratory judgment or paying some portion of the coverage in accordance with a settlement. Interstate urges that this cannot be so, for "the intended purpose of declaratory judgment actions and settlement negotiations [is] to resolve claims when coverage is unsure." (Def.'s Opp'n at 18 (quoting *Connecticut Ass'n of Health Care Facilities, Inc. v. Worrell*, 199 Conn. 609, 613 (1986) ("the purpose of a declaratory judgment action is to secure an adjudication of rights where there is a substantial question in dispute or a substantial uncertainty of legal relations between the parties").)

Thus, the question is whether the Connecticut legislature, in drafting subsection E, intended that insurance companies be required to formally take a specific position on a coverage dispute no matter what or when other steps are taken to resolve a disputed claim. Alternatively, Defendant argues subsection E's purpose is simply to prohibit the insurer from unreasonably stalling action on a specific insured's claim, and thus as long as the payment was made (or declaratory judgment action filed) "within a reasonable amount of time after the proof of loss

---

Interstate paid in full based on the chart she was shown, while also indicating she could not identify another off the top of her head. (Tr. at 674:23-675:9.)

13

statements were completed," the statute's purpose is served. Conn. Gen. Stat. § 38a-816(6)(E). Neither the legislative history of the statute nor any case law shed light on the section's purpose.[14]

Given that the Archdiocese did not advance this argument at trial and in the absence of Connecticut legislative history reflecting whether literal compliance was intended in all circumstances, or any state courts' analysis, this Court will leave it to the Connecticut Supreme Court to provide clarity on this issue in the appropriate case. Thus, it was not erroneous, let alone clearly so, to find there was no unfair trade practice for those instances in which Interstate initiated a declaratory action or negotiated a settlement within a reasonable period of time but never formally affirmed or denied coverage.

Both of Plaintiff's next arguments, suggesting that Defendant never affirmed coverage based upon "the pending column in trial Exhibit 262" and Ms. Sons' testimony regarding the Kansas City progress notes, miss the mark. Simply because there are claims pending (*see* Trial Exhibit 262), meaning they have not been affirmed or denied, does not mean that Interstate has

---

[14] "[T]he CUIPA statute is designed to ensure fair practices in insurance settlement." *Tucker v. Am. Int'l Grp., Inc.*, No. 3:09-CV-1499 CSH, 2015 WL 403195, at *34 n.49 (D. Conn. Jan. 28, 2015). The Massachusetts Supreme Judicial Court, interpreting the Massachusetts version of CUIPA which contains a provision identical to subsection E, noted that the statute was "enacted to encourage the settlement of insurance claims . . . and discourage insurers from forcing claimants into unnecessary litigation to obtain relief." *Clegg v. Butler*, 424 Mass. 413, 419, 676 N.E.2d 1134, 1139 (1997) (internal citations omitted). In Connecticut, subsection E explicitly uses the language "affirm or deny" which taken literally means the insurer must actually affirm or deny coverage for each claim. While settling without taking a position may not coincide with the language of the statute, a reading that an insurer could be found to have acted in violation of CUIPA by not explicitly affirming or denying coverage despite paying the claim within a reasonable amount of time after the proofs of loss were completed, does not advance protection of insureds to receive prompt appropriate resolution of their claims.

failed to affirm or deny coverage within the meaning of subsection E. In fact, in its Reply Memorandum, Plaintiff inconsistently stated

> For claims identified on Trial Ex. 262 as pending, coverage has not yet been affirmed or denied because Interstate has not received enough information to make that determination. . . . Because the Court's analysis suggests that a proof of loss is incomplete so long as information requested by Interstate remains outstanding . . . pending claims should also be excluded from the universe of claims under [this] analysis.

(Pl.'s Reply at 8.) In other words, Plaintiff simultaneously but contradictorily urges that the pending claims should be considered as evidence that Defendant never affirmed or denied these claims and that they be removed from the total sample of 57 claims used at trial.[15] Moreover, as highlighted by Defendant, Plaintiff's use of a portion of a quotation from Ms. Sons' testimony concerning Interstate's progress notes regarding the Kansas City claim is misleading.[16] Significantly, Plaintiff fails to note that Ms. Sons explained that the language, "we have never voluntarily paid under the program," in Interstate's notes referred to a request for settlement on cases that have no coverage. (Tr. at 747:3-7.) The Court is unpersuaded that its judgment should be amended or refined on these grounds.

### 2. The Court Correctly Considered all 57 Claims

Alternatively, Plaintiff argues that the Court should have included in its calculation "only those claims in which proofs of loss were submitted," thereby excluding the 25 unpaid claims and

---

[15] The Court addresses Plaintiffs argument that the claims should be excluded from consideration in Section (I)(B)(2).

[16] The language the Archdiocese quotes is actually part of a larger entry, which reads, in full (omitted portion in bold): "[w]e have never voluntarily paid under the program **and would not want to start a trend of paying cases as we have a reputation of making the diocese follow the policy and be self-insured.**" (Def.'s Opp'n at 19 (quoting Trial Ex. 291 at 3).)

15

the paid claims with insufficient evidence that the proof of loss was completed. (Pl.'s Mot. to Amend at 19.) According to Plaintiff, "[i]f a policyholder notifies its carrier of a claim but never seeks coverage by providing a proof of loss, then there is no event that starts the clock running — an event from which to measure a reasonable period of time in which to affirm or deny a claim — and Subsection E is simply inapplicable to that claim." (*Id.*) Defendant does not dispute this general premise, but rather reasons that Plaintiff's argument is meritless because "[t]he Archdiocese cannot rely on the absence of evidence that it was obligated to introduce." (Def.'s Opp'n at 21.)

With respect to the 25 unpaid claims, Plaintiff argues that there is a distinction between claims submitted to put Interstate on notice, which it asserts are the 1700 claims in Trial Ex. 262, and claims submitted for reimbursement, which it argues is a "much smaller universe." (Pl.'s Mot. to Amend at 19.)[17] Ms. Sons testified that Interstate opens files for claims in which it is put on notice, but does not consider that "notice" to be a "request for coverage." (Tr. at 802:24-803:6.) Most of the of unpaid claims, which make up over 75% of Interstate's priest sex abuse claims, do not reach Interstate's layer (Tr. at 643:21-644:2). However, the Archdiocese points to no evidence which establishes that the 25 specific unpaid claims at issue were instances in which the "notice" never developed into a "request for coverage." It was the Archdiocese's burden to offer evidence as to which of the sample unpaid claims had completed, submitted proofs of loss and which did not, and the Court cannot now exclude 25 claims from the denominator based upon the Archdiocese's

---

[17] Plaintiff's proposed findings of fact state: "Interstate produced a list of 1700 sexual misconduct claims against religious institution policyholders since 2000. Although the Court ordered the production of all 1700 claims files, the parties agreed to limit production to samples selected by Interstate of 25 paid claims, 25 unpaid claims and 7 more specific claims." (Ex. 2 (Pl.'s Proposed Findings of Fact) to Joint Trial Mem. [Doc. # 171] at 27.)

current assertion that there "was no evidence that proofs of loss were completed." (Pl.'s Mot. to Amend at 19.)

Similarly, this Court cannot remove from the calculation claims which the Archdiocese alleged at trial violated subsection E, without offering sufficient evidence for the Court to conclude that "proof of loss statements [had] been completed" for those claims as required by that subsection. Conn. Gen. Stat. § 38a-816(6)(E). At trial, the Archdiocese specifically alleged that Interstate's actions in Manchester and Sacramento constituted a violation of subsection E, but failed to prove proofs of loss were completed with regard to those claims. The Archdiocese cannot now benefit from its failure to prove those claims by asking the Court to exclude them from consideration.

Finally, the Archdiocese asserts that the sample size must be reduced by ten "duplicate" claim files for individual victims who alleged abuse over multiple policy years. Ms. Sons acknowledged at trial that "if there is a single claimant whose claim[] stretches across seven years, that's seven claims in this system." (Trial Tr. at 635:1-8 (discussing Trial Ex. 262).) Even if the Archdiocese is correct that these duplicate claims should not have been included in the calculation, it also admits that the Court must add five additional claims that were not included in the 57 sample but were analyzed by the Court, reducing the sample size by only five to a total of 52. (Pl.'s Mot. to Amend at 23.) Using this denominator instead of 57 alters the calculation that Plaintiff proved unfair practices in approximately 9.5 to 11.5% of cases, not 9 to 11%.[18] This half percent is

---

[18] This also ignores the fact that the numerator should be reduced by one because the Phoenix claim did not constitute a violation of subsection E. *See* footnote 9 above.

not a sufficiently large difference such that use of the lower percentage rises to the level of clear error.

### C. Section 38a-816(6)(G)

Finally, Plaintiff maintains that the Court erred by not separately considering whether Interstate violated Section 38a-816(6)(G), and that had it done so, it would have found that the Archdiocese established Interstate engaged in the general business practice of "compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds." Conn. Gen. Stat. § 38a-816(6)(G).[19] However, Interstate contends that because Plaintiff did not offer any evidence that the identified dioceses had been forced to commence suit following a low-ball settlement offer, its Section G claim was correctly dismissed.

The language of the statute is clear that one element of this particular unfair claim settlement practice requires proof that the insurance company offered "substantially less than the amounts ultimately recovered" by the insured through litigation. As Interstate notes, the Archdiocese failed to introduce such evidence at trial, and in its memorandum appears to concede as much: with regard to Phoenix and Sacramento, "[t]here is no evidence in the Progress Notes that Interstate made any settlement offer to these dioceses before they were forced to institute litigation with Interstate." (Pl.'s Mot. to Amend at 30.) It further concedes that "[f]or each of those 77 claims [in which Interstate paid the dioceses as a result of coverage litigation or bankruptcy of

---

[19] The Decision notes, before proceeding to analyze the claims together, that "[t]wo of Plaintiff's four CUIPA allegations [Sections E and G] are based on essentially the same conduct by Interstate: its failure to affirm or deny the underlying claims within a reasonable time after Plaintiff's provision of a proof of loss." (Memorandum of Decision at 73.)

the diocese], Interstate's own report (Trial Exhibit 262) demonstrates that the diocese was paid something, *which is more than the nonpayment from Interstate prior to litigation* (*id.* at 28 (emphasis added)).[20]

It is therefore apparent that the Archdiocese's argument is premised on the mistaken belief that an insurance company's failure to offer settlement at all is equivalent to its having made a low-ball offer. Plaintiff cites no supporting case law and the very language of subsection G, that the insurer must have "offer[ed] substantially less" than what the insured ultimately recovers requires on its face that there was some offer extended. To offer zero dollars is simply a "no pay" position, and this cannot be considered an "offer" within the meaning of subsection G.

Moreover, the type of conduct the Archdiocese complains of seems to be captured by other portions of CUIPA. For instance, when an insurer refuses to make any offer, it runs the risk of being found in violation of subsection F, which requires an insurer to attempt in good faith to effectuate equitable settlement of claims "in which liability has become reasonably clear." Conn. Gen. Stat. § 38a-816(6)(F). Additionally, subsection E, discussed above, by requiring the insurance company to either affirm or deny coverage within a reasonable time after proof of loss statements are completed, prohibits an insurance company from offering nothing and simply sitting back and

---

[20] Offering no legal support for its assertion, the Archdiocese halfheartedly argues that proof that Interstate paid claims while certain dioceses were in bankruptcy satisfies its burden of proof under subsection (6)(G). It then asserts that "Interstate's failure to pay anything pre-suit followed by even small payments in coverage litigation or bankruptcy violates the statute." (Pl.'s Mot. to Amend at 32.) As previously noted, subsection (6)(G) requires a showing that Interstate "offer[ed] substantially less than the amounts ultimately recovered in actions brought by [the] insureds." This is not the same as making no offer at all. Moreover, absent any authority that bankruptcy proceedings qualify as instituting litigation to recover under the insurance policy, the Court does not find manifest error on that ground.

waiting for the insured to initiate litigation. Accordingly, the Court finds no clear error in its ruling that Plaintiff failed to demonstrate violation of Section G.

## II. Conclusion

For the foregoing reasons, Plaintiff's Motion for Amended or Additional Findings and Conclusions of Law and to Amend the Judgment is DENIED.

IT IS SO ORDERED.

/s/
_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 26th day of July 2017.